**GREENBERG TRAURIG, LLP**
Dominic E. Draye (AZ Bar No. 033012)
   drayed@gtlaw.com
2375 E. Camelback Rd., Suite 800
Phoenix, AZ 85016
(602) 445-8425

**QUINN EMANUEL URQUHART**
**& SULLIVAN, LLP**
Derek L. Shaffer (DC Bar No. 478775)*
   derekshaffer@quinnemanuel.com
John F. Bash, III  (DC Bar No. 988874)*
   johnbash@quinnemanuel.com
Jonathan G. Cooper (DC Bar No. 999764)*
   jonathancooper@quinnemanuel.com
1300 I Street NW, Suite 900
Washington, DC 20005
(202) 538-8000
*Applications *pro hac vice* forthcoming

Attorneys for Plaintiffs
Americans for Prosperity &
Americans for Prosperity Foundation

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **Americans for Prosperity; Americans for Prosperity Foundation,**<br><br>       Plaintiffs,<br><br>v.<br><br>**Damien R. Meyer,** in his official capacity as Chairman of the Citizens Clean Elections Commission; **Amy B. Chan,** in her official capacity as Commissioner of the Citizens Clean Elections | No. _____<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT AND PERMANENT INJUNCTIVE RELIEF**<br><br>**JURY TRIAL DEMANDED** |

Commission; **Galen D. Paton**, in his official capacity as Commissioner of the Citizens Clean Elections Commission; **Mark Kimble**, in his official capacity as Commissioner of the Citizens Clean Elections Commission; **Steve M. Titla**, in his official capacity as Commissioner of the Citizens Clean Elections Commission; **Thomas M. Collins**, in his official capacity as Executive Director of the Citizens Clean Elections Commission; and **Adrian Fontes**, in his official capacity as Secretary of State of Arizona,
Defendants.

## Introduction

1.      The First Amendment safeguards the right of individuals to donate to private advocacy organizations of their choosing without undue risk that they will be subjected to their identities being disclosed or other chilling by the government. Yet Arizona's recently enacted statute, *see* Ariz. Stat. § 16-971 *et seq.* ("Proposition 211"), trammels that right by subjecting countless Americans nationwide to governmental doxxing for doing nothing more than supporting their chosen non-profit organizations and charities.   Specifically, Proposition 211 empowers the Arizona Secretary of State, the Citizens Clean Elections Commission and partisan advocacy groups, acting through the Commission, to enforce far-reaching look-through disclosure and disclaimer requirements in an

unrelenting effort to discourage contributions to non-profit organizations under the guise of discerning the "original source" of contributions used for so-called "campaign media spending," even where the donor may have never foreseen, much less intended, that the gift would ultimately be used in that particular manner.

2.      Making matters worse, the statute defines "campaign media spending" in ways that stretch far beyond election-related activity by sweeping up speech traditionally characterized as issue advocacy, effectively chilling the right to opine publicly and petition one's government under the First Amendment and shielding elected officials from criticism almost the entirety of each even-numbered year. For these reasons and more, Arizona's regulation is not narrowly tailored to any interest in election transparency, while imposing heavy burdens on First Amendment rights.

3.      Proposition 211 announces itself as Arizona's donor-identification law.  *See* Ariz. Stat. § 16-971 *et seq.*  Under that law, on pain of "significant civil penalties" (up to treble the amount of an expenditure at issue), a "covered person"—any person whose total "campaign media spending" exceeds $50,000 in statewide campaigns or $25,000 in any other campaign during a two-year election cycle—must disclose not only its own donors, but its donors' donors, and its donors' donors' donors (and so on *ad infinitum*).  Therefore, when an advocacy organization crosses this spending threshold, it becomes a "covered person" and

must disclose its donors who have donated more than $5,000 in a two-year period as well as its donors' donors who have donated more than $5,000 in that time period, and so on until the funds it expended are traced back to an "original source," even if this "original source" never foresaw, much less intended, that the donation would ultimately be used for "campaign media spending" by the particular advocacy organization making the required disclosure.

4.    Proposition 211 then mandates that officials "make the information [included in the disclosure reports] public." Ariz. Stat. § 16-973(H). Further, the Commission is required to establish "disclaimer requirements for public communications by covered persons" mandating that a covered communication state, "at a minimum, the names of the top three donors who directly or *indirectly* made the three largest contributions of original monies during the election cycle to the covered person." *Id.* § 16-974(C) (emphasis added). But "indirectly" is not limited to those donors who intended to support the communications in question, or even those donors who intended to support the organizations making the communications. As such, the disclaimer requirement puts unwitting donors at risk of harm by fabricating and broadcasting supposed associational ties to organizations they may not support or, for that matter, even know exist. It also announces—unfairly and often misleadingly—associational connections between direct donors and heterodox disclosing or disclaiming organizations, ascribing to

donors the wide variety of positions organizations state out on one or another emergent issue, regardless of the donors' particular, individualized motivations for donating to the organizations.

5.     While penetrating deeply into organizational and donor privacy, Proposition 211 is also remarkably broad in its coverage.  Proposition 211 uses "campaign media spending" as the trigger for disclosure and disclaimer requirements, which it defines broadly to include, *e.g.*, any public communication that "promotes, supports, attacks or opposes a candidate within six months" of a primary or general election involving that candidate or that merely "*refers* to a clearly identified candidate within ninety days before a primary election until the time of the general election" and is disseminated where the election is being held. *Id.* § 16-971(2)(a)(ii), (iii) (emphasis added).  Likewise covered is advocacy for or against any "state or local initiative or referendum," such as Proposition 211 itself, or that "supports, attacks, or opposes the recall of a public officer," as would arguably be true for *any* public statements directed at *current* officeholders.  *Id.* § 16-971(2)(a)(iv), (v).  Perhaps most sweeping of all is a catch-all covering any "other partisan campaign activity," a category that is undefined and potentially ensnares *any* issue advocacy that arguably correlates with the positions associated with one or another political party.  *Id.* § 16-971(2)(a)(vi).  Further, preparatory activities—such as research, design, production, polling, data analytics, mailing,

and social media list acquisition—associated with these public communications constitute "campaign media spending" such that they, too, trigger disclosure and disclaimer requirements.  *Id.* § 16-971(2)(a)(vii).

6.     Proposition 211's scope is thus breathtaking in its sweep; disclosure is required whether or not an "original source" intended for his or her donation to be used for a particular public communication or preparatory activity or even for "campaign media spending" generally, which, as defined, cuts into the core of traditional public debate over pressing issues of the day.  The law lacks guardrails to ensure that the speech it regulates has a sufficient nexus to the asserted interests, specific to the electoral context, that Arizona purports to have in the required donor information.   The unduly broad reach of Proposition 211 ventures far beyond anything the First Amendment permits.

7.     For all these reasons, Proposition 211 cannot withstand the "exacting scrutiny" courts apply to compelled disclosure requirements.   *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) (plurality opinion).[1] There is a glaring lack of fit between the chosen means and the claimed objectives. The stated purpose of Proposition 211 is to stop "'dark money,' the practice of

---

[1]   Although this particular subsection of the Court's opinion was joined only by a plurality of the Justices, the non-joining Justices who otherwise joined the majority opinion wrote separately to suggest that strict scrutiny, an even *more* demanding level of scrutiny, may apply.  *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2390 (2021) (Thomas, J., concurring); *id.* at 2391 (Alito, J., concurring).

laundering political contributions, often through multiple intermediaries, to hide the original source." Proposition 211, § 2(C). Yet any such laundering of money through intermediaries is separately prohibited outside of Proposition 211. *See* Ariz. Stat. § 16-1022(B); 52 U.S.C. § 30122. Moreover, this new, additional law has no intent, knowledge, or earmarking requirement tailored to prevent any calculated circumvention of existing campaign-finance laws; to the contrary, this law mandates disclosure and disclaimers where funds are used in a manner wholly unknown and unintended by the donors being named.

8.     The burdens imposed by Proposition 211 are daunting and chilling. Any group that engages in "campaign media spending"—defined broadly to include a wide swathe of public expression and petitioning activities protected by the First Amendment—above the threshold amount is subject to the onerous requirement of not only disclosing the name, mailing address, occupation, and employer of any individual donor, as well as the federal tax status and state of incorporation of any corporate donor, but also disclosing the same information with regard to its donors' donors until an "original source" is identified. Further still, all public communications made by such a group must state, at a minimum, the group's top three direct or indirect donors during the election cycle.

9.     Proposition 211 imposes still more burdens on First Amendment activity. A "covered person" is required to notify donors by providing "an

opportunity to opt out of having the donation used or transferred for campaign media spending." Ariz. Stat. § 16-972(B).  Without requiring affirmative consent from donors before their money may be used for "campaign media spending" (and their identities disclosed), Proposition 211 requires that the "covered person" sit silent and muzzled for up to 21 days before using or transferring the donors' monies for this purpose.  This structure forces direct donors to undertake the burden of affirmatively opting out, lest their identities otherwise be disclosed up to two years in the future as a result of their inaction.  Nor is any such opt-out option available to *in*direct donors, who ostensibly have *no* ability to opt out and no means of preventing their identities from being disclosed.  Nor does the opt-out provision apply to Proposition 211's disclaimer requirements—thereby ensuring that, at a minimum, the names of the top three direct or indirect donors to a group will be included on all public communications by that group.  Donors aside, the "opt-out" procedure will forbid a covered person from speaking for up to three weeks unless donors provide their affirmative consent before the period runs.

10.    Proposition 211 imposes still more burdens, such as requiring a "covered person" to retain "transfer records" detailing the identity of each person who contributed or transferred more than $2,500 for covered spending, the amount of each contribution or transfer, and the person to whom those monies were transferred.  Ariz. Stat. § 16-972(A), (D), (E).  In addition, donors must retain

records of "previous transfers of more than $2,500" identifying the intermediaries. *Id.* The covered person and donors must retain these records for "at least" five years. *Id.* These PAC-like administrative burdens make the lack of tailoring all the more glaring and problematic.

11. Proposition 211 is also unconstitutionally *under*inclusive. The disclosure and disclaimer requirements apply only to a "covered person," but the definition of "covered person" expressly "[d]oes not include" organizations "that spend only their own business income for campaign media spending," Ariz. Stat. § 16-971(7)(b)(ii), and "business income" is in turn defined as "[m]embership or *union* dues that do not exceed $5,000 from any one person *in a calendar year*." *Id.* § 16-971(1)(b) (emphases added). As such, most labor unions are specially exempted from disclosure, despite the absence of any discernible rationale justifying such categorically different treatment. Further, media and tech companies have a wholesale exemption from the definition of "campaign media spending" so long as they are not "owned or operated by a candidate, a candidate's spouse or a candidate committee, political party or political action committee." *Id.* § 16-971(2)(b)(i).

12. Beyond being facially unconstitutional, Proposition 211 is also unconstitutional as-applied to Plaintiffs. Plaintiffs have made public communications and conducted preparatory activities that could have been deemed

"campaign media spending" under the newly-enacted Proposition 211 if completed during the present election cycle, thereby triggering disclosure and disclaimer requirements as to its donors as well as its donors' donors.  Public disclosure and broadcasting will make individuals less likely to donate to advocacy and other non-profit organizations such as Plaintiffs by both compelling association and chilling the exercise of their First Amendment rights to associate freely and advocate values and projects that matter to them.

13.    The prospect of compelled disclosure and disclaimer is especially harmful for Plaintiffs and their donors, who may reasonably fear that reprisals may result from any disclosure of their donations and identities.  Some people publicly associated with the Plaintiffs have faced boycotts, character attacks, personal threats, and worse as a result.  Others simply have no desire for their giving to be made public.  Recognizing as much, Plaintiffs have pledged to keep the identities of their donors confidential.  In fact, many donors who contribute to Plaintiffs in amounts greater than $5,000 during any given two-year period insist that their identities remain confidential.  This assurance of confidentiality is vitally important and enables Plaintiffs' continued, robust participation in the public sphere—whereas Proposition 211's compelled disclosures vitiate this understanding and threaten to chill continuing donations and support for Plaintiffs.

14.     Faced with violation and chilling of First Amendment freedoms, Plaintiffs respectfully bring this suit to obtain a declaration that Proposition 211 in its entirety is unlawful on its face and as applied to Plaintiffs, as well as an order permanently enjoining Defendants from implementing or enforcing any portion of Proposition 211.

### Parties

15.     Plaintiff Americans for Prosperity ("AFP") is a Washington, D.C., nonprofit corporation headquartered in Virginia.   The organization's Arizona chapter is located in Phoenix, Arizona.   AFP is dedicated to the belief that every person has a unique set of gifts and the ability to contribute to society in their own way, an idea that has inspired progress since our nation's founding.   Driven by this belief, AFP engages in broad-based grassroots outreach to advocate for long-term solutions to the country's biggest problems that prevent people from realizing their incredible potential—unsustainable government spending and debt, a broken immigration system, a rigged economy, and a host of other issues.   AFP funds its activities by raising charitable contributions from donors throughout the country, including in Arizona.

16.     Plaintiff Americans for Prosperity Foundation ("AFPF") is a Delaware nonprofit corporation headquartered in Virginia.   For over 20 years, AFPF has been educating and training citizens to be advocates for freedom, creating real change at

the local, state, and federal levels.  In communities across the country, AFPF programs share knowledge and tools that encourage participants to apply the principles of a free and open society in their daily lives, believing this maximizes prosperity and well-being for all.  AFPF funds its activities by raising charitable contributions from donors throughout the country, including in Arizona.  Consistent with its mission and its tax status, AFPF has taken public positions on hot-button issues in Arizona, such as by running advertisements opposing the passage of Proposition 211.

17.    Defendant Damien R. Meyer is Chairman of the Citizens Clean Elections Commission ("the Commission").  Defendants Amy B. Chan, Galen D. Paton, Mark Kimble, and Steve M. Titla are Commissioners of the Commission, and Defendant Thomas M. Collins is the Executive Director of the Commission.  The Chairman and Commissioners of the Commission are responsible for implementing and enforcing the provisions of Proposition 211 by:  adopting and enforcing rules; issuing and enforcing civil subpoenas, including third-party subpoenas; initiating enforcement actions; conducting fact-finding hearings and investigations; considering, investigating, and pursuing any privately-filed complaints; imposing civil penalties for noncompliance, including penalties for late or incomplete disclosures and for any other violations; seeking legal and equitable relief in court as necessary; establishing the records persons must

maintain to support their disclosures; and performing any other act that may assist in implementing Proposition 211. The Executive Director of the Commission is responsible for the Commission's day-to-day operations.

18.    Defendant Adrian Fontes is the Secretary of State of Arizona. As the Secretary of State, he is responsible for receiving disclosure reports under Proposition 211 and ensuring that the disclosure reports are made public and provided to the Commission.

**Jurisdiction and Venue**

19.    This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

20.    Venue in this Court is proper under 28 U.S.C. § 1391(b)(1).

**Facts**

**I.    Arizona Proposition 211**

21.    Under Proposition 211, when a direct donor contributes "more than $5,000 in traceable monies in an election cycle" to a "covered person," the donor "must inform that covered person in writing, within ten days after receiving a written request from the covered person, of the identity of each other person that directly or indirectly contributed more than $2,500 in original monies being transferred and the amount of each other person's original monies being transferred." Ariz. Stat. § 16-972(D). This is required irrespective of whether the person who directly or indirectly contributed the original monies intended, desired,

13

had any control over, *or even knew* that the direct donor would be making any such contribution to a covered person. "Original monies" include "business income" and "an individual's personal monies." *Id.* § 16-971(12). "Business income" is defined to include both "[m]onies received by a person in commercial transactions in the ordinary course of the person's regular trade, business or investments" and "[m]embership or union dues that do not exceed $5,000 from any one person in a calendar year." *Id.* § 16-971(1). "Personal monies" include the following: "[a]ny assets of an individual that . . . the individual had legal control over and rightful title to"; "[i]ncome received by an individual or the individual's spouse, including salary . . . , dividends and proceeds from the individual's personal investments or bequests to the individual, including income from trusts established by bequests"; and the "portion of assets that are jointly owned by the individual and the individual's spouse equal to the individual's share of the asset." *Id.* § 16-971(14)(a).

22. "If the original monies were previously transferred, the donor must disclose all such previous transfers of more than $2,500 and identify the intermediaries." *Id.* § 16-972(D). "The donor must maintain these records for at least five years and provide the records on request to the Commission." *Id.* Similar requirements apply as to "[a]ny person that makes an in-kind contribution

to a covered person of more than $5,000 in an election cycle to enable campaign media spending." *Id.* § 16-972(E).

23.    In both instances, the "covered person" must "maintain transfer records . . . for at least five years and provide the records on request to the Commission." *Id.* § 16-972(A).  "Transfer records" must include "a written record of the identity of each person that directly or indirectly contributed or transferred more than $2,500 of original monies used for campaign media spending, the amount of each contribution or transfer and the person to whom those monies were transferred." *Id.* § 16-971(19).

24.    Once "any person" has "campaign media spending" that exceeds "$50,000 in statewide campaigns or . . . $25,000 in any other type of campaigns," it becomes a "covered person," *id.* § 16-971(7)(a), meaning it must report "[t]he identity of each donor of original monies who contributed, directly or indirectly, more than $5,000 of traceable monies or in-kind contributions," *id.* § 16-973(A)(6), as well as "[t]he identity of each person that acted as an intermediary and that transferred, in whole or in part, traceable monies of more than $5,000 from original sources to the covered person," *id.* § 16-973(A)(7).  Again, these disclosures are required irrespective of whether the original sources intended, desired, had any control over, *or even knew* that the ultimate donation to the covered person would even occur.  "Traceable monies" are defined to include

"[m]onies that have been given, loaned or promised to be given to a covered person and for which no donor has opted out" and "[m]onies used to pay for in-kind contributions to a covered person to enable campaign media spending." *Id.* § 16-971(18)(a), (b).   In order to "determine the sources, intermediaries and amounts of indirect contributions received, a covered person may rely on the information it received pursuant to section 16-972." *Id.* § 16-973(D).   Taken together, these provisions mandate that a covered person must disclose the identity not only of donors that "directly" contributed, but also donors that "indirectly contributed" to the entity.

25.    Under Proposition 211, "identity" is defined broadly to include "the name, mailing address, occupation and employer of" any individual donor as well as the "name, mailing address, federal tax status and state of incorporation, registration or partnership" of any institutional donor. *Id.* § 16-971(10)(a), (b).

26.    "All disclosure reports . . . shall be made electronically available to the Secretary of State and to any other body as directed by law.   Officials shall promptly make the information public and provide it to the Commission electronically." *Id.* § 16-973(H).

27.    Once "any person" has "campaign media spending" that exceeds "$50,000 in statewide campaigns or . . . $25,000 in any other type of campaigns," it becomes a "covered person," *id.* § 16-971(7)(a), meaning its "[p]ublic

16

communications . . . shall state, at a minimum, the names of the top three donors who directly or indirectly made the three largest contributions of original monies during the election cycle to the covered person." *Id.* § 16-974(C). "Public communication" is defined broadly to include "a paid communication to the public by means of broadcast, cable, satellite, internet or another digital method, newspaper, magazine, outdoor advertising facility, mass mailing or another mass distribution, telephone bank or any other form of general public political advertising or marketing, regardless of medium." *Id.* § 16-971(17)(a).

28.     Proposition 211's sweeping definition of "campaign media spending"—which triggers disclosure requirements—includes, but is not limited to:  any public communication that "promotes, supports, attacks or opposes a candidate within six months" of any election (primary or general); any public communication that merely "refers to a clearly identified candidate within ninety days before a primary election until the time of the general election" and is disseminated where the election is being held; any public communication "that promotes, supports, attacks or opposes the qualification or approval of any state or local initiative or referendum"; any public communication that "promotes, supports, attacks or opposes the recall of a public officer"; any "activity or public communication that supports the election or defeat of candidates of an identified political party or the electoral prospects of an identified political party, including

partisan voter registration, partisan get-out-the-vote activity *or other partisan campaign activity*"; and "research, design, production, polling, data analytics, mailing or social media list acquisition or any other activity conducted in preparation for or in conjunction with" any such public communication or activity. *Id.* § 16-971(2)(a)(ii)–(vii) (emphasis added).

29.    Given that the Arizona legislative session regularly extends past the first week of May, public expression addressing bills under active consideration will naturally trigger disclosures and disclaimers.  Further ensuring that coverage will be the rule rather than the exception are provisions of Proposition 211 that cover spending that is deemed, for instance, to implicate possible "recall of a public officer" or to align with "partisan campaign activity."  As such, Proposition 211 dampens debate and insulates elected officials from criticism precisely when and where issues of great public importance loom largest.  Moreover, given that Arizona's election cycle period begins "the day after general Election Day in even-numbered years and continu[es] through the end of general Election Day in the next even-numbered year," *id.* § 16-971(8), spending thresholds are held open for a two-year period, making them that much easier to cross and thus trigger disclosures and disclaimers.  Finally, the amount of "campaign media spending" used to gauge when the threshold for disclosure and disclaimer is reached includes not only activities by the relevant individual or organization, but all "campaign

media spending made by entities *established, financed, maintained or controlled by*" that organization—thereby sweeping individual organizations into a larger downstream chain and triggering obligations based on all resulting expenditures. *Id.* § 16-971(7)(a) (emphasis added).

30.     The opt-out procedure included in Proposition 211 compounds the chill by imposing additional burdens.  A "covered person" is required to notify donors by providing "an opportunity to opt out of having the donation used or transferred for campaign media spending," in order to avoid disclosure.  *Id.* § 16-972(B).  "The notice required . . . may be provided to the donor before or after the covered person receives a donor's monies, but the donor's monies may not be used or transferred for campaign media spending until at least twenty-one days after the notice is provided or until the donor provides written consent pursuant to this section, whichever is earlier." *Id.* § 16-972(C).

31.     The opt-out procedure is unavailable for indirect donors or publicly-broadcasted disclaimers.  Although a "covered person" must request "the identity of each other person that directly or indirectly contributed more than $2,500 in original monies and the amount of each other person's original monies being transferred," *id.* § 16-972(D), only "the donor" must be notified and provided an opportunity to opt out.  *Id.* § 16-972(B).  This leaves no tailoring whatsoever of the required disclaimers or indirect-donor disclosures, which are not limited to those

19

donors who have some modicum of awareness as to the activities at issue. As a result, unknowing indirect "donors" who simply support one advocacy organization without specifically contemplating that the organization will in turn donate those funds to a "covered person" will nonetheless be swept into a disclosure or publicly-broadcasted disclaimer by an entirely different advocacy organization based on that organization's own distinct, separate, unforeseen expression.

32.   Proposition 211 affords a 21-day waiting period after which the covered person may use a donation for "campaign media spending," entailing subsequent disclosure and disclaimer. This structure forces donors to undertake the burden of affirmatively opting out—not just from truly election-related activities but traditional issue advocacy—lest their identities be disclosed up to two years in the future, branding them as supporting a particular issue or organization merely because they failed to take state-prompted action at some time in the past. Therefore, disclosures under Proposition 211 can be mandated on the basis of some form of broadly-defined "campaign media spending" that was not even foreseeable to donors at the time they made their donations. These misleading disclosures and disclaimers also ascribe to direct donors the wide variety of issue positions taken by the varied organizations they may choose to support based upon individualized, nuanced considerations.

33.     The dollar thresholds in Proposition 211 do little to mitigate the chill. The two-year $5,000 limit can easily be triggered by indirect donors that regularly give to a non-profit organization or religious entity.  For example, when a church donates to a covered person, the covered person must disclose each parishioner who donated over $5,000 to the church during the two-year period—less than $50 per week.

34.     The absurdities that would follow from the plain terms of Proposition 211 go further still.  "Traceable monies" are defined to include "[m]onies that have been . . . loaned or promised to be given to a covered person and for which no donor has opted out of their use or transfer for campaign media spending."  *Id.* § 16-971(18)(a).  Disclosure reports made under Proposition 211 must include "[t]he identity of each person that acted as an intermediary and that transferred, in whole or in part, *traceable monies* of more than $5,000 from original sources to the covered person and the date, amount and source, both original and intermediate, of the transferred monies."  *Id.* § 16-973(A)(7) (emphasis added).  For commercial loans made by a bank, the bank acts as an "intermediary," and would for that reason be required to disclose the "original sources" of the funds it loans to any organization that may be a "covered person" under the law.  Setting aside the issue of actually *identifying* the "original sources," indirect donors in this instance— namely, bank account owners with more than $5,000 in their accounts—obviously

had no intent or knowledge that their money be used for any form of electioneering. Yet if Bank A were to loan more than $5,000 to Organization B (a covered person under Proposition 211), then Organization B's disclosures would necessarily include Depositors C and D who have more than $5,000 in their accounts at Bank A.

35.  "In-kind contribution" is defined to include "goods, services or anything of value that is provided without charge or at less than the usual and normal charge." *Id.* § 16-971(11). Therefore, *volunteers* who provide more than $5,000 in volunteer services over a two-year period to an organization must be disclosed as indirect donors should the organization in turn donate to a "covered person." Attorneys doing *pro bono* work would thus trigger disclosure of their own or their law firm's identity after providing just a few hours of assistance to an organization that in turn donates to a "covered person."

36.  While Proposition 211's disclosure and disclaimer requirements apply to a "covered person," the definition of "covered person" expressly "[d]oes not include" organizations "that spend only their own business income for campaign media spending." *Id.* § 16-971(7)(b)(ii). "Business income" is in turn defined as "[m]embership or union dues that do not exceed $5,000 from any one person in a calendar year." *Id.* § 16-971(1)(b). As such, most unions are conspicuously exempted from disclosure and the administrative burdens associated with transfer

records despite the absence of any discernible justification for such preferential treatment.  While Proposition 211 uses a $5,000 trigger for donor disclosures, it uses the *two*-year election cycle as the relevant timeframe for purposes of this trigger.  *Id.* § 16-973(A)(6).  On the other hand, the union exemption inexplicably shortens the relevant timeframe to the "calendar year," while using the same $5,000 trigger.  *Id.* § 16-971(1)(b).  Therefore, if a union's members each contribute $4,500 in union dues per calendar year which the union subsequently uses for campaign media spending, under Proposition 211's union exemption, the union would not be required to disclose the identity of its members; that exemption would obtain even though the union members individually contribute $9,000 to the union during the two-year election cycle, in excess of the $5,000 disclosure threshold applicable to like-situated advocacy organizations.

37.    In addition, media and tech companies have a wholesale exemption from the definition of "campaign media spending," which explicitly excludes "[a] news story, commentary or editorial by any broadcasting station, cable television operator, video service provider, programmer or producer, newspaper, magazine, ***website*** or other periodical publication."  *Id.* § 16-971(2)(b)(i) (emphasis added).  So long as the relevant company is not "owned or operated by a candidate, a candidate's spouse or a candidate committee, political party or political action committee," it is categorically exempt from the definition of "campaign media

spending" and immune from disclosure requirements. *Id.* Media and tech company contributions are also excluded when calculating the "covered person" monetary threshold, which relies on the definition of "campaign media spending," through which disclaimer requirements are triggered. *Id.* §§ 16-971(7)(a), 16-974(C).

38. Failure to comply with Proposition 211's disclaimer, disclosure, and associated administrative requirements results in "significant civil penalties," Proposition 211 § 2(D), amounting to "at least the amount of the undisclosed or improperly disclosed contribution" and up to "three times that amount." Ariz. Stat. § 16-976(A).

39. The Commission is "the primary agency authorized to implement and enforce" Proposition 211. *Id.* § 16-974(A). As such, the Commission is empowered to "[a]dopt and enforce rules"; "[i]ssue and enforce civil subpoenas, including third-party subpoenas"; "[i]nitiate enforcement actions"; "[c]onduct fact-finding hearings and investigations"; "[i]mpose civil penalties for noncompliance, including penalties for late or incomplete disclosures and for any other violations of [Proposition 211]"; "[s]eek legal and equitable relief in court as necessary"; "[e]stablish the records persons must maintain to support their disclosures"; and "[p]erform any other act that may assist in implementing [Proposition 211]." *Id.* § 16-974(A)(1)–(8).

24

40.     Beyond the Commission, "[a]ny qualified voter in [the] state may file a verified complaint with the Commission against a person that fails to comply with the requirements" of Proposition 211. *Id.* § 16-977(A). "If the Commission determines that the complaint, if true, states the factual basis for a violation of [Proposition 211] or rules adopted pursuant to [Proposition 211], the Commission shall investigate the allegations and provide the alleged violator with an opportunity to be heard." *Id.* § 16-977(B). "If the Commission dismisses at any time the complaint or takes no substantive enforcement action within ninety days after receiving the complaint, the complainant may bring a civil action against the Commission to compel it to take enforcement action[.] . . . In any matter in which the civil penalty for the alleged violation could be greater than $50,000, any claim or defense by the Commission of prosecutorial discretion is not a basis for dismissing or failing to act on the complaint." *Id.* § 16-977(C). This provision clearly (and, it would seem, designedly) empowers partisan advocacy groups to weaponize Proposition 211 to go after their adversaries.

## II.     Proposition 211's Effect on AFP & AFPF

41.     The excessive, invasive reach of Proposition 211's provisions profoundly chills Plaintiffs' exercise of their First Amendment rights. AFP has an Arizona chapter, with Arizona donors, that regularly engages in issue advocacy within the public arena on various state policies and controversies. Plaintiffs

regularly receive charitable contributions from their donors in amounts exceeding $5,000 during any given two-year election cycle. Leading up to Election Day 2022, AFPF produced and broadcasted radio advertisements warning about the unconstitutional aspects of Proposition 211 itself. Such advertisements would constitute "campaign media spending" under Proposition 211 if they were conducted during the present election cycle, *see* Ariz. Stat. § 16-971(2)(a)(iv), despite the fact that they constitute grass roots lobbying communications according to the IRS, *see* Treas. Reg. § 56.4911-2(b)(2)(i), (ii). And at least one Plaintiff spent well in excess of $50,000 on activities that would predictably be deemed "campaign media spending" under Proposition 211 during the 2022 election cycle.

42. Plaintiffs generally spend donor money on public advocacy in Arizona that could be deemed "campaign media spending" (as defined by Proposition 211), and Plaintiffs plan to do so in the current election cycle. Also, Plaintiffs generally donate to organizations that stand to qualify as covered persons under Proposition 211 during any given two-year election cycle, and they plan to do so during the current election cycle.

43. Compelled disclosure will chill the associational activity of Plaintiffs and their donors because they have a reasonable fear that reprisals will result from the disclosure of (i) the names, addresses, occupations, and employers of their individual donors and (ii) the names, addresses, federal tax status, and states of

incorporation of their institutional donors. Plaintiffs and their associates have

fierce critics, and their opponents regularly strive to identify the organizations'

donors in order to chill support. Those donors who have been public in their

support have, as a result, too often faced boycotts, personal threats, and even

violence, as the Supreme Court itself has recently recognized. *Americans for*

*Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2381 (2021); *see also id.* at 2388

(quoting *John Doe No. 1 v. Reed*, 561 U.S. 186, 208 (2010) (Alito, J., concurring));

*id.* at 2399–2400 (Sotomayor, J., dissenting).

44. For these reasons, Plaintiffs' donors reasonably cherish and rely upon

their First Amendment right to donate privately.

45. Accordingly, donors to AFP and AFPF frequently—and

understandably—insist that their personal information be kept private. Many

donors who have expressed a desire for their giving to be kept private contribute

over $5,000 during any given two-year election cycle. AFP and AFPF studiously

protect donor confidentiality through longstanding policies that forbid and prevent

disclosure while mandating careful protection of donor-identifying information.

46. Plaintiffs do not share information about a donor absent the donor's

explicit permission to do so. When Plaintiffs transfer information about donors,

they take precautions to minimize the risk that any transfer will reach unintended

recipients. Plaintiffs also take the utmost precautions to enforce these policies and

ensure that donor information is not leaked or disclosed.  Among other things, Plaintiffs train employees on the non-disclosure policies.  Further, the potential consequences of violating the confidentiality policy include termination.  Plaintiffs explain to donors the steps they take to protect donors' identities and assure them that their identities will not be disclosed unless and until Plaintiffs may be legally obligated to do so.

47.    A substantial number of donors will refrain from giving to the extent doing so exposes them to the risk of public disclosure and broadcasting.  In fact, individual donors regularly seek assurances that information identifying them will not be disclosed, and Plaintiffs provide such assurances while soliciting donors' financial support and encouraging their association.  To assuage any lingering fears of public exposure, Plaintiffs go to great lengths to assure donors that the confidentiality protections and procedures in place are legally as well as practically effective and adequate to prevent disclosure.

48.    The public disclosures and disclaimers compelled by Proposition 211 threaten to undermine the assurance of confidentiality upon which many donors rely when making contributions to Plaintiffs.

49.    Just as public disclosure and disclaimer will discourage donations, it will drain donations and resources otherwise available to sustain Plaintiffs' continuing activities, expression, and participation within the public arena.

**Count I – First Amendment (Chilling Protected Speech)**

**(Pursuant to 28 U.S.C. §§ 2201, 2202; 42 U.S.C. §§ 1983, 1988)**

50.    Plaintiffs repeat, re-allege, and incorporate the allegations in paragraphs 1–49 of this Complaint as though fully set forth herein.

51.    The First Amendment to the United States Constitution applies to Arizona by virtue of the Fourteenth Amendment.

52.    In violation of 42 U.S.C. § 1983, Proposition 211, on pain of "significant civil penalties," Proposition 211 § 2(D), infringes the rights of Plaintiffs and their supporters that are secured by the First and Fourteenth Amendments, irreparably injuring Plaintiffs.

53.    The compelled disclaimers, disclosures, speech restrictions, and associated administrative burdens required to comply with Proposition 211 are unconstitutional in their entirety, both on their face and as applied to Plaintiffs.

**A.    Facial Invalidity.**

54.    The First Amendment requires that, "[r]egardless of the type of association, compelled disclosure requirements [must be] reviewed under exacting scrutiny." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) (plurality opinion).  Under this standard, there must "be 'a substantial relation between the disclosure requirement and a sufficiently important governmental interest,' and . . . the disclosure requirement [must] be narrowly tailored to the

interest it promotes." *Id.* at 2385 (majority opinion) (quoting *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010)) (citing *Shelton v. Tucker*, 364 U.S. 479, 488 (1960)). "'[I]t is immaterial' to the level of scrutiny 'whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters.'" *Americans for Prosperity Found.*, 141 S. Ct. at 2383 (plurality opinion) (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958)).

55.    Although Proposition 211 purports to focus on expenditures and "monies *used to influence* Arizona elections," Proposition 211 § 2(B) (emphasis added), the Supreme Court "has never suggested that the dependence of a communication on the expenditure of money operates itself to introduce a nonspeech element or to reduce the exacting scrutiny required by the First Amendment." *Buckley v. Valeo*, 424 U.S. 1, 16 (1976).

56.    "In the First Amendment context, . . . 'a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Americans for Prosperity Found.*, 141 S. Ct. at 2387 (majority opinion) (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)). Therefore, Plaintiffs need *not* "'establish that no set of circumstances exists under which the [law] would be valid' or show that the law lacks 'a plainly legitimate sweep.'" *Id.* (quoting *Wash. State Grange v. Wash. State*

*Republican Party*, 552 U.S. 442, 449 (2008); *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

57.    On their face, Proposition 211's provisions are simultaneously too far-reaching and underinclusive in their scope relative to their claimed purposes, imposing burdens that serve to chill protected speech.

58.    ***Sweeping Scope.***  Proposition 211 is strikingly broad in its coverage and lacks a nexus to any asserted state interest in elections.  The massive burdens triggered by Proposition 211—looking through potentially several layers of monetary transfers—arise from relatively small monetary thresholds, implicate activities and donations nationwide, and are not justified by any state interest relative to which they are adequately tailored.

59.    Proposition 211's definition of "covered person" sweeps far beyond "organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate," subjecting organizations to disclosure and disclaimer requirements even when their major purposes do not involve any form of election-related activity.  *Buckley v. Valeo*, 424 U.S. 1, 79 (1976); *see also Wis. Right To Life, Inc. v. Barland*, 751 F.3d 804, 839 (7th Cir. 2014) (citing *id.*) ("To avoid overbreadth concerns in this sensitive area, *Buckley* held that independent groups not engaged in express election advocacy as their major purpose cannot be subjected to the complex and extensive regulatory

31

requirements that accompany the PAC designation. . . . [T]he [Supreme] Court has never endorsed imposing full, formal PAC-like burdens on these speakers.").[2] Under Proposition 211, non-profit and charitable organizations of any stripe that happen to engage in "campaign media spending" are all treated as PACs without any regard for their major purpose; disclosures and disclaimers are governmentally compelled in reference to individual donors based on the organizations' expenditures rather than the donors' reasons for contributing to them.

60.     Separate and apart from Proposition 211's application to organizations whose major purposes do not involve election-related activity, Proposition 211 requires disclosures and disclaimers of donors, regardless of whether those donors intended or were even aware that their donations would be transferred to another organization that engaged in what Arizona now dubs "campaign media spending." Such disclosures and disclaimers are premised on the assumption that, if Entity A gives to Entity B, and Entity B gives to Entity C, then Entity A must have

_____

[2]   While Plaintiffs recognize that Ninth Circuit precedent currently holds that disclosure requirements need not be limited according to the major purpose of an organization, *see, e.g.*, *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1009–10 (9th Cir. 2010), Plaintiffs respectfully maintain that such a limitation is dictated by the First Amendment and reserve the right to challenge the relevant precedent before the Ninth Circuit as well as the Supreme Court.  Regardless of the outcome on this point, Proposition 211 violates the First Amendment on other, independent grounds.

earmarked funds to Entity C.  But the Supreme Court has already rebuffed that assumption as "divorced from reality" and misconceived, particularly insomuch as it targets the same calculated, bad-faith circumvention that is already prohibited. *McCutcheon v. FEC*, 572 U.S. 185, 215, 216 (2014) (plurality opinion) ("One problem, however, is that the District Court's speculation relies on illegal earmarking.  Lest there be any confusion, a joint fundraising committee is simply a mechanism for individual committees to raise funds collectively, not to circumvent base limits or earmarking rules. . . .  These scenarios, along with others that have been suggested, are either illegal under current campaign finance laws or divorced from reality.").  Even when it comes to Proposition 211's compelled disclosures and disclaimers of *direct* donors to organizations that end up spending money on campaign media spending in Arizona, those rest on the false assumption that donors to large, heterodox organizations support *all* of the many issues and candidates that these organizations spend money supporting across the nation.

61.    The only government interests sufficient to withstand exacting scrutiny are well enumerated and discrete:  1) "provid[ing] the electorate with information as to where political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek . . . office" and 2) "deter[ring] actual corruption and avoid[ing] the appearance of corruption by exposing large contributions and expenditures to the light of publicity."

33

*Buckley v. Valeo*, 424 U.S. 1, 66–67 (1976) (internal citation and quotation omitted). Proposition 211, however, is not narrowly tailored relative to either interest because its disclosure and disclaimer requirements are not pegged to any specified donor intent, knowledge, or earmarking relative to any electioneering or even anything specifically to do with Arizona.

62. As for the informational interest, "[t]he simple interest in providing voters with additional relevant information does not justify a state requirement that a writer make statements or disclosures she would otherwise omit." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 348 (1995). Disclosure must inform voters "concerning those who support" specific candidates or issues. *Buckley*, 424 U.S. at 81. Instead, Arizona "casts a dragnet for sensitive donor information from tens of thousands of charities each year, even though that information [may be] relevant in only a small number of cases." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021). Even for direct donors, this is not a regime "whose scope is in proportion to the interest served." *Id.* (quoting *McCutcheon*, 572 U.S. at 218).

63. Many courts have emphasized the importance of limiting disclosure to contributions that have been specifically earmarked to support campaign-related advocacy. *Indep. Inst. v. Williams*, 812 F.3d 787, 789 (10th Cir. 2016) ("The provision serves the legitimate interest of informing the public about the financing of ads that mention political candidates in the final weeks of a campaign, and its

scope is sufficiently tailored to require disclosure only of funds earmarked for the financing of such ads."); *Lakewood Citizens Watchdog Grp. v. City of Lakewood*, 2021 WL 4060630, at *12 (D. Colo. Sept. 7, 2021) ("There is no earmarking requirement in the ordinance . . . . This creates a mismatch between the interest served–knowing who is speaking about a candidate–and the information given.") (internal quotation and citation omitted); *Indep. Inst. v. FEC*, 216 F. Supp. 3d 176, 191 (D.D.C. 2016) ("In addition, disclosure is limited to only those substantial donors who contribute . . . for the specific purpose of supporting the advertisement."); *see also Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2386 (2021) ("There is a dramatic mismatch, however, between the interest that the Attorney General seeks to promote and the disclosure regime that he has implemented in service of that end."); *Van Hollen v. FEC*, 811 F.3d 486, 501 (D.C. Cir. 2016) ("By affixing a purpose requirement to BCRA's disclosure provision, the FEC exercised its unique prerogative to safeguard the First Amendment when implementing its congressional directives.").

64.     Proposition 211 automatically requires disclosure of donors and intermediaries as well as disclaimer of a covered person's top three direct or indirect donors.  But Proposition 211 does not require that contributions be made by donors having any awareness, much less intent, that their funds will be used for the particular public communications or preparatory activities that trigger the

specific disclosures and disclaimers at issue. Absent any such earmarking limitation, such requirements manifestly are not tailored to any pertinent interests in this realm. Even those who donate *directly* to advocacy organizations as heterodox and expansive as Plaintiffs may not donate for the *specific purpose* of supporting the *specific* public communications that Plaintiffs wind up circulating in Arizona as public debates materialize and crystalize. Donors who contribute to non-profit and charitable organizations without earmarking their funds for any election-related purpose and who do so in response to general solicitations (as opposed to solicitations for specific election-related activity) are not donating for the purpose of influencing an election or even with the knowledge that their funds will be so used. Rather, these donors are donating in support of the overarching mission of the organizations. The organizations' subsequent use of the unearmarked funds is the organizations' speech, *not* that of individual donors.

65.    Because Proposition 211 ties disclosure requirements to the campaign media spending of heterodox organizations without attempting to limit itself according to any earmarking or knowledge requirement, donors are destined to be disclosed based on the unforeseeable, varied speech *organizations* may decide to undertake, in response to myriad intervening developments. Far from pegging individual-identifying disclosures and disclaimers to individuals' contributions and

rationales for same, Proposition 211 in effect requires individual disclosures and disclaimers based on unpredictable expenditures made by the organizations.

66.     Further, given that Proposition 211 requires disclosure of individual donors' occupations and employers, it subjects unwitting employers to doxxing based not on any sort of connection to campaign media spending in Arizona, but rather based on the unintended and unwitting actions of their employees.

67.     The disclosures required by Proposition 211 *undermine* the State's traditionally recognized interest in "provid[ing] the electorate with information." *Buckley v. Valeo*, 424 U.S. 1, 66 (1976).  Although Proposition 211 is styled the "Voters' Right to Know Act," Proposition 211 § 1, it requires no nexus between any covered donor, on the one hand, and Arizona voters, on the other.  Far from improving voters' knowledge, Proposition 211 stands affirmatively to mislead interested voters by directly tying named donors to candidates and issues those donors may support only glancingly, or not at all.  The sheer *volume* of information to be disclosed under Proposition 211 further undermines the state's informational interest, given voters' likely inability to appreciate any contributors beyond direct donors.  Only by relying on false, unexamined assumptions does Proposition 211 even purport to improve voters' understandings.  In actuality, donors (both direct and indirect) contribute to a particular organization—and in turn to the organization's donees—for a plethora of reasons.  By tying a single donation to all

downstream activities and donations and mandating disclosures and disclaimers on the basis of same, Proposition 211 chills protected speech and confuses voters, in violation of the First Amendment.

68.     Nor can any claimed anti-corruption interest aid defense of Proposition 211.   Because requiring disclosures and disclaimers of unwitting, attenuated donors does not meaningfully curb "dark money" practices, it is not "narrowly tailored" to any "sufficiently important governmental interest." *Americans for Prosperity Found.*, 141 S. Ct. at 2385 (internal quotation and citation omitted).   Particularly as to campaign media spending on ballot initiatives, there is no conceivable anti-corruption interest *at all* given that no candidate is in play.

69.     Regardless, such "dark money" practices are *already* illegal under Arizona law: "It is unlawful for any person to make a contribution in the name of another person, knowingly permit a person's name to be used to effect a contribution in the name of another person or knowingly accept a contribution made by a person in the name of another person.   A person who violates this subsection is guilty of a class 6 felony." Ariz. Stat. § 16-1022(B).   "Contribution" is defined in this context to include "any money, advance, deposit or other thing of value that is made to a person *for the purpose of influencing* an election." *Id.*

§ 16-901(11) (emphasis added). Yet Proposition 211 is indifferent to the purpose animating a particular donation.

70. These practices are illegal under federal law as well. Pursuant to 52 U.S.C. § 30122, "[n]o person shall make a contribution in the name of another person or *knowingly* permit his name to be used to effect such a contribution, and no person shall *knowingly* accept a contribution made by one person in the name of another person." 52 U.S.C. § 30122 (emphasis added). "Contribution" is defined to include "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person *for the purpose of influencing* any election for Federal office" and "the payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose." 52 U.S.C. § 30101(8)(A)(i), (ii) (emphasis added). Again, however, Proposition 211 does not limit itself according to a particular purpose or knowledge requirement.

71. In applying Section 30122 to closely held corporations and corporate LLCs, the FEC asks "whether funds were *intentionally funneled* through [one of these entities] *for the purpose of* making a contribution that evades the Act's reporting requirements." *Campaign Legal Ctr. v. FEC*, 952 F.3d 352, 355 (D.C. Cir. 2020) (emphases added); *see also United States v. Whittemore*, 776 F.3d 1074, 1081 (9th Cir. 2015) ("[T]he jury was permitted to conclude that Whittemore acted

without the *requisite intent* by giving funds to his donees without *the purpose* that these funds be used for improper campaign contributions, and, on that basis, to return a verdict of acquittal.") (emphases added); *United States v. El-Saadi*, 549 F. Supp. 3d 148, 162 (D.D.C. 2021) ("And the offense of permitting one's name to be used for a conduit contribution is not 'brought about' or 'accomplished' until the recipient political committee either wittingly or, as here, unwittingly accepts that contribution in the name of a straw donor acting *on behalf of* an undisclosed principal.") (emphasis added).

72.    Proposition 211 thus purports to tackle a problem that has already been solved while venturing far beyond any colorable solution to that problem. The specific provisions trespass over a constitutional line because they are not limited to those donations or activities that are "for the purpose of influencing an election," nor are they otherwise narrowly defined.  Proposition 211 operates to mandate disclosure and potential disclaimer of parishioners contributing just $50 per week, individuals who merely deposit money at banks, and volunteers performing acts of service (including attorneys doing *pro bono* work) regardless of their knowledge or intent that their funds or services would enable "campaign media spending" in Arizona.  Such applications are far removed from any asserted state interest underlying Proposition 211.

73.    These applications sharpen the contrast between Proposition 211 and existing laws that prevent donors from circumventing campaign finance regulations—the latter require intent.    *See* ¶¶ 69–71.    Proposition 211's contribution to extant legislation is ensnaring individuals who do *not* intend their contributions to support *any* particular candidate or campaign.

74.    Advocacy organizations as heterodox as Plaintiffs may take nuanced, idiosyncratic positions across a wide variety of issues.  It cannot fairly be assumed, even as to those who donate *directly* to such advocacy organizations, that *all* such donors necessarily support *all* positions advocated by the organizations.    By ascribing a single, uniform, all-encompassing viewpoint to these donors, Proposition 211 is relying upon a false assumption—one that is as unfair to donors as it is misleading to voters.

75.    Such disclosures have the practical effect of chilling First Amendment activity while sheltering elected officials from criticism on issues of public importance.    In no way are such disclosures "narrowly tailored" to any "sufficiently important governmental interest."  *Americans for Prosperity Found.*, 141 S. Ct. at 2385 (internal quotation and citation omitted).

76.    This lack of a nexus is all the more apparent and troubling given Proposition 211's sweeping, unbounded definition of "campaign media spending." As noted, the capacious definition includes, *e.g.*, public communications that

41

*merely reference* candidates for office; that are taken as criticizing or supporting current officeholder who may be subject to "recall"; that are deemed to fall within a catch-all for "other partisan campaign activity"; or that constitute preparatory activities for the making of any such broadly-defined communications. "Campaign media spending" associated with "statewide campaigns" as well as "any other type of campaigns" falls within the ambit of Proposition 211. Ariz. Stat. § 16-971(7)(a). The upshot regulates and penalizes incidental, issue-oriented references to a staggering variety of state and local officeholders and candidates.

77. By its terms, Proposition 211 targets traditional issue advocacy extending far outside anything fairly characterized as electioneering. If Proposition 211 had been in effect, advocacy organizations that are devoted to civil rights or immigration policy would have triggered coverage just by referencing Sherriff Joe Arpaio's contempt proceedings preceding his 2016 election in Maricopa County, Arizona. Such organizations' only choice would be to self-censor or to subject themselves—plus their donors, and all of their donors' donors—to Proposition 211's far-reaching disclosure, disclaimer, and associated administrative burdens.[3]  The same dilemma will now be confronted by advocacy

---

[3]  *See, e.g.*, Bill Morlin, *Arizona Sheriff Joe Arpaio Faces Criminal Contempt Charges*, Southern Poverty Law Center (Oct. 31, 2016) (available at https://www.splcenter.org/hatewatch/2016/10/31/arizona-sheriff-joe-arpaio-faces-criminal-contempt-charges).

groups across the spectrum that may predictably want to speak to how state prosecutors and judges are handling abortion restrictions in the wake of *Dobbs v. Jackson Women's Health Organization*.[4]   Other advocacy organizations will confront the dilemma when addressing issues of election integrity—issues that are inextricably bound up with elected officials and candidates in Arizona whose views may diverge in critical respects.[5]  By indiscriminately subjecting all such advocacy groups, and, by extension, all of their many donors, and chains of donors nationwide,  to invasive disclosures and significant burdens, Proposition 211 chills robust, undampened issue advocacy concerning issues of pressing public importance.

78.   Making matters worse, Proposition 211 defines "campaign media spending" to include a public communication that "promotes, supports, attacks or opposes the recall of a public officer."  Ariz. Stat. § 16-971(2)(a)(v).  Notably, any speech that criticizes or praises an existing officeholder could potentially be characterized as advocating (at least implicitly) for or against the target

---

[4]   *See, e.g.*,  *Abortion Rights at the Ballot Box*, ACLU (Aug. 18, 2022) (available at  https://www.acluaz.org/en/news/abortion-rights-ballot-box); Christine Vestal, *Liberal Prosecutors in Red States Vow Not to Enforce Abortion Bans*, Pew Trusts (June 24, 2022) (available at https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2022/06/24/liberal-prosecutors-in-red-states-vow-not-to-enforce-abortion-bans).

[5]   *See, e.g.*, Ian Vandewalker, *Arizona Primary Shows How Election Deniers Win Where Their Party Pushes the Big Lie*, Brennan Center (Aug. 4, 2022) (available at https://www.brennancenter.org/our-work/analysis-opinion/arizona-primary-shows-how-election-deniers-win-where-their-party-pushes).

officeholder's recall. Proposition 211 thus further chills such speech within the relevant time periods. At the very least, Proposition 211 sows uncertainty and leaves room for standardless discretion (on the part of the Commission combined with private complainants), which is anathema in the First Amendment context. *See Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality, Repression & Criminalization of a Generation v. City of Seattle*, 550 F.3d 788, 802–03 (9th Cir. 2008).

79. Proposition 211 specifically defines "campaign media spending" to include any activity or public communication "that supports the election or defeat of candidates of an identified political party or the electoral prospects of an identified political party, including partisan voter registration, partisan get-out-the-vote activity or ***other partisan campaign activity***." Ariz. Stat. § 16-971(2)(a)(vi) (emphasis added). Here, too, Proposition 211 invites and empowers the exercise of standardless, unpredictable discretion—and, indeed, partisan weaponization—in characterizing objectionable advocacy as "other partisan campaign activity." Especially in today's hyper-partisan climate, such open-ended standards make it all too easy for regulators to target and persecute perceived political enemies by painting advocacy on one or another hot-button issue as "partisan." Raging political controversies of our times—across issues such as immigration, abortion, taxation, and election integrity—occupy issue advocacy organizations around the

country and find expression in Arizona.  Meanwhile, Republicans and Democrats are staking out competing positions and squaring off on these issues as they campaign in Arizona.  Because it is unavoidably the case that issue advocacy may align with the campaign platforms of one political party or the other (or at least be so perceived), this sub-provision affords a catch-all trigger for regulating issue advocacy that is at the core of what the First Amendment protects against governmental intrusion.

80.     Compounding the uncertainties and problems posed by Proposition 211's expansive definitions are the mechanisms by which these definitions are to be construed and enforced.  The Commission itself is not subject to political accountability and, depending on how it is constituted at a particular point in time, may arrive at unpredictable, malleable, opportunistic views of what exactly triggers coverage and the potentially crushing burdens and penalties that follow.  Even beyond the Commission, however, "[a]ny qualified voter" in Arizona is *also* authorized to complain about anything he or she may perceive to violate Proposition 211.  Ariz. Stat. § 16-977(A).  Thus, all those wanting to advocate in Arizona now face exposure not only to the Commission, but to innumerable private enforcers who may exert pressure on the Commission or urge a judge to "compel" the Commission to go after any disfavored speaker or speech that poses perceived offense.  *Id.* § 16-977(C).

81.     Notably, Proposition 211 ensnares third parties around the country whose nexus to Arizona elections may be extremely attenuated to the point of nonexistence.  A citizen of Virginia who donated to a group that aligned with his or her values could later discover that his or her home address was disclosed to the public, not because of who he or she gave to, but because of the political speech of another group he or she has never heard of, never donated to, and may even disagree with—merely because some portion of the money he or she gave to a different entity, for different reasons, ended up weaving its way to a group that was engaged in issue advocacy in Arizona, in ways that Proposition 211 adventurously equates with electioneering.

82.     In fact, Proposition 211 reaches activity occurring wholly outside Arizona's borders.  "Campaign media spending" includes any "activity conducted in *preparation for* . . . any of the [other] activities" included in the definition of "campaign media spending."   Ariz. Stat. § 16-971(2)(a)(vii) (emphasis added). These preparatory activities include, but are not limited to, "[r]esearch, design, production, polling, data analytics, mailing [and] social media list acquisition."  *Id.* Proposition 211 therefore regulates an out-of-state organization that spends over $50,000 designing and producing a "public communication" that merely "refers to a clearly identified candidate" in an online post or national newsletter discussing a salient political issue, so long as the post or newsletter "is disseminated in the

jurisdiction where the candidate's election is taking place" within "ninety days before a primary election until the time of the general election."  *Id.* § 16-971(2)(a)(iii).   This is particularly concerning for online posts that are "disseminated" wherever users have access to the internet.

83.  ***Underinclusive.***   Conspicuous, inexplicable carve-outs render Proposition 211 impermissibly underinclusive.   A law is unconstitutionally underinclusive when its reach is too limited, regulating some activities while excluding others that are no less integral to the government's claimed interest. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 802 (2011).  This "analysis serves to 'ensure that the proffered state interest actually underlies the law.'"  *Mariani v. United States*, 212 F.3d 761, 773–74 (3d Cir. 2000) (quoting *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 677 (1990) (Brennan, J., concurring)).

84.  Here, Proposition 211's disclosure and disclaimer requirements apply only to a "covered person," but the definition of "covered person" expressly "[d]oes not include" organizations "that spend only their own business income for campaign media spending," Ariz. Stat. § 16-971(7)(b)(ii), and "business income" is in turn defined as "[m]embership or union dues that do not exceed $5,000 from any one person in a calendar year," *id.* § 16-971(1)(b).  That exclusion dovetails with the different timeframes associated with donor disclosures, on the one hand, and the union exemption, on the other; Proposition 211 treats most labor unions more

favorably than it does other advocacy associations, exempting them from its extensive disclosure requirements and associated administrative burdens without any ostensible justification for this preferential treatment. Further still, media and tech companies have a wholesale exemption from the definition of "campaign media spending."

85. Because unions as well as media and tech companies are conspicuously and inexplicably exempted from disclosure and disclaimer requirements, it should be apparent that the "proffered" interest does not "actually underlie[]" the proposed law. *Mariani*, 212 F.3d at 773–74. Any valid state interest underlying Proposition 211's disclosure and disclaimer requirements would ostensibly apply to unions, the media, and tech companies just as it applies to any other person or organization. "There is no precedent supporting laws that attempt to distinguish between corporations which are deemed to be exempt as media corporations and those which are not. [The Supreme Court] ha[s] consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers." *Citizens United v. FEC*, 558 U.S. 310, 352 (2010) (internal citations and quotations omitted); *see also Citizens United v. Gessler*, 773 F.3d 200, 210, 216 (10th Cir. 2014) ("We reject the Secretary's contention that the media exemptions can be justified on the ground that the First Amendment provides greater protection for the press than other speakers. . . . Because

Colorado has determined that it does not have a sufficient informational interest to impose disclosure burdens on media entities, it does not have a sufficient interest to impose those requirements on [Plaintiff].").

86. ***Administrative Burdens.***   The administrative costs and burdens associated with maintaining "transfer records" for "at least" five years and notifying donors regarding the use of their funds for "campaign media spending" unduly burden protected First Amendment activity, further confirming the lack of requisite tailoring. *See FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 254 n.7 (1986) (plurality opinion) ("[T]he administrative costs of complying with such increased responsibilities may create a disincentive for the organization itself to speak.").

87.   Proposition 211 also places additional burdens on Plaintiffs under the guise of providing donors with a choice to opt out.  To begin, the opt-out provision forbids speech for up to a 21-day period unless and until donors provide affirmative consent or decline to opt out.  Because elections and political matters often require prompt speech, "timing is of the essence in politics . . . [W]hen an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 163 (1969) (Harlan, J., concurring).   Any "delay may permanently vitiate the expressive

content" of such a message. *NAACP v. City of Richmond*, 743 F.2d 1346, 1356 (9th Cir. 1984).

88.    Moreover, the opt-out provision provides a veto right to donors, thereby exacerbating the chilling effect.  For a nationwide advocacy group with heterodox views, such as AFP and AFPF, donors may agree with some of the group's positions while disagreeing with others.  By providing a special veto power to such donors nationwide, Proposition 211's opt-out procedure creates the risk that donors will hamstring the advocacy of groups such as AFP and AFPF.

89.    Making matters worse, Arizona's law—if permitted to stand— threatens to subject AFP and AFPF to a head-spinning array of opt-out provisions from other states that would be no less empowered to impose themselves maximally on the natural flow of political expression and donations nationwide. Other states would be free to follow Arizona's lead, or to go their own way, by fashioning and imposing *their own* opt-out provisions potentially with different requirements and timelines, effectively hamstringing and muzzling advocacy organizations around the country in dizzying red tape.

90.    Notably, the opt-out procedure does not apply at all to disclaimers or indirect donors, reflecting another defect in tailoring.  Only "the donor" must be notified and afforded an opportunity to opt out. Ariz. Stat. § 16-972(B).  And even "the donor" may be disclosed up to *two years* after making his or her donation

based on some form of "campaign media spending"—as broadly defined—that was unforeseeable at the time he or she made the donation.

91.    Even if the opt-out procedure applied to indirect donors, Proposition 211 would be unworkable.  Covered entities would be required to identify and then notify individuals whose money changed hands multiple times before being contributed to a covered entity engaged in campaign media spending in Arizona. Tracing the flow of fungible money across time and organizations may pose unworkable burdens for many covered entities.  And indirect "donors" would predictably be baffled by notices asking whether money that was originally given to one entity for one purpose may be used by an entirely different entity for a different purpose.

92.    More troubling, applying the opt-out procedure to indirect donors would have even greater chilling effects, subjecting a covered entity's speech to veto not only by direct donors, but also by individuals who have only an attenuated link to the covered entity's finances.   Indirect donors who have no direct connection to an advocacy organization could nevertheless "opt out" of having their money (which was originally donated to one group and then transferred to another without their knowledge) used for campaign media spending, thus enabling them to shut down the speech of covered entities subject to Proposition 211.

93.     Proposition 211 also imposes formidable, gratuitous burdens by requiring transfer records as it does.  Any person donating more than $5,000 in traceable monies to a covered person is required to inform that covered person in writing of the identity of each person that directly or indirectly contributed more than $2,500 in original monies and the amount of such transfer, as well as all previous transfers of more than $2,500.  Ariz. Stat. § 16-972(D).  But those being disclosed to the covered person pursuant to this provision, based on any donation exceeding $2,500, have no control over the ultimate use of their funds or even knowledge as to how their funds will end up being used, meaning they have no control over to whom their identity will be disclosed.  Absent any ability for donors to earmark their funds or opt out of disclosure to the covered person, this operates as a trap for unwary donors who would otherwise have no reason to know that donating would subject them to disclosure to some other unknown entity.  Nor are any protections necessarily in place to ensure that these records remain confidential in the hands of the covered person.  Because no direct transfer or relationship of any kind between the original donor and the covered person is required, there is no assurance that the covered person will respect any wishes of the original source and there are no policies or protocols for preventing further disclosure.

94.     These transfer records afford obvious dangers unmatched by any putative upside.  Because they are not meant to be publicized in the same way that

the disclosures by covered persons are, they can serve no such informational interest.  At the same time, they place donors at grave risk, given that there is no control over how these records are stored or used.  To make matters worse, Proposition 211 mandates that transfer records be retained far beyond the election cycle in which the donation is made.  "A covered person must maintain transfer records . . . for at least five years." Ariz. Stat. § 16-972(A).  This extends several years beyond the relevant election cycle and expenditures.  Such an ongoing requirement "discourages [non-PACs], particularly small [ones] with limited resources, from engaging in protected political speech."  *Iowa Right to Life Comm., Inc. v. Tooker*, 717 F.3d 576, 597 (8th Cir. 2013) (quoting *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 874 (8th Cir. 2012)); *see also Swanson*, 692 F.3d at 873 ("[A]n association is compelled to decide whether exercising its constitutional right is worth the time and expense of entering a long-term morass of regulatory red tape.").

95.   For all these reasons, "the collective burdens associated with" complying with Proposition 211 operate to "chill political speech," *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 874 (8th Cir. 2012), and to "interfere[] with the 'open marketplace' of ideas protected by the First Amendment."  *Citizens United v. FEC*, 558 U.S. 310, 354 (2010) (quoting *N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 208 (2008)).   "[T]he

protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals. The risk of a chilling effect on association is enough, '[b]ecause First Amendment freedoms need breathing space to survive.'" *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2389 (2021) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

96. ***Other Laws Provide Narrower Alternatives.*** The absence of requisite tailoring becomes all the more apparent upon reviewing the laws other states have enacted in attempting to stop so-called "dark money," which laws are much more narrowly tailored than Arizona's. While Plaintiffs do not take a position as to whether any other state laws are sufficiently tailored to survive scrutiny under the First Amendment, it suffices to note they are more narrowly tailored than Arizona's law.

97. Many states require disclosure only of donors who donate for the *purpose* of influencing election-related activity. Under Montana law, incidental committees, which are defined as "political committee[s] that [are] not specifically organized or operating for the primary purpose of supporting or opposing candidates or ballot issues," Mont. Code § 13-1-101(24)(a), only must disclose information regarding contributions which are "*designated by the contributor* for a specified candidate, ballot issue, or petition for nomination or that are made by the contributor *in response to an appeal* by the incidental committee for contributions

to support incidental committee election activity." *Id.* § 13-37-232(2) (emphases added). This earmarking requirement operates to make Montana's law more narrowly tailored than Proposition 211, which contains no such requirement. Similarly, other states require disclosure only when donors donate *for the purpose* of furthering an independent expenditure. *See, e.g.*, Okla. Stat. tit. 74, ch. 62, State Ethics Comm'n Rule 2.107(E). Still other states require disclosure of donors who make a "contribution," which these states subsequently define to include a purpose requirement. *See, e.g.*, Ark. Code §§ 7-6-220(b)(4), 7-6-207(b)(1)(B), 7-6-201(4)(A); Ga. Code §§ 21-5-34(f)(2)(A), 21-5-3(7); Kan. Stat. §§ 25-4150, 25-4148(b)(2), 25-4143(e)(1)(A).

98.     Other states directly prohibit contributions and expenditures incurred "in a fictitious name, anonymously, or by one . . . person through an agent, relative or other person in such a manner as to conceal the identity of the source of the contribution." *See, e.g.*, Idaho Code § 67-6614. And, as noted, Arizona itself already has laws, not at issue here, that prohibit conscious funneling of money through one entity in an effort to influence elections on behalf of another. *See* ¶ 69. Proposition 211 gratuitously goes much further than these other regulations do in purported pursuit of the same purposes, and it reflects an unprecedented, unjustifiable lack of tailoring.

99.     Proposition 211 also goes far beyond the disclosure requirements under the federal Bipartisan Campaign Reform Act ("BCRA"), which were upheld as applied in *Citizens United v. FEC*, 558 U.S. 310 (2010).  The additional burdens imposed by Arizona's law are "a far cry" from BCRA, *Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 841 (7th Cir. 2014), which contains no look-through provision as to indirect donors or intermediaries and imposes no associated transfer record or opt-out correspondence requirements.

100.     Equally important, BCRA is clearer and more circumscribed in specifying the references that can trigger it.    BCRA defines "electioneering communication," which is the basis for disclosure, *see* 52 U.S.C. § 30104(f)(1), to only include those that "refer[] to a clearly identified candidate for Federal office." *Id.* § 30104(f)(3)(A)(i)(I).  "Federal office" is defined as "the office of President or Vice President, or of Senator or Representative in, or Delegate or Resident Commissioner to, the Congress."  *Id.* § 30101(3).  In stark contrast, Proposition 211 regulates activity associated with "statewide campaigns" and "*any other type of campaigns.*"  Ariz. Stat. § 16-971(7)(a) (emphasis added).  Proposition 211 thus designedly encompasses a wide variety of elected officials involved in a wide variety of facets of everyday life, from state prosecutors, to county sheriffs, to all elected judges. *See* ¶ 77 & nn. 3–5.  Proposition 211 uniquely imperils the ability of advocacy groups to speak on hot-button issues, such as immigration or abortion,

if they so much as reference any state and local officials within the relevant windows, are taken as expressing support or opposition for a staggering panoply of current officeholders potentially subject to recall, or are otherwise deemed (by the Commission or any aggrieved voter) to be "partisan." *See* Ariz. Stat. § 16-971(2)(a).

101. Proposition 211's disclosure requirements are also triggered by advocacy concerning ballot initiatives (as to which there is no conceivable anti-corruption interest), while BCRA's disclosure requirements are not. And unlike Proposition 211, BCRA's disclosures do not turn on vague standards that invite standardless discretion, such as speech that "promotes . . . or opposes the recall of a public officer" or involves "partisan campaign activity." Ariz. Stat. § 16-971(2)(a)(v), (vi).

102. BCRA also is more tailored when it comes to timeframes and media of communication. "Electioneering communication" under BCRA is defined as "any broadcast, cable, or satellite communication which refers to a clearly identified candidate for Federal office; is made within 60 days before a general, special, or runoff election . . . or 30 days before a primary . . . election . . . ; and . . . is targeted to the relevant electorate." 52 U.S.C. § 30104(f)(3)(A)(i).

103. By contrast, Proposition 211 defines "campaign media spending" to include *all* public communications referring to a clearly identified candidate

"within *ninety days* before a primary election *until* the time of the general election"

disseminated in the jurisdiction of the election, as well as preparatory activities

associated with these communications.   Ariz. Stat. § 16-971(2)(a)(iii), (vii)

(emphases added).   Proposition 211 also covers broader *forms* of public

communications than BCRA, such as those made by means of the "internet or

another digital method, newspaper, magazine, outdoor advertising facility, mass

mailing or another distribution, telephone bank or any other form of general public

political advertising or marketing, regardless of medium."  *Id.* § 16-971(17)(a).  In

these respects and others, BCRA is more narrowly tailored than Proposition 211.

104.   ***Right to Petition.***   The First Amendment also protects the right "to

petition the Government for a redress of grievances."  U.S. Const. amend. I.  "The

right to petition is cut from the same cloth as the other guarantees of that

Amendment, and is an assurance of a particular freedom of expression."

*McDonald v. Smith*, 472 U.S. 479, 482 (1985).   The Supreme Court has

"recognized this right to petition as one of 'the most precious of the liberties

safeguarded by the Bill of Rights,' and ha[s] explained that the right is implied by

'[t]he very idea of a government, republican in form.'"  *BE & K Const. Co. v.*

*NLRB*, 536 U.S. 516, 524–25 (2002) (quoting *United Mine Workers of Am., Dist.*

*12 v. Ill. Bar Ass'n*, 389 U.S. 217, 222 (1967); *United States v. Cruikshank*, 92 U.S.

542, 552 (1876)).   "[T]he right to petition extends to all departments of the

government, including the executive department, the legislature, agencies, and the courts." *White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000).

105.   The Supreme Court has "recurrently treated the right to petition similarly to, and frequently as overlapping with, the First Amendment's other guarantees of free expression." *McDonald v. Smith*, 472 U.S. 479, 490 (1985) (Brennan, J., concurring).   Through its broad definition of "campaign media spending," Proposition 211 encompasses far more than election-related activity, sweeping up speech addressing the pressing issues of the day.   Through its daunting disclosure, disclaimer, and associated administrative requirements and burdens, Proposition 211 chills the right to opine publicly and petition one's government in violation of this "precious" First Amendment right.

**B.     Proposition 211 Is Unconstitutional As Applied To Plaintiffs.**

106.   Proposition 211 is also unconstitutional specifically as applied to AFP and AFPF.

107.   Given the requirements that public disclaimers accompany covered communications, Ariz. Stat. § 16-974(C), and that "[o]fficials shall promptly make the information" included in the disclosure reports "public," *id.* § 16-973(H), there is a serious risk of harm to Plaintiffs' donors, Plaintiffs' donors' donors, and so on.

108.   This compelled disclosure and disclaimer will chill the expression of Plaintiffs and their donors because they have a reasonable fear that threats,

harassment, and reprisals will result from any disclosure or broadcasting of their donations.  Plaintiffs and their associates have fierce critics, and their opponents regularly strive to identify the organizations' donors in order to threaten, attack, and sow fear among those who support organizations like Plaintiffs.  Once suspected donors are publicly outed, they are empirically at risk of facing boycotts, character attacks, personal threats, and even violence, ¶¶ 13, 43, particularly "[i]n a climate marked by the so-called cancel or call-out culture that has resulted in people losing employment, being ejected or driven out of restaurants while eating their meals[,] and where the Internet removes any geographic barriers to cyber harassment of others." *Americans for Prosperity v. Grewal*, 2019 WL 4855853, at *20 (D.N.J. Oct. 2, 2019).  Therefore, in the case of the Plaintiffs, "[t]he deterrent effect feared by these organizations is real and pervasive[.]"  *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2388 (2021).

109.  Plaintiffs' "supporters have been subjected to bomb threats, protests, stalking, and physical violence.  Such risks are heightened in the 21st century and seem to grow with each passing year, as 'anyone with access to a computer [can] compile a wealth of information about' anyone else, including such sensitive details as a person's home address or the school attended by his children."  *Id.* (quoting *John Doe No. 1 v. Reed*, 561 U.S. 186, 208 (2010) (Alito, J., concurring)).  Plaintiffs' "donors face a reasonable probability of threats, harassment, and

reprisals if their affiliations are made public." *Americans for Prosperity Found.*, 141 S. Ct. at 2400 (Sotomayor, J., dissenting).   All disclosures required by Proposition 211 are indeed made "public," Ariz. Stat. § 16-973(H), and disclaimers are broadcasted publicly, *id.* § 16-974(C).

110.   Part and parcel of Plaintiffs' commitment to maintain confidentiality, Plaintiffs have implemented protocols to protect and secure the confidentiality of donor information.   *See* ¶¶ 45–47.   Plaintiffs scrupulously protect donor confidentiality with strict security measures to avoid inadvertent or unauthorized disclosure.  For example, Plaintiffs maintain donor information in a highly-secure database and restrict access for most employees.  Only those individuals who have a need to know the donor information are given access the database.   Plaintiffs have consistently protected the confidentiality of their donor information by training staff members and rarely sharing such information outside of AFP and AFPF.

111.   Just as Plaintiffs promise confidentiality and anonymity in soliciting donations, Plaintiffs' donors rely on such assurances in making their donations. The compelled disclosures associated with Proposition 211 violate the understandings and assurances surrounding many of the donations Plaintiffs receive.  Therefore, judicial relief is important to vindicate the assurances Plaintiffs

have provided to individual donors that their individual donor information will not generally become known outside of AFP and AFPF.

112.  This evidence demonstrates a "reasonable probability that the group[s'] members would face threats, harassment, [and] reprisals if their names were disclosed," making Proposition 211 unconstitutional as applied to Plaintiffs. *Citizens United v. FEC*, 558 U.S. 310, 370 (2010) (internal citation omitted).

113.  As to Plaintiffs' own direct donors, disclosures and disclaimers will chill speech because they attribute to these donors the wide variety of unique positions Plaintiffs take across whatever may materialize as the pressing issues of the day.  "The disclosure requirement 'creates an unnecessary risk of chilling' in violation of the First Amendment, indiscriminately sweeping up the information of every major donor with reason to remain anonymous."  *Americans for Prosperity Found.*, 141 S. Ct. at 2388 (quoting *Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 968 (1984)).

114.  "Regardless of the type of association, compelled disclosure requirements" such as Proposition 211 "are reviewed under exacting scrutiny." *Americans for Prosperity Found.*, 141 S. Ct. at 2383 (plurality opinion). Proposition 211, with its various disclaimer and disclosure requirements and associated administrative burdens, is not "narrowly tailored" to *any* "sufficiently important governmental interest." *Id.* at 2385 (majority opinion).  Its provisions

are simultaneously too far-reaching and underinclusive in scope relative to their claimed purposes, demonstrating an obvious lack of tailoring to any asserted state interest and placing extreme and undue burdens on First Amendment rights.

115.   As applied to Plaintiffs, Proposition 211 will unconstitutionally chill the organizations' protected speech, especially considering the history of threats and violence specifically directed toward these organizations and their donors.

**Count II – First Amendment (Compelled Association)**

**(Pursuant to 28 U.S.C. §§ 2201, 2202; 42 U.S.C. §§ 1983, 1988)**

116.   Plaintiffs repeat, re-allege, and incorporate the allegations in paragraphs 1–115 of this Complaint as though fully set forth herein.

117.   Proposition 211's disclosure and disclaimer regime also violates the First Amendment by improperly compelling association.  In particular, Proposition 211 affiliates organizations and their donors with various issue positions, other organizations, and candidates based on the ultimate use of their fungible donations, irrespective of their own intent or beliefs.  Given that Proposition 211 requires no nexus between any covered donor, on the one hand, and Arizona voters, on the other, it will publicly and falsely compel donors (including Plaintiffs and their donors) to associate with causes they have no interest in and may even oppose. Donors (both direct and indirect) contribute to a particular organization—and in turn to the organization's donees—for a plethora of reasons.  By tying a single

donation to all downstream activities and donations and mandating disclosures and disclaimers on the basis of same, Proposition 211 compels association both on its face and as applied to Plaintiffs, in violation of the First Amendment.

**A.  Proposition 211 Compels Association on its Face.**

118.  "The First Amendment protects the basic right to freely associate for expressive purposes; correspondingly, '[t]he right to eschew association for expressive purposes is likewise protected.'"  *Crowe v. Or. State Bar*, 989 F.3d 714, 729 (9th Cir. 2021) (quoting *Janus v. AFSCME*, 138 S. Ct. 2448, 2463 (2018)).

119.  Proposition 211 unconstitutionally compels association by requiring covered persons to disclose individuals who may stand diametrically opposed to their values or particular issue positions.  Proposition 211 thereby associates "donors" with a covered person merely because they contributed to an entirely different entity, after which their fungible donation was transferred one or more times and then received by the covered person, in spite of the fact that the covered person used the donation for a specific purpose well removed from the donor's initial, generalized expression of support.  For example, a Christian group that becomes a covered person is compelled to affiliate itself with a mosque that may have donated to a religious-liberty organization that in turn donated to the Christian group.  The mosque is similarly compelled to affiliate itself with the Christian group simply because it donated to a religious-liberty organization, even though it

had no specific intent or knowledge that this donation would make its way to the Christian group. Proposition 211 violates the constitutional rights of both the indirect donor (the mosque) and the covered person (the Christian group) by mandating these affiliations. Further, to the extent the indirect donor (the mosque) is one of the top three donors to the covered person (the Christian group) during the election cycle, the Christian group will be required to list the name of the mosque on the disclaimer accompanying its public communications.

120. The burden runs both ways. Donors from New York who contribute to one group aligned with their values will later discover that Arizona has associated their contributions with an entirely different group pursuing a distinct mission and activity that Arizona then deemed to be electioneering. Rather than associating donors based on who they actually gave to, Proposition 211 associates donors based on the political speech of another group they may have never heard of, never donated to, and may disagree with in relevant part—merely because some portion of the money they gave to a different entity for a distinct cause with a distinct mission wound its way to a group advocating on a particular issue in Arizona.

121. Such compulsory association violates the First Amendment, as "[f]orcing free and independent individuals to endorse ideas they find objectionable is always demeaning," and "a law commanding 'involuntary

affirmation' of objected-to beliefs would require 'even more immediate and urgent grounds' than a law demanding silence." *Janus*, 138 S. Ct. at 2464 (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U. S. 624, 633 (1943)).

122.   The Supreme Court "has recognized the vital relationship between freedom to associate and privacy in one's associations." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958).   "[C]ompelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *Id.*   "[P]articularly where a group espouses dissident beliefs," the "[i]nviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association." *Id.*   Therefore, even compelled disclosure of organizations' *direct* donors violates their freedom of association as protected by the First Amendment.

**B.   Proposition 211 Compels Association As Applied to Plaintiffs.**

123.   Proposition 211 unconstitutionally compels association by Plaintiffs and their donors.  A reasonable probability of donor harm, *see* ¶¶ 108–109,  arises from the government's express drawing of ties to organizations their donors may not support or even know exist.  Because Plaintiffs donate amounts exceeding $5,000 to organizations that may qualify as covered persons under Proposition 211, those covered persons—and any additional covered persons they subsequently

donate to in amounts exceeding $5,000—would need to disclose the identities of Plaintiffs as well as *Plaintiffs' donors*.  The premise and thrust of such disclosure would be that associational ties exist between Plaintiffs' donors and other organizations, even though Plaintiffs' donors could not have known precisely how their donations would be used, relative to Arizona or otherwise.

124.   As a result, Plaintiffs and their donors will be compelled to associate with various issue positions, other organizations, and candidates in Arizona based on the ultimate use of their fungible donations, even where they did not and could not intend or foresee this ultimate use when they made their initial donation to an entirely different entity.  Therefore, both on its face and as applied to Plaintiffs, Proposition 211 compels association, in flagrant violation of the First Amendment.

**Prayer for Relief**

Wherefore, Plaintiffs respectfully request that judgment be entered in their favor and against the Defendants as follows:

1.   A declaration that Proposition 211 violates the First Amendment (as incorporated by the Fourteenth Amendment) both facially and as-applied to Plaintiffs, and is therefore null and void in its entirety;

2.   An order permanently enjoining Defendants from implementing and enforcing any portion of Proposition 211;

3.      An award to Plaintiffs of their reasonable attorneys' fees and costs; and

4.      A grant to Plaintiffs of such additional or different relief as the Court deems just and proper.

### Jury Demand

Plaintiffs, Americans for Prosperity and Americans for Prosperity Foundation, hereby demand a trial by jury as to all issues so triable in this case.


DATED this 17th day of March, 2023.


**GREENBERG TRAURIG, LLP**

*/s/ Dominic E. Draye*
Dominic E. Draye
    drayed@gtlaw.com
2375 E. Camelback Rd., Suite 700
Phoenix, AZ 85016
(602) 445-8425

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

*/s/ Derek L. Shaffer*
Derek L. Shaffer*
derekshaffer@quinnemanuel.com
John F. Bash, III*
johnbash@quinnemanuel.com
Jonathan G. Cooper*
jonathancooper@quinnemanuel.com
1300 I Street NW, Suite 900
Washington, DC 20005
(202) 538-8000

*Applications *pro hac vice* forthcoming

Attorneys for Plaintiffs
Americans for Prosperity &
Americans for Prosperity Foundation