Daniel J. Adelman (011368)
Chanele N. Reyes (034898)
Arizona Center for Law in the Public Interest
352 E. Camelback Rd., Suite 200
Phoenix, AZ 85004
(602)248-8850
danny@aclpi.org
chanele@aclpi.org

David Kolker* (DC Bar # 394558)
Tara Malloy* (DC Bar # 988280)
Elizabeth D. Shimek* (WI Bar # 1095937)
Campaign Legal Center Action
1101 14th St., NW, Suite 400 Washington, DC 20005
(202)736-2200
dkolker@campaignlegalcenter.org
tmalloy@campaignlegalcenter.org
eshimek@campaignlegalcenter.org
*Appearing *Pro Hac Vice*

*Attorneys for Voters' Right to Know*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **Americans for Prosperity**, et al., | No. 2:23-cv-00470-ROS |
| Plaintiffs, | |
| v. | |
| **Damien R. Meyer**, in his official capacity as Chairman of the Citizens Clean Elections Commission, et al., | **PROPOSED INTERVENOR VOTERS' RIGHT TO KNOW'S MOTION TO DISMISS** |
| Defendants. | (Assigned to the Honorable Roslyn O. Silver) |

The Voters' Right to Know Act ("VRTKA" or "Act") is narrowly tailored to serve compelling First Amendment interests. By shining light on the original sources of "dark money" campaign contributions, the Act enhances robust debate and provides voters with information critical to choosing, and holding accountable, their elected leaders. Because Plaintiffs Americans for Prosperity ("AFP") and Americans for Prosperity Foundation ("AFPF") cannot demonstrate that they would be entitled to relief under any interpretation of facts susceptible of proof, intervenor-movant Voters' Right to Know moves for an order pursuant to Fed. R. Civ. P. 12(b)(6) dismissing Plaintiffs' complaint with prejudice.

## STATEMENT OF THE CASE

### I.     Proposed Intervenor Voters' Right to Know

Voters' Right to Know ("VRTK") is a political action committee registered with the State of Arizona.[1] VRTK drafted the language of Proposition 211 and submitted almost 400,000 signatures to place the initiative on the ballot—which passed with 72% of voters' approval.[2]

VRTK has published on its website answers to "frequently asked questions" that explain the details of how the Act works. *Voters' Right to Know Act—Frequently Asked Questions*, VRTK's "Stop Dark Money" website, https://www.stopdarkmoney.com/faq.

### II.    The Rise of Dark Money Nationally

After the Supreme Court in *Citizens United v. FEC*, 558 U.S. 310 (2010), invalidated the limits on corporate independent expenditures supporting or opposing candidates for office, the D.C. Circuit held that political committees that make only independent expenditures (and no contributions) can receive unlimited contributions for

---

[1] VRTK's committee reports can be found on the Secretary of State's website at https://seethemoney.az.gov/Reporting/Explore#JurisdictionId=0%7CPage|Page=11|startYear=2023|endYear=2025|IsLessActive=false|ShowOfficeHolder=false|View=Detail|Name=2~100542|TablePage=1|TableLength=10.

[2] *See Arizona Proposition 211, Campaign Finance Sources Disclosure Initiative (2022)*, https://ballotpedia.org/Arizona_Proposition_211,_Campaign_Finance_Sources_Disclosure_Initiative_(2022).

their donors. *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) (en banc). Such "independent expenditure only political committees" came to be known as "super PACs."

In the wake of these legal developments, elections have increasingly become awash in super PAC and other "independent" spending—dubbed "dark money" when it is not accompanied by public disclosure of the interests funding the spending. By routing their money through 501(c)(4) corporations, super PACs, or limited liability corporations, wealthy interests fund huge electoral expenditures while obscuring their identity and hiding behind opaque front groups. *See, e.g.*, Anna Massoglia, *'Dark money' groups find new ways to hide donors in 2020 election*, OpenSecrets (Oct. 30, 2020), https://www.opensecrets.org/news/2020/10/dark-money-2020-new-ways-to-hide-donors/.

Since 2010, dark-money groups have spent more than $2.6 billion to influence federal elections. Anna Massoglia, *'Dark money' groups have poured billions into federal elections since the Supreme Court's 2010 Citizens United decision*, OpenSecrets (Jan. 24, 2023), https://www.opensecrets.org/news/2023/01/dark-money-groups-have-poured-billions-into-federal-elections-since-the-supreme-courts-2010-citizens-united-decision/. The 2020 election alone saw more than $1 billion in "dark money" spending at the federal level, including $660 million in donations from opaque political nonprofits and shell companies to outside groups. Anna Massoglia & Karl Evers-Hillstrom, *'Dark Money' topped $1 billion in 2020, largely boosting Democrats*, OpenSecrets (Mar. 17, 2021), https://www.opensecrets.org/news/2021/03/one-billion-dark-money-2020-electioncycle/.

### III.   Dark Money in Arizona

Similarly, between 2006 and 2014, dark money spending exploded in state races. *See* Chisun Lee, et al., *Secret Spending in the States*, Brennan Ctr. for Justice 7 (June 26, 2016), https://www.brennancenter.org/sites/default/files/2019-08/Report_Secret_Spending_in_the_States.pdf. But Arizona showed "by far the biggest surge in dark money, with the amount in 2014 rising to 295 times—nearly three hundred times—the level in 2006." *Id.*

1    Before the passage of Proposition 211, Arizona's existing campaign finance

2    disclosure system was described as "one of the most pro-dark-money statutes

3    imaginable." *See* Alexander J. Lindvall, *Ending Dark Money in Arizona*, 44 Seton Hall

4    Legis. J. 61, 73 (2019); *see also* David R. Berman, *Dark Money in Arizona: The Right to*

5    *Know, Free Speech and Playing Whack-a-Mole*, Morrison Inst. for Pub. Pol'y 3-4 (2014).

6    In a particularly egregious 2014 case, Arizona Public Service ("APS") secretly

7    spent more than $10 million through its holding company, Pinnacle West Capital

8    Corporation, to influence the race for seats on its regulating agency, the Arizona

9    Corporation Commission. *See* David Brancaccio and Alex Schroeder, *In Arizona, a story*

10   *of secret campaign spending and rising electric bills*, Marketplace (Oct. 10, 2022),

11   https://www.marketplace.org/2022/10/10/secret-campaign-spending-rising-electric-bills-

12   arizona/. It took nearly five years for the true source of this spending to come to light in

13   2019, when it was finally revealed that Pinnacle West Capital gave $12.9 million to

14   sixteen different political groups in 2014, with $10.7 million going to groups that spent to

15   influence the Corporation Commission elections that year. Ryan Randazzo, *APS*

16   *acknowledges spending millions to elect Corporation Commission members, after years of*

17   *questions*, Ariz. Republic (Mar. 29, 2019).

18                        **MEMORANDUM OF POINTS AND AUTHORITIES**

19   The Court should dismiss Plaintiffs' complaint under Fed. R. Civ. P. 12(b)(6)

20   because Plaintiffs cannot provide more than "labels and conclusions" and their factual

21   allegations are not "enough to raise a right to relief above the speculative level." *Bell Atl.*

22   *Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

23   **I.    Plaintiffs Cannot Demonstrate That the VRTKA Is Facially Unconstitutional.**

24   For their facial challenge, Plaintiffs must demonstrate that a "substantial number of

25   [the Act's] applications are unconstitutional, judged in relation to the statute's plainly

26   legitimate sweep." *Ams. for Prosperity Found. v. Bonta,* 141 S. Ct. 2373, 2387 (2021)

27   (citation and quotation marks omitted). Plaintiffs make no attempt to meet this standard.

28   Their complaint does not even *allege* that there are a "substantial number" of

1  unconstitutional applications of the Act. Plaintiffs instead rely upon their general concerns

2  about how the statute may affect them and their donors—who are not plaintiffs here—

3  along with speculative applications of the Act. However, "[i]n determining whether a law

4  is facially invalid, [a court] must be careful not to go beyond the statute's facial

5  requirements and speculate about 'hypothetical' or 'imaginary' cases." *Washington State*

6  *Grange v. Washington State Republican Party*, 552 U.S. 442, 449–50 (2008).

7      **A.**    **The VRTKA promotes First Amendment interests.**

8      The Act, like other disclosure laws, does not limit campaign expenditures or

9  contributions. As the Supreme Court has held, "[d]isclaimer and disclosure requirements

10  . . . impose no ceiling on campaign-related activities . . . and do not prevent anyone from

11  speaking." *Citizens United*, 558 U.S. at 366 (citations and quotation marks omitted).

12  Plaintiffs focus only on their putative right to receive anonymous donations, but "ignore[]

13  the competing First Amendment interests of individual citizens seeking to make informed

14  choices in the political marketplace." *McConnell v. FEC*, 540 U.S. 93, 197 (2003)

15  (citation omitted), *overruled in part on other grounds*, *Citizens United*. Because the Act

16  adds to robust debate by providing the public with critical information—i.e., *more*

17  speech—about the persons behind campaign spending and contributions, it promotes the

18  values and principles that underlie the First Amendment.

19      The right to free speech was designed to enable self-government, ensure responsive

20  officeholders, and prevent the corruption of democratic processes.[3] Properly understood,

21  disclosure laws like the VRTKA enhance, rather than constrain, the free speech necessary

22  to sustain our democracy. As the Supreme Court has explained, "[i]n a republic where the

23  people are sovereign, the ability of the citizenry to make informed choices [in elections] is

24  essential." *Buckley v. Valeo*, 424 U.S. 1, 14-15 (1976). Moreover, empirical research

---

26  [3] *See Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 308 (2012) ("Our cases
have often noted the close connection between our Nation's commitment to self-
27  government and the rights protected by the First Amendment."); *Human Life of Wash.,
Inc. v. Brumsickle*, 624 F.3d 990, 1005, 1022 (9th Cir. 2010) ("disclosure requirements
28  have become an important part of our First Amendment tradition.").

4

confirms that knowing the sources of election messaging is a "particularly credible" informational cue for voters seeking to make decisions consistent with their policy preferences. Elizabeth Garrett & Daniel A. Smith, *Veiled Political Actors and Campaign Disclosure Laws in Direct Democracy*, 4 Election L.J. 295, 296 (2015).[4] Disclosure laws thus directly serve the democratic values animating the First Amendment—"secur[ing] the widest possible dissemination of information from diverse and antagonistic sources" and facilitating "uninhibited, robust, and wide-open" public debate on political issues. *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 266, 270 (1964).

As the Supreme Court explained in *Citizens United*:

> With the advent of the Internet, prompt disclosure of expenditures can provide shareholders and citizens with the information needed to hold corporations and elected officials accountable for their positions and supporters. . . . [C]itizens can see whether elected officials are in the pocket of so-called moneyed interests. The First Amendment protects political speech; *and disclosure permits citizens and shareholders to react to the speech of corporate entities in a proper way*.

558 U.S. at 370-71 (citations and quotation marks omitted; emphasis added). Rather than abridging anyone's ability to speak freely, the VRTKA empowers citizens to engage meaningfully in self-government and is entirely consistent with both the language and purpose of the First Amendment. It neither unconstitutionally "chill[s] protected speech" nor "compel[s] association." *See* Compl. Counts I & II.

**B.    The VRTKA satisfies the applicable standard of review: exacting scrutiny.**

The relevant standard of review for disclosure requirements is exacting scrutiny, which "requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Citizens United*, 558 U.S. at 366 (citations

---

[4] Transparency about ballot measure spending similarly provides voters useful information, especially when other informational shortcuts like party affiliation, campaign platforms, and candidate demeanor are absent. *See* Jennifer A. Heerwig & Katherine Shaw, *Through a Glass, Darkly: The Rhetoric and Reality of Campaign Finance Disclosure*, 102 Geo. L.J. 1443, 1471-72 (2014).

omitted). "While exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, it does require that they be narrowly tailored to the government's asserted interest." *Bonta,* 141 S. Ct. at 2383. The Act clearly satisfies this test by restoring campaign finance disclosure to its original intent and objective: that the true source of contributions would be reported to the public, not the names of meaningless front groups or shell corporations.

In *Buckley*, 424 U.S. at 66-68, the Court summarized three critical interests served by campaign disclosure laws: (1) providing the electorate with information as to where political campaign money comes from to aid voters in evaluating candidates; (2) deterring actual corruption and the appearance of corruption by shining light on large contributions and expenditures; and (3) gathering the data necessary to detect violations of the law. The first of these interests, the public's informational interest, is "alone . . . sufficient to justify" disclosure laws. *Citizens United*, 558 U.S. at 369.

None of these substantial interests can be properly served if donor disclosure is limited to intermediaries who mask the true source of the funds. First, voters cannot accurately assess campaign advertisements for potential biases or hidden political agendas if they do not know the true source of funds publicizing the message. The "interest in learning the source of funding for a political advertisement extends past the entity that is directly responsible"—often "ad hoc organizations with creative but misleading names"— to the "actual contributors to such groups." *No on E, San Franciscans Opposing the Affordable Hous. Prod. Act v. Chiu*, 62 F.4th 529, 541 (9th Cir. 2023) (citations and quotation marks omitted). It is impossible for "'uninhibited, robust, and wide-open' speech [to] occur when organizations hide themselves from the scrutiny of the voting public." *McConnell*, 540 U.S. at 197 (citations omitted). Second, disclosure will not discourage corruption if the true sources of funds remain unidentified. And third, the government cannot detect violations if the true sources of contributions remain unknown.

Requiring spenders to disclose the original source of funds behind election spending promotes *every* informational interest implicated by a campaign finance regime.

1          **1.      The VRTKA is narrowly tailored.**

Campaign finance disclosure laws typically require persons engaged in election-related spending to report such expenditures and the donors who gave money to finance them. What is unique about the Act is that it requires big campaign spenders to disclose the original sources of the large contributions they use for electoral purposes. The Act is thus narrowly tailored to address the recent explosion in "dark money" spending.

**a.      The Act's high thresholds target big donors and spenders.**

By targeting only big spenders on Arizona elections and large contributors to those spenders, the Act's burdens are minimal. Campaign spenders do not become covered persons until they spend $50,000 in an election cycle on statewide elections, or $25,000 on other elections. A.R.S. § 16-971(7). Persons or organizations who spend less than those amounts do not have to give their donors notice of how their dollars may be spent, nor determine whether their donors were the original source of the monies received. Donors who contribute $5,000 or less to covered persons do not have to provide any information about the source of their donations, A.R.S. § 16-972(D), and covered persons do not report the identity of any original sources unless they have contributed more than $5,000 each, A.R.S. § 16-973(A)(6). This figure is *five times* as high as the $1,000 threshold for the donor disclosure upheld in *Citizens United*. 558 U.S. at 366-67; *see* 52 U.S.C. § 30104(f)(2). "[D]isclosure laws specifying a monetary threshold at which contributions or expenditures trigger reporting requirements ensure that the government does not burden minimal political advocacy. The acceptable threshold for triggering reporting requirements need not be high." *Nat'l Ass'n for Gun Rights, Inc. v. Mangan*, 933 F.3d 1102, 1118 (9th Cir. 2019) (upholding a $1,000 threshold). The Act's high thresholds thus far exceed other reporting thresholds that have been found constitutional.

**b.      The Act's notice provisions are narrowly tailored to provide flexibility to both covered persons and major donors, and to protect donors' free speech.**

Under the Act, donors have significant control over whether their contributions will be used for campaign spending and whether their names will be included in covered

7

persons' disclosure reports. Contrary to Plaintiffs' allegations (*see* Compl. ¶¶ 30-32, 45-49 & Count II), the Act *protects* the First Amendment interests of donors far more than most other disclosure laws. Donors to covered persons receive notice that their contributions may be used for campaign media spending, and if they wish to remain anonymous or prevent their money from being used for such spending, they can "opt out" and provide the covered person financial support for non-campaign purposes. A.R.S. §§ 16-971(18); 16-972(B), (C). And if a donor is eager to make its donation available to the covered person for campaign spending, that donor can immediately consent in writing to provide that permission, thus making its contribution instantly available for a covered person's campaign spending. *Id.* These First Amendment protections for donors make the Act even more narrowly tailored than the disclosure provisions upheld in *Citizens United*.

Much of Plaintiffs' complaint focuses on the control the Act provides to donors; they even allege (Compl. ¶ 88) that the opt-out provision "exacerbat[es] the chilling effect" by giving a "veto right to donors." But Plaintiffs have no constitutional right to force persons to make donations or to keep donors unaware about how their money might be spent. This allegation ignores the First Amendment rights of direct donors and contradicts Plaintiffs' other assertions, such as their allegation (*see id.* ¶ 60) that the Act is flawed because upstream donors may *not* learn how their funds may be spent.

Indeed, faced with the clear advantages of the opt-out provisions, Plaintiffs argue that they both sweep too broadly, and not broadly enough. On the one hand, Plaintiffs describe (*id.* ¶¶ 9, 30-31) these provisions as a burden on covered persons who must give their donors notice if they intend to use the contributions they receive for campaign media spending.[5] On the other hand, Plaintiffs complain (*id.* ¶¶ 31, 60, 74) that the law requires

---

[5] Plaintiffs ignore the fact that A.R.S. § 16-972(C) allows covered persons to provide the notice *before or after* they receive a donation. This provides covered persons with the flexibility to decide when and to whom they direct this notice. For instance, covered persons who may not anticipate engaging in significant campaign media spending at the beginning of an election cycle can raise funds without providing the notice to donors at that time, but later provide the required notice to appropriate donors to make sufficient funds available for campaign spending.

too little: it neither *requires* that upstream original sources be given the power to opt out of the covered person's electoral spending, nor mandates that the notice identify which specific campaign media spending the received funds will support. These criticisms contradict each other. By striking a balance between the interests of donors and covered persons, and providing flexibility to both groups, the Act narrowly focuses on disclosing large sources of dark money and minimizes administrative burdens.

While it is true (Compl. ¶ 9) that the Act does not *require* a covered person to provide any notice to the original sources of the funds being passed on by the direct contributor to the covered person, nothing in the Act prevents a covered person from doing so. Under A.R.S. § 16-972(D), a direct contributor will provide the identity of the original sources of the "monies being transferred" to the covered person, and nothing in the Act prevents a direct contributor from discussing with its own upstream donors how it intends to pass on their original monies; the direct contributor can then choose not to contribute certain upstream donors' funds to certain recipients or to opt out of campaign spending entirely when contributing certain original monies. Likewise, nothing in the Act prevents a covered person—upon learning the identity of upstream donors whose original money is being transferred by a direct contributor—from contacting the upstream donors to discuss how their funds might be spent. And nothing in the Act prevents a source of original monies from instructing a recipient of such funds not to pass on the funds to a covered person. This unique flexibility makes the Act more narrowly tailored and protective of First Amendment interests than most other disclosure laws that do not provide any notice or opt-out power to potential contributors. It also forecloses Plaintiffs' Count II because the Act does not compel association—neither on its face nor as applied to Plaintiffs.

Finally, Plaintiffs offer another contradiction: they complain (Compl. ¶ 88) that the Act gives Plaintiffs' donors a "veto right," yet simultaneously allege (*id.* at ¶¶ 45-49) that the Act interferes with their ability to keep their donors' identities secret. But what Plaintiffs label a "veto right" is simply a provision protecting the First Amendment

interests of contributors by giving *them* the power to avoid triggering disclosure. In other words, Plaintiffs want to both fundraise without alerting donors to how their contributions will be used and also deploy those funds to influence elections without informing voters of the true source of money behind their advocacy. Nothing in the Constitution guarantees Plaintiffs the right to keep either their own donors or the public in the dark.

### c.    The Act targets spending directly related to campaign spending.

The definition of "campaign media spending" is narrowly targeted at election-related spending and is clearly constitutional. A.R.S. § 16-971(2). *Citizens United* upheld federal disclosure requirements for "electioneering communications," 52 U.S.C. § 30104(f)(3), and rejected the argument that disclosure requirements must be limited to communications that contain express advocacy or its functional equivalent. Indeed, the Court held, 8-1, that the public had an "informational interest" in knowing the source of funding even for advertisements encouraging viewers to watch a movie about Hillary Clinton: "*Even if the ads only pertain to a commercial transaction*, the public has an interest in knowing who is speaking about a candidate shortly before an election." 558 U.S. at 369 (emphasis added). *See also Human Life*, 624 F.3d at 1016 ("[T]he position that disclosure requirements cannot constitutionally reach issue advocacy is unsupportable."); *Gaspee Project v. Mederos*, 13 F.4th 79, 86 (1st Cir. 2021); *Del. Strong Families v. Att'y Gen. of Del.*, 793 F.3d 304, 308 (3d Cir. 2015).[6] Part of the Act's definition of campaign media spending, A.R.S. § 16-971(2)(a)(iii), is modeled after this federal definition and is constitutional for the same reasons.

Plaintiffs also challenge (Compl. ¶¶ 78, 101) the part of the Act's definition of campaign-related spending that uses a "promotes, supports, attacks, or opposes" standard. In *McConnell*, however, the Supreme Court upheld this kind of definition and explained

---

[6]  Given this precedent, there would be no constitutional bar, for example, to requiring disclosure about money spent on an ad disseminated shortly before an election commenting on Sheriff Arpaio's "contempt proceedings preceding his 2016 election" (Compl. ¶ 77), in light of such content's relevance to his qualifications for office.

10

that words like "'promote,' 'oppose,' 'attack,' and 'support' . . . 'provide explicit standards for those who apply them' and 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited.'" 540 U.S. at 170 n.64 (citation omitted). More recently, the Ninth Circuit rejected a vagueness challenge to Hawaii's "support" or "oppose" standard in a disclosure requirement. *Yamada v. Snipes*, 786 F.3d 1182, 1192-93 (9th Cir. 2015) (citing *McConnell*, 540 U.S. at 170 n.64).[7]

Finally, Plaintiffs object (Compl. ¶¶ 76, 79) to the inclusion of "other partisan campaign activity" but ignore the statutory context in which this phrase resides. The definition of "campaign media spending" covers, in relevant part, "a public communication that *supports the election or defeat* of candidates of an identified political party or the electoral prospects of an identified political party, *including* partisan voter registration, partisan get-out-the-vote activity or other partisan campaign activity." A.R.S. § 16-971(2)(a)(ii)-(vii) (emphases added). Thus, to trigger disclosure under this definition, the public communication must *both* "support the election or defeat" of an identified political party's candidates or the political party itself *and* constitute "partisan campaign activity" such as efforts to drive voters of only one political party to the polls. The "other partisan campaign activity" language thus does not stand alone, but rather modifies and illustrates the "promote/ support" test that precedes it.

### 2. Existing law does not address the dark money problem.

Contrary to Plaintiffs' allegations (Compl. ¶¶ 7, 60, 69-72), existing restrictions on earmarking and giving "in the name of another" do not reach or redress the problems created by current dark money abuses. Provisions such as Ariz. Stat. § 16-1022(B) and 52 U.S.C. § 30122 prohibit contributions when one person knowingly gives money in the name of another person—i.e., "straw donor" scenarios. Similarly, the federal requirement

---

[7] The Act also uses this standard when defining spending to influence ballot referenda. A.R.S. § 16-971(2)(a)(iv). The Supreme Court has expressed approval of disclosure in the ballot measure context, where "[i]dentification of the source of advertising" enables voters "to evaluate the arguments to which they are being subjected." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 792 n.32 (1978); *see also Citizens Against Rent Control/Coal. for Fair Housing v. City of Berkeley*, 454 U.S. 290, 299 (1981).

that money earmarked and "directed through an intermediary" must be treated as if the

contribution had come from the person directing the earmark covers only explicit pass-

through schemes. 52 U.S.C. § 30116(a)(8). As the Supreme Court has twice recognized:

> The earmarking provision . . . would reach only the most clumsy attempts
> to pass contributions through to candidates. To treat the earmarking
> provision as the outer limit of acceptable tailoring would disarm any
> serious effort to limit the corrosive effects of . . . "understandings"
> regarding . . . what interests particular donors are seeking to promote.

*FEC v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431, 462-63 (2001).

*Accord FEC v. Beaumont*, 539 U.S. 146, 160 (2003).

Most fundamentally, existing straw donor prohibitions apply only to schemes in

which one person is knowingly substituted for another as the contribution's true source,

and earmarking rules apply only to situations in which a donor expressly directs that

money be passed on to a specific campaign committee—not to more generalized transfers

of money. Thus, if a donor contributes $1,000,000 to a limited liability corporation or a

section 501(c)(4) nonprofit corporation and instructs the recipient to use the money to

support "liberal," "conservative," "pro-choice," or "pro-life" candidates, and those funds

are then laundered one or more times through other organizations before they are spent on

likeminded campaign ads, the absence of specific earmarking or giving in the name of

another will allow those transfers to avoid being properly disclosed. Without a law like

the VRTKA, voters will remain in the dark about the true source of the resulting million

dollar expenditures.

Further, the Supreme Court has made clear that donor disclosure can extend

beyond expressly earmarked contributions. It upheld the federal electioneering

communications disclosure statute, 52 U.S.C. § 30104(f)(2)(E)-(F), that requires groups to

disclose *all* of their donors if they do not fund such communications through a segregated

account established exclusively for that purpose. *McConnell*, 540 U.S. at 194-202. *Accord*

*Ctr. for Individual Freedom, Inc. v. Tennant*, 706 F.3d 270, 292 (4th Cir. 2013)

(upholding disclosure requirement without earmarking limitation because "*McConnell*

12

compels us to find that [it] is constitutional"); *Gaspee Project*, 13 F.4th at 95. Indeed, the Fourth Circuit reversed a decision for imposing an "earmark" limitation to "cure" the alleged unconstitutionality of a disclosure requirement. *Tennant*, 706 F.3d at 292. As this Circuit recently found, no court has held that a law "fails narrow tailoring unless it is limited to the disclosure of earmarked contributions." *No on E*, 62 F.4th at 545.

### 3.     The Act is not underinclusive.

Plaintiffs allege (Compl. ¶¶ 11, 36-37, 83-85) that the Act is underinclusive because of its purported failure to regulate business income, unions, and media and technology companies. But Plaintiffs misconstrue the Act, and moreover, face an extremely heavy burden to show that the Act is unconstitutional because it supposedly fails to require *more* disclosure about campaign media spending: "[T]he First Amendment imposes no freestanding underinclusiveness limitation." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015) (citations and quotation marks omitted). As the Supreme Court has noted, it often upholds law "even under strict scrutiny—that conceivably could have restricted even greater amounts of speech in service of their stated interests." *Id.*

Contrary to Plaintiffs' suggestion (Compl. ¶ 84), unions receive no special treatment under the Act. Although the definition of "business income" includes up to $5,000 in membership or union dues from any one person in a calendar year, A.R.S. § 16-971(1)(b), that definition applies to *all* membership organizations, not just unions— including, for example, the Chamber of Commerce and all other business-oriented membership organizations.

Second, while it is true that the definition of "campaign media spending" excludes "news story, commentary or editorial" distributed through a variety of media, this exception is nearly identical to the so-called media exemption in federal law which the Supreme Court upheld in *McConnell*: "[52 U.S.C. § 30104(f)(3)(B)(i)] excepts news items and commentary only; it does not afford *carte blanche* to media companies generally to ignore [the Federal Election Campaign Act's (FECA)] provisions." *McConnell*, 540 U.S. 208-09 (citations and quotation marks omitted). Although *Citizens United* called into

question the media exemption's application to FECA's prohibition on corporations using their general treasury profits to finance independent expenditures, 558 U.S. at 352-354, the Court did not find FECA's disclosure requirements underinclusive. Citizens United was thus required to abide by those requirements regarding ads it had created to publicize a movie about Hillary Clinton. *Id.* at 366-72.

Third, although Plaintiffs allege (Compl. ¶ 37) that "tech companies have a wholesale exemption from the definition of 'campaign media spending,'" that is incorrect. Just as *McConnell* explained, this exemption covers only news items and commentary. If such material is published on a website, it is included in the Act's media exemption, but it is not a privilege that applies categorically to certain industries, tech-related or otherwise.

## C.    Plaintiffs' Sweeping Allegations Would Undermine Almost All Electoral Disclosure Laws.

Most of Plaintiffs' allegations focus on the relationship between Plaintiffs and their direct donors, not the original sources who might be identified under the Act. Plaintiffs, for example, allege (Compl. ¶ 46) that they "do not share information about a donor absent the donor's explicit permission to do so." Similarly, Plaintiffs allege (*id.* ¶ 60) that even "Proposition 211's compelled disclosures . . . of *direct* donors" "rest on the false assumption that donors to large, heterodox organizations support *all* of the many issues and candidates that these organizations spend money supporting across the nation." But many campaign finance disclosure laws require that election-related spenders report their direct donors—usually with a reporting threshold far below the Act's—without any criteria related to how many issues the donors and receiving organizations agree upon.[8] No precedent suggests there is a constitutional right to guaranty the confidentiality of donors in the electoral context or that donor disclosure can be required only if donors'

---

[8]  By way of comparison, under FECA, persons who make "electioneering communications" must file disclosure reports once they have spent more than $10,000 on such communications and must disclose contributors who gave $1,000 or more. 52 U.S.C. § 30104(f)(1) & (2)(E). Persons who make "independent expenditures" must file disclosure reports once they have spent more than $250 on such communications and must disclose contributors who gave more than $200. 52 U.S.C. § 30104(c)(1) & (2)(C).

contributions are expressly tied to particular communications. In other words, Plaintiffs'
conclusory allegations prove too much and, if accepted, would threaten most existing
campaign finance disclosure laws. *See also No on E*, 62 F.4th at 541 (noting that the
disclosure "laws at issue further the governmental interest in revealing the source of
campaign funding, not ensuring that every donor agrees with every aspect of the
message").

Plaintiffs allege generally (Compl. ¶ 12) that "[p]ublic disclosure and broadcasting
will make individuals less likely to donate to advocacy and other non-profits such as
Plaintiffs," but the Supreme Court long ago recognized that disclosure laws might have
that effect on some donors when it upheld such laws:

> It is undoubtedly true that public disclosure of contributions . . . will deter
> some individuals who otherwise might contribute. . . . These are not
> insignificant burdens on individual rights, and they must be weighed
> carefully against the interests which Congress has sought to promote by this
> legislation. In this process, we note . . . that disclosure requirements certainly
> in most applications appear to be *the least restrictive means of curbing the
> evils of campaign ignorance and corruption* that Congress found to exist.

*Buckley*, 424 U.S. at 68 (footnotes omitted; emphasis added). In sum, Plaintiffs pay little
attention to any unique harms stemming from the specific traceback requirements of the
Act and instead attempt to avoid the well-established, constitutional requirement to
disclose donors whose money Plaintiffs use to influence elections.

## II.     Plaintiffs Cannot Demonstrate That the VRTKA Is Unconstitutional As Applied to Them.

Even if Plaintiffs could prove all the allegations in their complaint, they would still
fail to qualify for an as-applied exemption under *NAACP v. Alabama ex rel. Patterson*,
357 U.S. 449 (1958). The Supreme Court has recognized an exemption from disclosure
for the members of politically and socially marginalized groups, like the tiny Socialist
Workers' Party of Ohio (SWP), who can show a "reasonable probability" of harassment
and reprisals if their donors are disclosed. *See Brown v. Socialist Workers '74 Campaign
Comm. (Ohio)*, 459 U.S. 87, 88 (1982). Politically powerful actors like AFP, however, are
"a far cry from the sixty-member SWP," which was "repeatedly unsuccessful at the polls,

and incapable of raising sufficient funds." *ProtectMarriage.com v. Bowen*, 830 F. Supp. 2d 914, 928 (E.D. Cal. 2011), *aff'd in part, dismissed in part as moot sub nom. Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827 (9th Cir. 2014). And groups who have won this exemption in the past have often had members who suffered *governmental* harassment and surveillance. *See Brown*, 459 U.S. at 99.

Plaintiffs do not allege that their organizations have suffered the kind of violence, threats, harassment, or reprisals that warranted exemptions for the SWP and NAACP. Moreover, unlike those vulnerable organizations, Plaintiffs do not even allege that they are membership organizations, but instead focus (Compl. ¶¶ 12, 15, 16, 43) on vague allegations about possible harassment of their *donors*. But their donors are not plaintiffs here, and Plaintiffs have made no allegation either that they are representing their donors in any sort of organizational capacity or that their members, if they have any, face harm. Moreover, Plaintiffs have not alleged any reason why disclosing the original sources of the funds they use for campaign spending presents any different or heightened risk that would implicate *NAACP*-style harassment concerns.

As discussed above, the Court has long recognized that disclosure might discourage some donors from making contributions, so Plaintiffs' vague theory (Compl. ¶ 12; emphases added) that public disclosure "will make individuals *less likely* to donate to advocacy and other nonprofit organizations *such as Plaintiffs*" cannot support an as-applied challenge—especially since this allegation does not even assert that *Plaintiffs themselves* will receive fewer donations. Indeed, Plaintiffs (*id.* ¶¶15-16) do not include any allegations of harm to themselves. Instead, Plaintiffs focus (Compl. ¶ 111) on their donors' purported preference for anonymity and Plaintiffs' past organizational pledges to maintain donor confidentiality. But a disclosure law is not unconstitutional simply because an organization has operated with greater secrecy in the past and wishes to continue doing so. And Plaintiffs do not allege that any specific donor has notified them of an intent to stop donating because of the Act's disclosure requirements. *No on E*, 62 F.4th at 543 (finding that "donors' alleged desire not to have their names listed" is

insufficient to establish that disclosure creates real "deterrent effect" on fundraising).

Moreover, Plaintiffs are national, extremely well-funded organizations.[9] Plaintiffs admit (Compl. ¶ 43) that prior to Proposition 211, they already had long experience with "critics" and "opponents." Nothing in Plaintiffs' complaint alleges that they intend to spend such a significant amount of money to influence Arizona elections that the disclosures required by the Act would create a noticeable increase in the amount of attention, much less potential harassment, that they or their donors might receive. Instead, Plaintiffs rely on dicta regarding donor harassment in unrelated past cases, such as *Bonta*. *See* Compl. ¶¶ 108-09. Insofar as Plaintiffs purport to rely on that case, however, the Supreme Court made no findings there as to whether AFPF merited an as-applied exemption from the law at issue there.

Finally, insofar as Plaintiffs have generally alleged (Compl. ¶¶ 108, 109) that they have faced "fierce critics," "boycotts," and "protests," it would be antithetical to the First Amendment to insulate them from lawful criticism spurred by their own speech. "[A] principal 'function of free speech . . . is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.'" *Texas v. Johnson*, 491 U.S. 397, 408-409 (1989) (citation omitted).

**III.    Conclusion**

The Court should dismiss Plaintiffs' complaint with prejudice.

---

[9]  In 2021, AFP's total revenue was $113,776,550, and AFPF's was $11,877,459. https://s3.documentcloud.org/documents/23404092/2021-americans-for-prosperity-990.pdf; https://s3.documentcloud.org/documents/23404093/2021-americans-for-prosperity-foundation-990.pdf. Their affiliated super PAC, Americans for Prosperity Action ("AFPA"), had total federal receipts in 2021-22 of $78,515,133. https://www.fec.gov/data/committee/C00687103/. In the same period, AFPA spent $69,495,635 on independent expenditures and reported the names of hundreds of donors. https://www.fec.gov/data/receipts/?committee_id=C00687103&two_year_transaction_period=2022&data_type=processed. Plaintiffs make no allegations that such donors have faced any harassment from these disclosures.

1    DATED this 28th day of April, 2023.

2

3                                    ARIZONA CENTER FOR LAW IN
                                     THE PUBLIC INTEREST
4

5                                    Daniel J. Adelman
                                     Chanele N. Reyes
6                                    352 E. Camelback Rd., Suite 200
                                     Phoenix, AZ  85012
7

8                                    CAMPAIGN LEGAL CENTER ACTION

9                                    */s/ Tara Malloy*
                                     David Kolker (*pro hac vice*)
10                                   Tara Malloy (*pro hac vice*)
                                     Elizabeth D. Shimek (*pro hac vice*)
11                                   1101 14th St., NW, Suite 400
                                     Washington, DC 20005
12

13                                   *Attorneys for Voters' Right to Know*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28