Mary R. O'Grady, 011434
James D. Smith, 016760
Emma J. Cone-Roddy, 034285
Sarah P. Lawson, 036436
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2000
Phoenix, Arizona 85012
(602) 640-9000
mogrady@omlaw.com
jsmith@omlaw.com
econe-roddy@omlaw.com
slawson@omlaw.com

Attorneys for Defendants Damien R. Meyer; Amy B. Chan; Galen D. Paton; Mark Kimble; Steve M. Titla; Thomas M. Collins

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Americans for Prosperity, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>Damien R. Meyer, et al.,<br><br>Defendants. | Case No. CV-23-00470-PHX-ROS<br><br>DEFENDANTS DAMIEN R. MEYER, AMY B. CHAN, GALEN D. PATON, MARK KIMBLE, STEVE M. TITLA, AND THOMAS M. COLLINS' MOTION TO DISMISS |

More than 72% of Arizona voters in the 2022 general election passed The Voters' Right to Know Act ("Prop. 211" or "the Act"), a citizens' initiative requiring disclosure of large contributions to political advertising. This law requires transparency, allowing Arizona voters to make informed decisions by disclosing who is spending tens of thousands of dollars to influence elections in Arizona.

This lawsuit brings facial and as-applied challenges under the First Amendment to Prop. 211. Plaintiffs allege that disclosing their high-dollar donors will violate the First Amendment by chilling speech and compelling association. But Courts have upheld campaign finance disclosure requirements for decades, recognizing the importance of

1   providing voters information about who is trying to influence their vote.  *E.g., Citizens*

2   *United v. FEC*, 558 U.S. 310, 367 (2010); *Buckley v. Valeo*, 424 U.S. 1, 67 (1976).

3           Plaintiffs have not alleged facts to support their burden.  Despite a meandering and

4   lengthy Complaint chock-full of legal arguments, they did not plead facts showing *any*

5   likelihood that disclosing certain high-level donors would chill speech by subjecting them

6   (or anyone else) to threats, harassment, or reprisals.  And nothing in Plaintiffs' Complaint

7   addresses that the Supreme Court—and courts across the country—have upheld more

8   rigorous electioneering disclosure requirements.   Simply put, these disclosure

9   requirements do not prohibit or limit speech and do not violate the First Amendment.

10  Defendants Damien R. Meyer, Amy B. Chan, Galen D. Paton, Mark Kimble, Steve M.

11  Titla, and Thomas M. Collins (collectively, the "Commission Defendants") request that

12  the Court dismiss the Complaint with prejudice because it fails to state a claim for which

13  relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).[1]

14                          **The Applicable Legal Standards**

15          While the Court presumes the truth of well-pleaded facts now, it need not accept

16  conclusory statements or legal conclusions (even if cast as factual allegations).  *E.g.*,

17  *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017) (affirming dismissal); *Coto*

18  *Settlement v. Eisenberg*, 593 F.3d 1031, 1034 (9th Cir. 2010).

19          To prevail on their facial challenges, Plaintiffs must either "establish that no set of

20  circumstances exists under which the [law] would be valid" or show that Prop. 211 has a

21  "substantial number of [] applications [that] are unconstitutional, judged in relation to the

22  statute's plainly legitimate sweep."  *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373,

23  2387 (2021) (citations omitted).[2]

24

25  [1] Alternatively, the Commission Defendants ask the Court to order Plaintiffs to make a
    more definite statement under Rule 12(e) with a short, plain statement of the *facts* they

26  allege entitles *them* to relief, rather than legal theories and argument.  *See* Fed. R. Civ. P.
    8(a)(2) & (d)(1).

27  [2] *Bonta* is the centerpiece of the Complaint.  It is not a campaign funding/disclosure case.
    There, a regulation required *every* charity to disclose everyone who donated $5,000 or

28  more, ostensibly for anti-fraud efforts.  The state, however, *never* used that information

                                        2

To state an as-applied First Amendment challenge to Prop. 211, Plaintiffs must plead facts showing "a reasonable probability that disclosure of its contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties." *Citizens United*, 558 U.S. at 367 (quotation marks and citation omitted). The Complaint does not satisfy these standards.

### Prop. 211 Statutory Framework

Prop. 211 (codified at A.R.S. §§ 16-971 to -979; *see also* 2022 Ariz. Legis. Serv. Prop. 211) requires disclosing original sources of funds that exceed specified thresholds and are used for "campaign media spending." A.R.S. § 16-973. By requiring the disclosure of the original source of funds, it uncovers what is referred to as "dark money," which results from transferring contributions, often through multiple intermediaries, to hide the original source. Ex. 1, Prop. 211 § 2(C).[3]

Prop. 211 is tailored to fit this legitimate purpose. It requires only "covered person[s]"—people/entities whose campaign media spending is more than $50,000 on statewide elections and more than $25,000 on other elections—to disclose the sources of donations exceeding $5,000. A.R.S. §§ 16-971(7), 16-973(A). "Campaign media spending" are expenditures for certain public communications related to election campaigns, as well as the research and similar preparation behind the public communication. *Id.* § 16-971(2). The law requires a covered person to notify contributors before using their donations for campaign media spending; the donors then have a chance to opt out, so Prop. 211 does not compel association. *Id.* § 16-972(B). If donors opt out, the covered person cannot use their money on campaign media spending, and the covered person does not disclose those donors. *Id.* A donor who opts out may still donate to the covered person; opting out just prevents the covered person from using that money for

---

to initiate an investigation. 141 S. Ct. at 2386. The state gathered information for law enforcement's convenience, not for electioneering disclosure.

[3] Excerpts from the Secretary of State's publicity pamphlet relating to Prop. 211 are attached as Exhibit 1. The Court may take judicial notice of this public record. *E.g.*, *Xcentric Ventures, L.L.C. v. Borodkin*, 908 F. Supp. 2d 1040, 1046 (D. Ariz. 2012).

campaign media spending.

Donations are traced to the original sources of the funds; that is, an individual's personal money or an organization's business income. *Id.* § 16-971(12), (14), (1). Large-dollar donors cannot hide their involvement by funneling contributions through intermediary shell companies. The covered person must collect information so it can disclose who provided the "original monies" being spent. *Id.* §§ 16-971(1), (12), (14), -972(D), (E). The covered person may rely on information from the donors to make its report unless "the covered person knows or has reason to know that the information relied on is false or unreliable." *Id.* § 16-973(D). A covered person files any reports with the Secretary of State after spending $50,000 on a statewide campaign or $25,000 on other campaigns. *Id.* § 16-973(A).

The Arizona Citizens Clean Elections Commission (the "Commission") is responsible for enforcing the Act. *Id.* § 16-974(A). Not surprisingly, it may adopt and enforce rules, initiate enforcement actions, and perform other acts to assist in implementing the law. *Id.* The Commission also may impose civil penalties. *Id.* § 16-976(A). The Commission's enforcement decisions are subject to judicial review. *See id.* §§ 16-974(B) (opportunity for judicial review for party against whom penalty imposed); 12-910 (judicial review of administrative decisions).

**Argument**

## I.    PROP. 211 DOES NOT VIOLATE THE FIRST AMENDMENT BY CHILLING SPEECH (Count I).

Prop. 211 establishes disclosure requirements for election-related spending. It does not prohibit or limit any person or entity from expressing political views. "Disclaimer and disclosure requirements . . . do not prevent anyone from speaking." *Citizens United*, 558 U.S. at 366 (citation and quotation marks omitted). Indeed, "disclosure permits citizens and shareholders to react to the speech of corporate entities in a proper way." *Id.* at 371 (upholding disclosure requirements under Bipartisan Campaign Reform Act of 2002). Courts review such disclosure requirements under

"exacting scrutiny."  Under that standard, Prop. 211 must have a "substantial relation" with a "sufficiently important" governmental interest, *Citizens United*, 558 U.S. at 366-67, and the "strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights," *Americans for Prosperity*, 141 S. Ct. at 2378 (citation omitted).  Prop. 211 must be "narrowly tailored to the government's asserted interest," but it need not "be the least restrictive means of achieving [its] ends . . . ." *Id.*  Like other disclosure laws across the country, Prop. 211 meets those standards.

### A.    Plaintiffs' Facial Challenge Fails.

#### 1.    Prop. 211 Serves Substantial Government Interests.

Courts have identified at least four important interests behind election disclosure requirements.  First, disclosure provides voters information about who is spending money to influence elections; it lets the public better assess the messages and the candidates. *Buckley*, 424 U.S. at 67.  Second, transparency deters corruption by exposing the sources of money, letting voters assess post-election favors elected officials might be providing. *Id.*  Third, a "State indisputably has a compelling interest in preserving the integrity of its election process," so it "may enact laws . . . when necessary to ensure that elections are fair and honest." *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989). Fourth, the government has an administrative interest to promote those three interests. *Buckley*, 424 U.S. at 67-68; *see also Citizens United*, 558 U.S. at 368 (disclosures permit the people to evaluate election arguments).

These are commonsense principles. "[D]isclosure permits citizens and shareholders to react to the speech of corporate entities in a proper way.  This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages." *Citizens United*, 558 U.S. at 371.  The Ninth Circuit recently affirmed the importance of the "strong governmental interest in informing voters about who funds political advertisements." *No on E, San Franciscans Opposing the Affordable Hous. Prod. Act v. Chiu*, 62 F.4th 529, 540 (9th Cir. 2023) (collecting cases).  Cases

5

throughout the country describe these interests as important or compelling.[4]

Prop. 211's disclosure requirements serve these interests. It "is intended to protect and promote rights and interests guaranteed by the First Amendment . . . to promote self-government and ensure responsive officeholders, to prevent corruption and to assist Arizona voters in making informed election decisions by securing their right to know the source of monies used to influence Arizona elections." Ex. 1, Prop. 211 § 2(B).

### 2. Prop. 211 Is Narrowly Tailored to Advance Important Interests.

Plaintiffs ignore that Prop. 211 is narrowly tailored to meet the purposes described above. The disclosure requirements apply only to entities that spend more than $50,000 in statewide campaigns or more than $25,000 in other campaigns. A.R.S. § 16-973(A); *see also* A.R.S. § 16-971(7). The law does not apply to individuals or organizations that spend their own money on "campaign media spending." A.R.S. § 16-971(7)(b)(i), (ii). In addition, only donors that give more than $5,000 are disclosed. A.R.S. § 16-973(A)(6), (G). And there are exceptions to prevent harm to donors in particular cases. A.R.S. § 16-973(F). A donor can also avoid disclosure by opting out of the organization using its donation for campaign media spending. A.R.S. § 16-972(B), (C). All of these factors narrowly tailor Prop. 211 to advance the important governmental interests it serves.

### 3. Plaintiffs' Facial Overbreadth Challenge Fails.

Facial overbreadth challenges stretch notions of standing; the complaining party is arguing about potential harm to *others*. Thus, "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 801

---

[4] *E.g.*, *Gaspee Project v. Mederos*, 13 F.4th 79, 86 (1st Cir. 2021) ("[T]he Board's interest in an informed electorate *vis-à-vis* the source of election-related spending is sufficiently important to support reasonable disclosure and disclaimer regulations."); *Alaska Right to Life Comm. v. Miles*, 441 F.3d 773, 791-92 (9th Cir. 2006) (informational interest, anti-corruption interest, and administrative interest are "compelling"); *Comm. for Just. & Fairness v. Ariz. Sec'y of State's Off.*, 332 P.3d 94, 107 (Ariz. Ct. App. 2014) (informational interest, the anti-corruption interest, and administrative interest are "sufficiently important" to require disclosure).

(1984).  Courts require that "a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep.  Invalidation for overbreadth is strong medicine that is not to be casually employed."  *United States v. Williams*, 553 U.S. 285, 292-93 (2008) (citations and quotation marks omitted).

> ### a.  Nothing requires that Prop. 211 encompass only groups or donors with a "major purpose" of electioneering.

Plaintiffs' scattershot Complaint makes it unclear what exactly concerns them. They first seem to contend (Doc. 1 ¶¶ 58-60) that Prop. 211 reaches groups and donors that do not have a major purpose of spending on elections.  But no authority requires Prop. 211 to have a more limited scope of disclosure.  If groups or donors are funding campaign media spending, the identified government interests exist even if campaign media spending is not a "major" purpose.  Holding otherwise deprives voters of information about the sources of monies used to influence elections.

*Citizens United* confirms that applying disclosure and disclaimer requirements to organizations for which campaign media spending is not a major purpose bears a substantial relationship to government interests.  Requiring non-political committees to disclose their donors was justified because "the public has an interest in knowing who is speaking about a candidate shortly before an election."  *Citizens United,* 558 U.S. at 369.

Likewise, the Ninth Circuit's recent decision in *No on E* rejects Plaintiffs' theory. That ballot proposition required disclosing secondary donors if they were one of the top three contributors to a committee.  The "secondary-contributor requirement is substantially related to" the government's strong interest in informing voters about who funds political advertisements.  *No on E*, 62 F.4th at 540.  "[I]ndividuals and entities interested in funding election-related speech often join together in ad hoc organizations with creative but misleading names" obscuring the interests supporting a ballot measure, keeping valuable information from voters.  *ACLU of Nev. v. Heller*, 378 F.3d 979, 994 (9th Cir. 2004).

Prop. 211's original source disclosure requirement lets voters learn about the "actual contributors to such groups and thereby provide useful information concerning the interests supporting or opposing a ballot proposition or a candidate." *Id.* "[T]here is a compelling state interest in informing voters who or what entity is trying to persuade them to vote in a certain way." *Alaska Right to Life Comm.,* 441 F.3d at 793. And that "important (and even compelling) informational interest" extends to ballot measure committees. *Family PAC v. McKenna*, 685 F.3d 800, 806 (9th Cir. 2012) (upholding Washington law requiring disclosure of $25 or more to political committees). "Knowing which interested parties back or oppose a ballot measure is critical, especially when one considers that ballot-measure language is typically confusing, and the long-term policy ramifications of the ballot measure are often unknown." *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1105-06 (9th Cir. 2003); *see also Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520, 543 (9th Cir. 2015) (disclosing identities of ballot measure proponents "is substantially related to the government's important interests").

### b. No constitutional principle requires donors to "earmark" their contributions or that Arizona choose Plaintiffs' preferred approach.

Many of Plaintiffs' arguments turn on hypothetical situations; they do not plead facts showing the situations exist. Thus, it is crucial to remember Plaintiffs must (1) establish that no set of circumstances exists under which Prop. 211 would be valid or (2) show that Prop. 211 has a substantial number of applications that are unconstitutional, judged in relation to its plainly legitimate sweep. *Bonta*, 141 S. Ct. at 2387. Musings about how many angels can dance on the head of a pin do not meet that burden. Plaintiffs' arguments highlight why "[f]acial challenges are disfavored . . . . [T]hey raise the risk of premature interpretation of statutes on the basis of factually barebones records." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008) (citation and quotation marks omitted).

Plaintiffs hypothesize that unidentified donors may contribute more than $5,000

to groups without knowing the groups would funnel that money to electioneering.  Those unidentified, fictional donors may then be surprised to learn the organization to which they contributed sent money to a different organization.  In Plaintiffs' view, the only constitutionally permissible approach is to allow disclosure only if those donors earmark their contributions for that electioneering.  (Doc. 1 ¶¶ 60-68.)  Of course, Plaintiffs have not alleged that anyone falls into this category of donating more than $5,000 but not realizing the recipient spends the money on electioneering.

The First Circuit rejected an argument like Plaintiffs' in *Gaspee Project*. Arguments that "many general-fund donors may not endorse all of an organization's election-related expenditures" erroneously ignore the "ample opportunity for donors to opt out from having their donations used for independent expenditures or electioneering communications . . . ."  *Gaspee Project*, 13 F.4th at 89.  In addition to opting out of electioneering, donors may contribute less than the thresholds.  *Id.*  Prop. 211 offers those same offramps.  A.R.S. §§ 16-972(B)–(E), 16-973(A), (G).

In fact, the Ninth Circuit recently held that the First Amendment does not require limiting disclosure to contributors who earmarked donations only for electioneering. "[P]roviding information to the electorate may require looking beyond the named organization that runs the advertisement."  *No on E*, 62 F.4th at 540.  Disclosing secondary contributors "is substantially related to the government interest in informing the electorate" because "the interest in learning the source of funding for a political advertisement extends past the entity that is directly responsible . . . ."  *Id.* at 541.  The Court also rejected Plaintiffs' argument that disclosure "compels" association between contributors and organizations they may not support; these laws "further the governmental interest in revealing the source of campaign funding, *not ensuring that every donor agrees with every aspect of the message*."  *Id.* (emphasis added).

Related is Plaintiffs' argument (Doc. 1 ¶¶ 69-73, 96-103) that other states' laws and federal law use approaches that Plaintiffs prefer.  Again, there is no constitutional principle giving Plaintiffs the right to dictate how states pursue their important interests.

1   No constitutional standard asks whether a statute could be "better" (in some subjective
2   way).  Disclosure "requirements need not reflect the least restrictive means available to
3   achieve the [government's] goals" so long as they "achieve a reasonable fit."  *Gaspee*
4   *Project*, 14 F.3d at 88; *see also Bonta*, 141 S. Ct. at 2384 (exacting scrutiny does not
5   require "the least restrictive means of achieving" government interest).  Prop. 211 has
6   that reasonable fit.

7                    **c.    Plaintiffs' various criticisms of Prop. 211 do not support
8                            their overbreadth claim.**

9           Plaintiffs also complain (Doc. 1 ¶¶ 76-79) that Prop. 211 defines "campaign media
10  spending" too broadly.  But that phrase is limited to paid communication referring to
11  named candidates, initiatives or referenda, recalls of public officials, and candidates of
12  identified   political   parties   (A.R.S.   § 16-971(2)(a))   and   preparations   for   those
13  communications.  *Id.* § 16-971(2)(a)(vii).[5]  There is no First Amendment violation just
14  because Plaintiffs prefer a more limited definition.

15          Plaintiffs' fanciful hypotheticals about "campaign media spending" (Doc. 1 ¶¶ 77-
16  78) do not meet their pleading burden.  First, they did not plead that such things occurred.
17  Second, their hypotheticals misinterpret the law.  The theoretical advocacy group that
18  wanted to discuss immigration before the 2016 election would fall under Prop. 211 only
19  if it named Joe Arpaio (a candidate for county office) in the 90 days before the primary
20  and spent more than $25,000 on communications within the scope of the Act.

21          Plaintiffs misunderstand recalls when suggesting (Doc. 1 ¶ 78) that "any speech
22  that criticizes or praises an existing officeholder" falls under A.R.S. § 16-971(2)(a)(v).
23  Until someone applies for a recall petition, there is no recall possibility that the law
24  covers.  *See* A.R.S. §§ 19-202.01 & -203 (application for recall petition; recall petition).

25          Plaintiffs then complain (Doc. 1 ¶¶ 79-80) about enforcement.  They posit that
26  actors with mal intent may suggest anything "hot button" is "partisan" and falls under

27  _____
28  [5] This preparation concept captures a covered person that spent $100,000 preparing an
    elaborate video but only $20,000 disseminating it.

Prop. 211.  That ignores basic principles for interpreting legal text.  In this context, the ordinary meaning of "partisan" is relating to political party activity.  *See* A.R.S. § 16-971(2)(a)(vi).[6]  Likewise, they speculate (Doc. 1 ¶ 80) about bad actors using the disclosure requirements to harass political opponents.  If speculating about misuse of a statute or regulation sufficed, then every facial challenge would succeed.  Plus, Plaintiffs ignore that the legal action they worry about is against the Commission (not against the offending party) and requires a neutral judicial officer's involvement.  A.R.S. § 16-977(C).

Plaintiffs' next overbreadth, chilling argument (Doc. 1 ¶¶ 81-82) relates to hypothetical out-of-state donors who are surprised to learn their $5,000+ contribution went to Arizona electioneering.  These hypothetical contributors also must have failed to opt out.  A.R.S. § 16-972.  The Act's opt-out provision prevents Prop. 211 from ensnaring unsuspecting large-dollar contributors.

Likewise, Plaintiffs misunderstand (Doc. 1 ¶ 82) how the law applies to materials posted on the internet.  Prop. 211 applies to a communication within 90 days of an election that refers to a candidate *and* is "disseminated in the jurisdiction" of the election.  A.R.S. § 16-971(2)(a)(iii).  Americans for Prosperity passively posting something on its Virginia-based website mentioning an Arizona candidate alone is not "disseminating" it here.  Dissemination means directing the communication toward Arizona, not passively including a post on a Virginia website.  *See, e.g.*, *Atl. Asset Mgmt. Grp., Inc. v. Csira*, 328 F. Supp. 2d 614, 619 (E.D. Va. 2004) (passive postings on website cannot establish personal jurisdiction).  Moreover, under A.R.S. § 16-971(b)(i), such a posting on a website is not campaign media spending.

Last, Plaintiffs argue (Doc. 1 ¶¶ 104-05) that Prop. 211 somehow interferes with the right to petition.  None of the cases Plaintiffs cited addressed campaign spending.  In fact, *McDonald v. Smith*, 472 U.S. 479, 485 (1985) (cited at Doc. 1 ¶ 104), emphasized

---

[6] Title 16 often uses "partisan."  Every context refers to a recognized political party or party affiliation.  *E.g.*, A.R.S. §§ 16-314(C), 16-544(D) & (G)(1), 16-901(38).

1    "there is no sound basis for granting greater constitutional protection to statements" made

2    under the Petition Clause.   *McDonald* rejected creating an implied Petition Clause

3    privilege for defamatory statements in communication to government officials.   Just as

4    courts have upheld campaign disclosure laws against other First Amendment challenges,

5    Plaintiffs' novel Petition Clause challenge also fails.

6    In sum, nothing in Plaintiffs' 67-page, 124-paragraph Complaint supports a claim

7    that these disclosure requirements are unconstitutionally overbroad.

8    ### 4.   Plaintiffs' Authority Refutes Their Underinclusiveness Argument.

9

10   Plaintiffs cite (Doc. 1 ¶ 83) *Mariani v. United States*, 212 F.3d 761 (3d Cir. 2000),

11   to argue that Prop. 211 is unconstitutional because it is underinclusive, but *Mariani*

12   rejected that argument.   The "First Amendment underinclusiveness analysis requires

13   neither a perfect nor even the best available fit between ends and means."   *Id.* at 774

14   (rejecting challenge to campaign funding law).   There is not a "requirement that [a law]

15   redress the harm completely."   *Id.*   The Commission Defendants agree.

16   Plaintiffs' arguments are based on misunderstandings about Prop. 211's scope.

17   For example, they misread Prop. 211's provision about dues of business organizations

18   (*e.g.*, Chamber of Commerce) and labor unions.   A.R.S. § 16-971(1)(b).   The law treats

19   membership dues as business income because they are the income of organizations and

20   unions for the work they do for their members.   The $5,000 annual cap just prevents

21   organizations from evading the law by concealing campaign spending donations as

22   membership dues.   This is a policy decision that has no constitutional implications.

23   Prop. 211 includes no exclusion for "tech companies."   (Doc. 1 ¶ 85.)   With limited

24   exceptions, Prop. 211 does not apply to websites, A.R.S. § 16-971(2)(b)(i), which would

25   affect Plaintiffs as well as other organizations that have websites.   The argument (Doc. 1

26   ¶ 85) about media companies also misses the mark.   Federal law likewise excludes media

27   companies' stories and editorials from disclosure requirements, 52 U.S.C.

28   § 30104(f)(3)(B)(i), as do other Arizona campaign finance laws, A.R.S. §16-911(B)(2)

(exceptions from definition of contribution).  Paid advertising on media, however, is not exempted.  These definitions do not prevent Prop. 211 from accomplishing its purpose. Plaintiffs' underinclusive argument fails.

### 5.    Prop. 211's Reporting Requirements Are Not Burdensome.

Their arguments about Prop. 211's administrative burdens again misconstrue the Act.  Prop. 211 does not "forbi[d] speech for up to a 21-day period" while donors may opt out (*see* Doc. 1 ¶ 87); it is surprising Plaintiffs would say otherwise.  Of course, Plaintiffs may engage in any speech during those 21 days.  At most, they cannot spend the subject donors' money on campaign media spending during that time, but Plaintiffs could also eliminate that limitation by simply obtaining donor consent when they receive the donations.  A.R.S. § 16-972(C).  In any event, Plaintiffs did not plead any facts suggesting the opt out is affecting anyone's ability to launch campaign media spending.

The gist of Plaintiffs' burden argument (Doc. 1 ¶¶ 87-88, 92) is that "opt-out" provisions in Prop. 211 let donors impede covered entities' speech by prohibiting their monies to be used on campaign media spending.  Plaintiffs appear to lament that donors may choose to contribute to an organization but opt out of its electioneering; it is unclear why giving donors this opt-out right would violate the First Amendment.  Indeed, the donor opt-out is a less burdensome restriction than requiring corporate entities to maintain segregated campaign funds.  *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 261 (1986) ("requiring that contributors may be informed that their money may be used" for campaign purposes is "far more narrowly tailored and less burdensome" than requiring segregated fund).

Plaintiffs complain that it may be burdensome to collect information about indirect donors (Doc. 1 ¶¶ 90-91), but Prop. 211 generally lets covered persons rely on information they receive from their direct donors.  A.R.S. § 16-973.  Likewise, Plaintiffs' complaint that Prop. 211's requirement to keep for five years records of $2,500+ contributions ignores the more stringent recordkeeping requirements in federal law.  *See* 52 U.S.C. § 30102 (requiring keeping records for three years of any contribution

exceeding $50 or aggregating more than $200 in a calendar year).  The Court approved such record keeping requirements in *Buckley* because they "mak[e] it relatively difficult to aggregate secret contributions in amounts that surpass" limits required for disclosure. 424 U.S. at 84.

Yet again, Plaintiffs' authority (Doc. 1 ¶ 94) regarding the administrative burden supports Prop. 211.  Their authority *rejected* facial and as-applied challenges to these reporting requirements:

- Reporting an independent expenditure of over $750 within 48 hours.
- Providing contact information for a person in the organization, contact information for the funding source and any beneficiary, and information about the expenditure.
- Filing an initial report within 48 hours of an independent expenditure.

*Iowa Right to Life Comm., Inc. v. Tooker*, 717 F.3d 576, 592-94 (8th Cir. 2013).  The unconstitutionally burdensome disclosures required regularly reporting (1) cash on hand, (2) contact information for any contributor over $25, (3) total contributions, (4) loans made, (5) contact information for every disbursement recipient plus amount, purpose, and date of every disbursement, (6) disbursements by a consultant, and (7) debts owed.  *Id.* at 596-97.  *And those reporting requirements were ongoing, even if the entity never made another independent expenditure*.  *Id.* at 597.  That is nothing like Prop. 211's event-driven, limited disclosure requirements based on significant donation and spending thresholds.

Plaintiffs' concerns about transfer records (Doc. 1 ¶¶ 93-94) are also unwarranted. Any disclosure requirement requires related recordkeeping for potential enforcement. Prop. 211's requirement that a covered person maintain transfer records, A.R.S. § 16-972(D), serves a legitimate purpose and imposes no unconstitutional burden.

Plaintiffs' facial challenge cannot overcome the caselaw supporting electioneering disclosures, and their claim should be dismissed.

**B.      The As-Applied Challenge Lacks Necessary Factual Allegations.**

To succeed on their as-applied challenge (Doc. 1 ¶¶ 106-15), Plaintiffs must show "a reasonable probability that the compelled disclosure of personal information will subject them to threats, harassment, or reprisals from either Government officials or private parties." *John Doe No. 1 v. Reed*, 561 U.S. 186, 200 (2010) (citation and internal brackets omitted).

*NAACP v. Alabama, ex rel. Patterson*, 357 U.S. 449 (1958), does not help Plaintiffs.  The NAACP "made an uncontroverted showing" that revealing its members' identities "exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility."  *Id.* at 462.  The "Alabama Attorney General sought the group's membership lists" as "part of an effort to oust the organization from the State . . . ."  *Bonta*, 141 S. Ct. at 2382; *see also, e.g.*, *Brown v. Socialist Workers '74 Campaign Comm. (Ohio)*, 459 U.S. 87, 99 (1982) (FBI harassment of Socialist Workers Party justified as-applied exemption).[7]

But nothing in Plaintiffs' Complaint alleges *any* harassment of them, their donors, or their members by anyone in Arizona, whether private or state affiliated.  Plaintiffs allude to past incidents, but it is unclear when those occurred or why those justify a wholesale exemption from otherwise valid campaign finance disclosure laws.[8]

As-applied challenges to a valid disclosure law require far more than what Plaintiffs pleaded.  Such challenges have succeeded in the electioneering context only involving groups "having small constituencies and promoting historically unpopular and almost universally-rejected ideas."  *ProtectMarriage.com v. Bowen*, 599 F. Supp. 2d

---

[7] The NAACP's brief detailed the horrific, state-sponsored and state-tolerated violence its members endured.  Br. of Pet'r, at *12-17, *NAACP v. Alabama, ex rel. Patterson*, No. 91, 1957 WL 87216 (1957).  Plaintiffs are not like the NAACP in the Jim Crow South.

[8] Plaintiffs (Doc. 1 ¶ 43) point to dicta that they have "faced boycotts, personal threats, and even violence" in *Bonta*, 141 S. Ct. at 2381.  The Court did not grant Plaintiffs as-applied relief because that disclosure regime—unrelated to electioneering—was not "narrowly tailored to an important government interest"; instead, it featured California's "interest in amassing sensitive information for its own convenience."  *Id.* at 2389.

15

1197, 1216 (E.D. Cal. 2009) (collecting cases). Only groups "seeking to further ideas historically and pervasively rejected and vilified by both this country's government and its citizens" have been able to avoid disclosure laws that otherwise satisfy exacting scrutiny. *Id.* at 1215; *accord Doe v. Reed*, 823 F. Supp. 2d 1195, 1203-04 (W.D. Wash. 2011) (refusing to grant as-applied exemption for signers of initiative petition).

Plaintiffs also have not alleged that "police were or are now unable or unwilling to mitigate any claimed harassment or are now unable or unwilling to control the same, should disclosure be made," nor that any harassment has occurred in Arizona. *Doe*, 823 F. Supp. 2d at 1212. They did not allege they are a minority, disfavored group. Their as-applied challenge is untenable and fails basic pleading requirements.

## II.   PROP. 211 DOES NOT COMPEL ANY ASSOCIATION; NOTHING COMPELS DONORS TO ASSOCIATE WITH A GROUP (Count II).

The premise of Count II (Doc. 1 ¶¶ 117-24) is that Prop. 211's disclosure requirements compel donors to associate with causes they may not support. Their complaint is based on no factual allegations, only speculation. It also ignores Prop. 211's opt-out opportunity and a donor's ability to avoid disclosure by spending less than the threshold. Beyond that, the claim fails as a legal matter because electioneering disclosures do not compel association between contributors and organizations they may not fully support; these laws "further the governmental interest in revealing the source of campaign funding, *not ensuring that every donor agrees with every aspect of the message*." *No on E*, 62 F.4th at 541 (emphasis added).

Plaintiffs' cited authority (Doc. 1 ¶ 118) is inapposite. They rely on cases involving mandatory union payments for government employees and a mandatory state bar association. *Janus v. AFSCME*, 138 S. Ct. 2448 (2018); *Crowe v. Or. State Bar*, 989 F.3d 714 (9th Cir. 2021). Those lines of cases are worlds apart from Prop. 211's campaign finance disclosure requirements that relate to voluntary contributions and spending.

Plaintiffs' strained hypotheticals (Doc. 1 ¶ 119)—such as a Christian organization donating to a religious freedom organization that also received funding from an Islamic

group—provide no support for their facial or as-applied claim.  Under Plaintiffs' view, the Christian and Islamic groups are "forced" to associate together if the religious freedom organization engaged in electioneering.  Even ignoring the numerous off-ramps Prop. 211 provides to guard against this scenario, such a far-fetched hypothetical situation highlights the problems with facial challenges that make them disfavored.  *Wash. State Grange*, 552 U.S. at 450-51.  Nothing in the Complaint suggests anything like this fictionalized story occurred or likely will occur.

The Supreme Court rejected a similar theory of facial invalidity under the First Amendment based on speculation about "voter confusion" in *Washington State Grange,* 552 U.S. at 455.  The Court declined to "presume" that requiring candidates to self-designate their party preferences in primary elections would confuse voters and affect political parties' associational rights.  *Id.* at 454-55.  Like Plaintiffs, those challengers "brought their suit as a facial challenge," so there was "no evidentiary record against which to assess their assertions that voters will be confused," just "sheer speculation" about that possibility.  *Id.*  So too here.

Plaintiffs' as-applied challenge (Doc. 1 ¶¶ 123-24) is even more deficient.  Plaintiffs did not allege that they contribute to any other organizations that espouse views somehow contrary to what Plaintiffs' contributors believe.  Even more curious is Plaintiffs' allegation (Doc. 1 ¶ 124) that *Plaintiffs* "will be compelled to associate" with organizations they disagree with.  Plaintiffs are sending those organizations money—no one is compelling them to do so, and Plaintiffs control those funds.  The argument is frivolous and provides no basis for a compelled association claim.

## CONCLUSION

Prop. 211 has yet to be enforced and implementing regulations have yet to be written and approved.  Its disclosure requirements comply with the First Amendment.  Plaintiffs' Complaint should be dismissed with prejudice.

1    DATED this 28th day of April, 2023.

2                          OSBORN MALEDON, P.A.

3
                           By s/James D. Smith
4                              Mary R. O'Grady
                               James D. Smith
5                              Emma J. Cone-Roddy
                               Sarah P. Lawson
6                              2929 North Central Avenue, Suite 2000
                               Phoenix, Arizona 85012
7
                               Attorneys for Defendants Damien R. Meyer;
8                              Amy B. Chan; Galen D. Paton; Mark Kimble;
                               Steve M. Titla; Thomas M. Collins
9

10

11

12                    **CERTIFICATE OF SERVICE**

13        I hereby certify that on April 28, 2023, I electronically transmitted the attached

14   document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

15   Notice of Electronic Filing to all CM/ECF registrants.

16        I hereby certify that on April 28, 2023, I served the attached document by first-

17   class mail on the Honorable Roslyn O. Silver, United States District Court, Sandra Day

18   O'Connor U.S. Courthouse, Suite 624, 401 West Washington Street, SPC 59, Phoenix,

19   Arizona 85003-2158.

20

21                               s/Karen McClain

22
     9903816
23

24

25

26

27

28

                                        18