**GREENBERG TRAURIG, LLP**
Dominic E. Draye (AZ Bar No. 033012)
    drayed@gtlaw.com
2375 E. Camelback Rd., Suite 800
Phoenix, AZ 85016
(602) 445-8425

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Derek L. Shaffer (DC Bar No. 478775)*
    derekshaffer@quinnemanuel.com
John F. Bash, III  (DC Bar No. 988874)*
    johnbash@quinnemanuel.com
Jonathan G. Cooper (DC Bar No. 999764)*
    jonathancooper@quinnemanuel.com
Paul D. Henderson (DC Bar No. 1644366)*
    paulhenderson@quinnemanuel.com
1300 I Street NW, Suite 900
Washington, DC 20005
(202) 538-8000
*Admitted *pro hac vice*

Attorneys for Plaintiffs
Americans for Prosperity &
Americans for Prosperity Foundation

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **Americans for Prosperity**, et al., | No. 2:23-cv-00470-ROS |
| Plaintiffs, | |
| v. | **PLAINTIFFS AMERICANS FOR PROSPERITY & AMERICANS FOR PROSPERITY FOUNDATION'S OMNIBUS OPPOSITION TO MOTIONS TO DISMISS** |
| **Damien R. Meyer**, et al., | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

LEGAL STANDARDS ...................................................................................... 2

I.     Federal Rule Of Civil Procedure 8 .......................................................... 2

II.    Exacting Scrutiny .................................................................................. 2

III.   Facial Challenge ................................................................................... 3

IV.   As-Applied Challenge ........................................................................... 3

ARGUMENT ................................................................................................... 4

I.     Proposition 211 Unconstitutionally Chills First Amendment Rights On Its
Face And As Applied to Plaintiffs. .......................................................... 4

   A.    Proposition 211 Is Unconstitutional On Its Face. ............................... 7

     1.   Proposition 211 Is Grossly Overinclusive. ......................................... 8

     2.   Proposition 211 Is Unconstitutionally Underinclusive. ..................... 20

     3.   Proposition 211 Imposes Onerous Administrative Burdens. ............. 23

     4.   Proposition 211 Does Not Advance The State's Purported Interests. ....... 27

     5.   Proposition 211 Unconstitutionally Infringes The Right To Petition. ...... 31

   B.    Proposition 211 Is Unconstitutional As Applied to Plaintiffs. .......... 32

II.    Proposition 211 Unconstitutionally Compels Association. .................... 35

III.   Proposition 211 Differs From All Other Disclosure Laws Defendants Cite. ........ 36

CONCLUSION ................................................................................................ 39

# <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

## <u>Cases</u>

*4805 Convoy, Inc. v. City of San Diego*,
  183 F.3d 1108 (9th Cir. 1999) ................................................................. 8

*Americans for Prosperity Found. v. Bonta*,
  141 S. Ct. 2373 (2021) ............................................................... passim

*Americans for Prosperity v. Grewal*,
  2019 WL 4855853 (D.N.J. Oct. 2, 2019) ....................................... 4

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ......................................... 2, 5, 14, 25, 32, 36

*Assoc. Gen. Contractors of America v. Cal. Dep't of Transp.*,
  713 F.3d 1187 (9th Cir. 2013) ............................................... 3

*Atlantic Asset Management Group, Inc. v. Csira*,
  328 F. Supp. 2d 614 (E.D. Va. 2004) .................................... 13

*Austin v. Michigan Chamber of Commerce*,
  494 U.S. 652 (1990) ................................................................ 22

*BE & K Const. Co. v. NLRB*,
  536 U.S. 516 (2002) ................................................................ 31

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................. 2

*Brown v. Entm't Merchs. Ass'n*,
  564 U.S. 786 (2011) ................................................................ 21

*Brown v. Socialist Workers '74 Campaign Committee*,
  459 U.S. 87 (1982) .................................................................... 4

*Buckley v. Valeo*,
  424 U.S. 1 (1976) ............................................... 4, 20, 28, 32, 33

*Citizens United v. FEC*,
  558 U.S. 310 (2010) ....................................................... 4, 22, 36

*Colonial Savings, FA v. Gulino*,
  2010 WL 1996608 (D. Ariz. May 19, 2010) ............................ 5

ii

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
    657 F.3d 936 (9th Cir. 2011) ....................................................................... 29

*DeGregory v. A.G. of N.H.*,
    383 U.S. 825 (1966) ..................................................................................... 24

*Elrod v. Burns*,
    427 U.S. 347 (1976) ....................................................................................... 3

*First Nat. Bank of Boston v. Bellotti*,
    435 U.S. 765 (1978) ..................................................................................... 27

*Forsyth County v. Nationalist Movement*,
    505 U.S. 123 (1992) ................................................................................ 8, 12

*Human Life of Wash. Inc. v. Brumsickle*,
    624 F.3d 990 (9th Cir. 2010) ....................................................................... 20

*IMDb.com Inc. v. Becerra*,
    962 F.3d 1111 (9th Cir. 2020) ..................................................................... 21

*Indep. Inst. v. FEC*,
    216 F. Supp. 3d 176 (D.D.C. 2016) ........................................................... 14

*Indep. Inst. v. Williams*,
    812 F.3d 787 (10th Cir. 2016) ..................................................................... 14

*John Doe No. 1 v. Reed*,
    561 U.S. 186 (2010) ................................................................................ 3, 30

*Lakewood Citizens Watchdog Grp. v. City of Lakewood*,
    2021 WL 4060630 (D. Colo. Sept. 7, 2021) ............................................... 14

*McCutcheon v. FEC*,
    572 U.S. 185 (2014) ..................................................................................... 16

*McDonald v. Smith*,
    472 U.S. 479 (1985) ..................................................................................... 31

*Minn. Citizens Concerned for Life, Inc. v. Swanson*,
    692 F.3d 864 (8th Cir. 2012) ....................................................................... 38

*NAACP v. Alabama*,
    357 U.S. 449 (1958) ..................................................................................... 28

*NAACP v. City of Richmond,*
   743 F.2d 1346 (9th Cir. 1984) .................................................................. 23

*No On E v. Chiu,*
   62 F.4th 529 (9th Cir. 2023) ............................................................. 37, 38

*Rosen v. Port of Portland,*
   641 F.2d 1243 (9th Cir. 1981) ................................................................... 3

*Shuttlesworth v. City of Birmingham,*
   394 U.S. 147 (1969) .................................................................................. 23

*United States v. Cruikshank,*
   92 U.S. 542 (1876) ................................................................................... 31

*United States v. Stevens,*
   559 U.S. 460 (2010) ................................................................................... 3

*United States v. Swisher,*
   811 F.3d 299 (9th Cir. 2016) ..................................................................... 3

*Van Hollen v. FEC,*
   811 F.3d 486 (D.C. Cir. 2016) ................................................................. 15

*Wash. State Grange v. Wash. State Republican Party,*
   552 U.S. 442 (2008) ................................................................................... 3

*White v. Lee,*
   227 F.3d 1214 (9th Cir. 2000) ................................................................. 31

*Wis. Right To Life, Inc. v. Barland,*
   751 F.3d 804 (7th Cir. 2014) ................................................................... 20

*Yates v. United States,*
   574 U.S. 528 (2015) ................................................................................. 13

## **Constitutional Provisions & Statutes**

U.S. Const. amend. I .................................................................................. 31

52 U.S.C. § 30101 ..................................................................................... 19

52 U.S.C. § 30102 ..................................................................................... 19

52 U.S.C. § 30104 ..................................................................... 20, 22, 36

52 U.S.C. § 30122 ........................................................................................... 29

Ariz. Stat. § 16-971 ................................................................................... passim

Ariz. Stat. § 16-972 ........................................................................................ 23

Ariz. Stat. § 16-973 ................................................................................... passim

Ariz. Stat. § 16-974 ..................................................................................... 9, 14

Ariz. Stat. § 16-977 ............................................................... 6, 11, 14, 18, 37, 38

Ariz. Stat. § 16-1022 ...................................................................................... 29

Ariz. Stat. § 19-202.01 ................................................................................... 11

Ariz. Stat. § 19-203 ........................................................................................ 11

### Rules and Regulations

11 C.F.R. § 104.20............................................................................................ 36

Fed. R. Civ. P. 8 ............................................................................................... 2

Fed. R. Civ. Pro. 12 .......................................................................................... 5

### Other Authorities

Arizona Secretary of State, *2016 Initiatives, Referendums & Recalls—
   Initiative, Referendum and Recall Applications—No. I-22-2016*
   (available at
   https://apps.azsos.gov/election/2016/general/initiatives.htm) ..................... 10

Arizona Secretary of State, *Application for Serial Number, Initiative
   Petition—Protect Arizona Agriculture Act* (May 3, 2019) (available at
   https://apps.azsos.gov/election/2020/general/ballotmeasuretext/I-10-
   2020.pdf)...................................................................................................... 11

*Campaign spending in governor race breaks Arizona record*,
   The Arizona Republic (Jan. 20, 2023) ......................................................... 19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Lorraine Longhi, *The fight for the preserve is over:  Scottsdale voters overwhelmingly approve Prop. 420*, The Arizona Republic (Nov. 6, 2018) (available at https://www.azcentral.com/story/news/local/scottsdale/2018/11/06/scottsdale-proposition-420-desert-edge-development-mcdowell-sonoran-preserve-question-1-sales-tax/1809403002/) ............................................................... 10

National Association of State Charity Officials, *The Charleston Principles: Guidelines On Charitable Solicitations Using The Internet* (available at https://www.nasconet.org/wp-content/uploads/2018/04/Charleston-Principles.pdf) ............................................................................................... 14

Plaintiffs Americans for Prosperity ("AFP") and Americans for Prosperity Foundation ("AFPF") respectfully oppose the motions to dismiss (actual and proposed) of:  Defendants Damien R. Meyer, Amy B. Chan, Galen D. Paton, Mark Kimble, Steve M. Titla, and Thomas M. Collins ("Comm'n Mot.") (Dkt. 23), joined by Defendant Adrian Fontes (Dkt. 25); Arizona Attorney General Kristin K. Mayes ("AG Mot.") (Dkt. 28-2); and Voters' Right to Know ("VRTK Mot.") (Dkt. 22-2).[1]

## PRELIMINARY STATEMENT

Proposition 211 is a hammer for which a vast array of speech becomes a "campaign-related" nail.  Contrary to the Defendants' mischaracterization, Proposition 211 extends far beyond election-related activity.  It ensnares pure issue advocacy on matters of pressing public concern and vacuums up the identities of donors, and donors of donors, and anyone in a potentially unending donor chain extending from any entity engaged in these broadly defined activities.  Its sweeping scope and invasive look-through demands are unprecedented.  Worse, Proposition 211 imposes onerous administrative requirements as a chilling precondition to engaging in protected speech.  This framework chills the First Amendment speech and associational rights of not only these Plaintiffs but countless issue advocacy groups spanning the spectrum around the country.

To contrive grounds for dismissing this constitutional challenge to Proposition 211, Defendants purport to defend a law quite different from the law that was enacted.  Defendants do so, presumably, because they recognize that the actual provisions of Proposition 211 are constitutionally indefensible once properly analyzed against

---

[1] Plaintiffs respectfully oppose VRTK's motion to intervene in this case.  *See* Dkt. 31.  Denial would moot VRTK's proposed motion to dismiss, which was attached to its motion to intervene.  Nevertheless, Plaintiffs respond to VRTK's motion to dismiss for the sake of completeness and expedition.

precedent that calls for exacting scrutiny.  *See, e.g.*, *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) (plurality opinion).

For present purposes, however, it suffices to note that the detailed allegations of the Complaint, once credited (as they must be, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), amply state claims relative to the unprecedented law that is now before the Court.  This Court's review should proceed on a well-developed factual record before Proposition 211 may be permitted to chill untold numbers of issue-advocacy organizations nationwide.

## LEGAL STANDARDS

### I.    Federal Rule Of Civil Procedure 8

A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Rather, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  Moreover, this Court's standing order makes clear that motions to dismiss are "discouraged."  *See* Dkt. 9.

### II.   Exacting Scrutiny

"Regardless of the type of association, compelled disclosure requirements [must be] reviewed under exacting scrutiny."  *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) (plurality opinion).  "Under that standard, there must be 'a substantial relation between the disclosure requirement and a sufficiently important

governmental interest,'" and the disclosure requirement must "be narrowly tailored to the government's asserted interest."  *Id.* (citation omitted).[2]  Exacting scrutiny is equally or more demanding than intermediate scrutiny, which applies to (among other things) gender-based discrimination.  *Assoc. Gen. Contractors of America v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1195 (9th Cir. 2013); *see United States v. Swisher*, 811 F.3d 299, 317 (9th Cir. 2016) (en banc).   Defendants bear the burden of satisfying exacting scrutiny, s*ee Bonta*, 141 S. Ct. at 2383; *Rosen v. Port of Portland*, 641 F.2d 1243, 1246 (9th Cir. 1981); *Elrod v. Burns*, 427 U.S. 347, 362 (1976), and they cannot justify such a dragnet based on "[m]ere administrative convenience":  the theory that more coverage is better, easier, or more certain to ensnare any legitimate targets.  *Bonta*, 141 S. Ct. at 2387 (majority opinion) (quoting *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010)).

## III.    Facial Challenge

A law is facially unconstitutional under the First Amendment "if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *Bonta*, 141 S. Ct. at 2387 (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)).   The Attorney General therefore errs by suggesting, based on earlier decisions, that there must be "***no*** set of circumstances . . . under which [Proposition 211] would be valid."  AG Mot. 2, 6 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)) (emphasis added).

## IV.    As-Applied Challenge

Plaintiffs' as-applied challenge requires showing "a 'reasonable probability' that disclosure of its contributors' names 'will subject them to threats, harassment, or reprisals

---

[2]   The concurring opinions in *Bonta* commend strict scrutiny, an even *more* demanding level of scrutiny.  *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2390 (2021) (Thomas, J., concurring); *id.* at 2391 (Alito, J., concurring).

3

from either Government officials or private parties.'" *Citizens United v. FEC*, 558 U.S. 310, 367 (2010) (quoting *Buckley v. Valeo*, 424 U.S. 1, 74 (1976)). "The proof may include, for example, specific evidence of past or present harassment of members due to their associational ties, or of harassment directed against the organization itself." *Buckley*, 424 U.S. at 74. "A pattern of threats or specific manifestations of public hostility may be sufficient," *id.*, as evidenced by "instances of recent harassment . . . ." *Brown v. Socialist Workers '74 Campaign Committee*, 459 U.S. 87, 100–101 (1982); *see Americans for Prosperity v. Grewal*, 2019 WL 4855853, at *20 (D.N.J. Oct. 2, 2019) ("In a climate marked by the so-called cancel or call-out culture that has resulted in people losing employment, being ejected or driven out of restaurants . . .; and where the Internet removes any geographic barriers to cyber harassment of others . . . a 'reasonable probability' standard strikes the Court as less burdensome as Defendants maintain.").

## ARGUMENT

### I.    Proposition 211 Unconstitutionally Chills First Amendment Rights On Its Face And As Applied to Plaintiffs.

Proposition 211 fails exacting scrutiny because it "lacks guardrails to ensure that the speech it regulates has a sufficient nexus to the asserted interests, specific to the electoral context, that Arizona purports to have in the required donor information." Compl. ¶ 6. Its cumulative scope is both overly "broad," *id.* ¶ 5, and conspicuously "underinclusive," *id.* ¶ 83, and the law imposes "massive burdens" on anyone caught in its sweep, *id.* ¶ 58. In effect, Proposition 211 chills the right to opine publicly on matters of pressing concern, to petition the government, and to join and support associations for these shared purposes, all while shielding elected officials from criticism. *Id.* ¶ 2. It follows that Proposition 211 lacks "a substantial relation" with any "sufficiently important governmental interest" and is not "narrowly tailored to the interest[s]" it purports to promote. *Bonta*, 141 S. Ct. at 2385 (quotations omitted).

4

Once the applicable standards are duly considered, Defendants' arguments for dismissal fall away. Only by ignoring the Complaint's concrete allegations can Defendants purport to carry their burden of showing that the law is "substantial[ly] relat[ed]" and "narrowly tailored" to an important state interest. *Bonta*, 141 S. Ct. at 2385. Defendants ask the Court to turn Rule 8's pleading standard on its head and to eviscerate exacting scrutiny and Defendants' burden thereunder in ways that are unprecedented. Although Defendants assert the availability of workarounds that range from counter-factual to impracticable, their proposed solutions (which effectively rewrite or ignore key provisions of the law) and their discounting of the practical problems resulting from the law's novel provisions (particularly as to unending look-throughs and *sui-generis* opt-outs) cannot be credited at any stage and certainly not at the pleading stage, over contrary, concrete allegations. Indeed, this Court should draw all reasonable inferences in Plaintiffs' favor. *Iqbal*, 556 U.S. at 678.[3]

Defendants repeatedly mischaracterize Proposition 211 as "requiring disclosure of large contributions to political advertising," claiming that "[c]ourts have upheld campaign finance disclosure requirements for decades." Comm'n Mot. 1. But that is only partially true. Yes, this law compels disclosure (unconstitutionally). *See, e.g.*, Compl. ¶ 60. But that is not *all* it does. It also goes *further*, imposing heavy administrative burdens and outright prior restraints on speech. *Id.* ¶ 87. Moreover, it imposes such burdens *far outside* the electoral context. In arguing to uphold Proposition 211, Defendants will need to defend the *actual* provisions of Proposition 211 and defend

---

[3]     Defendants ask, in the alternative, for a more definite statement under Rule 12(e) regarding the allegations. Comm'n Mot. 2 n.1. But this Complaint is not "so vague or ambiguous that [Defendants] cannot reasonably prepare a response." Fed. R. Civ. Pro. 12(e). In any event, "'[w]here the information sought' by the moving party 'is available through the discovery process, a Rule 12(e) motion should be denied.'" *Colonial Savings, FA v. Gulino*, 2010 WL 1996608, at *10 (D. Ariz. May 19, 2010).

them as an integrated *whole*—inclusive of its sweeping scope, compelled disclosures, disclaimers, restrictions, and administrative burdens, which combine into a stew that is altogether toxic to the exercise of First Amendment speech and associational rights.

Crucially, any ambiguity in Proposition 211 only compounds the chill resulting from the law's enforcement mechanisms.  *See* Ariz. Stat. § 16-977.  As the law's chief enforcer, the Commission is not subject to political accountability, and it may arrive at unpredictable, malleable, and opportunistic positions.  Compl. ¶ 80.

Still more concerningly, private parties are *separately* empowered to enforce the law pursuant to their own interpretations, however expansive and aggressive those may be.  Ariz. Stat. § 16-977.  Under Proposition 211, "[a]ny qualified voter in [the] state may file a verified complaint with the [C]ommission" against alleged violators.  *Id.* § 16-977(A).  If the Commission determines the complaint states a plausible violation, it must "investigate" and "provide the alleged violator with an opportunity to be heard."  *Id.* § 16-977(B).  But clemency from the Commission does not leave any speaker in the clear. If the Commission dismisses or takes no action on the complaint within 90 days, "the complainant may bring a civil action against the [C]ommission to *compel* it to take enforcement action."  *Id.* § 16-977(C) (emphasis added).  Notably, "[i]n any matter in which the civil penalty for the alleged violation could be greater than $50,000"—virtually any conceivable claim—"any claim or defense by the [C]ommission of prosecutorial discretion is not a basis for dismissing or failing to act on the complaint."  *Id.*

Such deputization of the entire electorate as enforcers sows still greater unpredictability and chill.  Vested with enforcement power, private parties can opportunistically interpret Proposition 211 to harass political opponents in a process that is a recipe for chilling speech during the crucial months before an election.  Compl. ¶ 40. Such weaponization is particularly worrisome given Proposition 211's broad triggers—

particularly its vague catch-all for "other partisan campaign activity"—as further discussed below.  *See infra* Section I.A.1.  Although any private action "is against the Commission" and "requires a neutral judicial officer's involvement," Comm'n Mot. 11, private enforcement introduces all the uncertainties inherent in litigation, which can ultimately force the Commission to pursue investigations and enforcement actions even where it otherwise would not.  A process with a neutral adjudicator still results in First Amendment chill; no one would defend a law requiring approval by neutral Article III judges before a citizen may speak.  The problem for covered entities here is that they face exposure dependent upon the uncertain outcomes of countless private lawsuits with their donors' privacy on the line if they lose.  Although Defendants claim that "speculating about misuse" is improper, Comm'n Mot. 11, they overlook the fact that regulated entities and their donors *must* so speculate because what one person calls a *mis*use today may become another person's legal theory for compelling enforcement tomorrow.  It is not "speculation" to read a statute and point out how it works.  Given that Proposition 211's recordkeeping requirements apply now, organizations and donors do not have the luxury of waiting and seeing—they will either succumb to chill now, or else be subject to coverage and enforcement to the extent they (or any donee, or any donee's donee) do or say anything that might arguably trigger Proposition 211's fearsome regime.

A.     **Proposition 211 Is Unconstitutional On Its Face.**

Proposition 211 is invalid on its face.  Given the law's vast scope, onerous burdens, and distant (at best) relation to any important state interest, a "substantial number of its applications are unconstitutional" relative to any "plainly legitimate sweep."  *Bonta*, 141 S. Ct. at 2387.

Although Defendants complain that "[m]any of Plaintiffs' arguments turn on hypothetical situations," Comm'n Mot. 8, that is an inherent feature of facial challenges,

7

which designedly permit a plaintiff to "challenge an overly broad statute or regulation by showing that it may inhibit the First Amendment rights of individuals *who are not before the court*." *4805 Convoy, Inc. v. City of San Diego*, 183 F.3d 1108, 1112 (9th Cir. 1999) (emphasis added).  The Supreme Court recognizes "that 'the very existence of some broadly written laws has the *potential* to chill the expressive activity of others not before the court.'"  *Id.* (emphasis added) (quoting *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129 (1992)).  Accordingly, the Complaint does exactly what a facial challenge is meant to do by demonstrating how Proposition 211's "broad[]" language has the "potential to chill" the rights of other parties.  *Id.*  If Defendants seek to prevail on the premise that facial challenges have no place in this context, *see* Comm'n Mot. 17 (claiming that supposedly "far-fetched" consequences "highlight[] the problems with facial challenges that make them disfavored"), they will need to make the climb up to the Supreme Court and urge it to overturn its decades-old and recently-reiterated precedent.

Defendants are also wrong to say that Plaintiffs allege "fanciful hypotheticals," Comm'n Mot. 10, "fantasy scenarios," or "exaggerated and irrelevant hypotheticals," AG Mot. 7.  To the contrary, Plaintiffs' concerns arise from Proposition 211's plain text, which regulated entities are not at liberty to ignore as they endeavor to comply.  Far from being "fantasy," many of these concerns are ripped from the headlines and real-world experience, as compared against Proposition 211's express provisions.  *See, e.g.*, *infra* Section I.A.1.  In no event can Plaintiffs' allegations properly be dismissed as "fantasy" before any factual record gets assembled.

### 1.   Proposition 211 Is Grossly Overinclusive.

***Overbroad Triggers.***  Proposition 211 is not "narrowly tailored," *Bonta*, 141 S. Ct. at 2385, given the broad definition of "campaign media spending," which triggers the law's crushing burdens.  By operation of Proposition 211, on pain of "significant civil

penalties," Proposition 211 § 2(D), a "covered person"—any person whose total "campaign media spending" exceeds $50,000 in statewide campaigns or $25,000 in any other campaign during a two-year election cycle, Ariz. Stat. § 16-971(7)—is subject to the law's limitless disclosure and disclaimer requirements, *id.* §§ 16-973(A), 16-974(C). Proposition 211 in turn defines "campaign media spending" to include, for example, a public communication that:  (i) merely "refers to a clearly identified candidate"; (ii) advocates for or against the "qualification or approval of any state or local initiative or referendum"; (iii) is taken as criticizing or supporting officeholders who may be subject to "recall"; or (iv) is deemed to fall within a catch-all for "other partisan campaign activity," as well as activities "conducted in preparation for or in conjunction with" such broadly-defined communications.  *See id.* § 16-971(2)(a).  As a result, the law regulates and penalizes incidental, issue-oriented references to a staggering variety of state and local officeholders, candidates, and issues.

Under Ariz. Stat. § 16-971(2)(a)(iii), "campaign media spending" includes any "public communication that ***refers*** to a clearly identified candidate" if it is made "within ninety days before a primary election until the time of the general election" and is "disseminated in the jurisdiction where the candidate's election is taking place" (emphasis added).  This broad trigger sweeps in issue advocacy well outside the electoral context—indeed, just the mere ***mention*** of an elected official's name would be covered between May and November of any even-numbered year.  Had Proposition 211 then been in effect, immigration advocacy organizations would have triggered coverage just by mentioning Sherriff Joe Arpaio's contempt proceedings before his 2016 election.  Compl. ¶ 77.  Other organizations would have confronted the same dilemma when defending election integrity simply by mentioning Kari Lake or Stephen Richer in 2022.  *See id.* This trigger will also cover groups that run ads supporting a tax bill, for instance, that

9

reference Democratic and Republican legislators who support it, even though the ads were designed to promote an issue (tax policy) rather than influence elections.

The trigger for ballot measures is also stunningly broad, such that it would have swept up advocacy concerning Proposition 211 itself if it had been effect during the 2022 election cycle.  Ariz. Stat. § 16-971(2)(a)(iv); *see* Compl. ¶ 41.  The vast array of recent state and local measures highlights this trigger's sweep.  Such measures have involved issues ranging from animal welfare, to nature preservation, to transportation safety.  Speaking to any such issues, or funding any entity that cares about any such issues (and may in turn donate towards the shared mission), now means stepping into a dragnet:

- In 2016, the proposed "Save the Puppies and Kittens" initiative would have preserved the right of local governments to ban puppy mills by preempting attempts by the state legislature to supersede local authority.[4]

- In 2018, Scottsdale Proposition 420 amended Scottsdale's city charter to prohibit the alteration of the McDowell Sonoran Preserve and to limit the use of preserve funds for any purpose not outlined in the amendment.[5]

- In 2020, the proposed "Protect Arizona Agriculture Act" would have ordered the Arizona Associate Director of Agriculture to suspend the use of

---

[4]   *See* Arizona Secretary of State, *2016 Initiatives, Referendums & Recalls—Initiative, Referendum and Recall Applications—No. I-22-2016* (available at https://apps.azsos.gov/election/2016/general/initiatives.htm).

[5]   *See* Lorraine Longhi, *The fight for the preserve is over:  Scottsdale voters overwhelmingly approve Prop. 420*, The Arizona Republic (Nov. 6, 2018) (available at https://www.azcentral.com/story/news/local/scottsdale/2018/11/06/scottsdale-proposition-420-desert-edge-development-mcdowell-sonoran-preserve-question-1-sales-tax/1809403002/).

certain agricultural chemicals and review their effects on native bees, native pollinators, and beneficial insects.[6]

Such measures are classic subjects of pure issue advocacy. Advocating for the humane treatment of puppies and kittens does not equate with "political advertising," Comm'n Mot. 1, or "election-related spending," VRTK Mot. 10. Indeed, charitable organizations can engage in such advocacy consistent with their 501(c)(3) status. Under Proposition 211, however, all such groups will be equated with electioneering committees and subjected to corresponding administrative and disclosure burdens.

Proposition 211's coverage can also be triggered by a communication that "promotes, supports, attacks or opposes a candidate within six months preceding an election involving that candidate" (effectively February through November of any even-numbered year) or that "promotes, supports, attacks or opposes the recall of a public officer" at *any* time. Ariz. Stat. § 16-971(2)(a)(iii), (v). But any speech that criticizes or praises an officeholder could potentially be characterized as advocating (at least implicitly) for or against the officeholder's recall. Compl. ¶ 78. This dynamic is all the more concerning given Proposition 211's private enforcers, who will have discretion to interpret the law and weaponize it against political enemies. Ariz. Stat. § 16-977.

Defendants offer the bare assertion that "[u]ntil someone applies for a recall petition, there is no recall possibility that the law covers." Comm'n Mot. 10. But Proposition 211 nowhere so specifies. Although Defendants cite Ariz. Stat. §§ 19-202.01 & 203, these provisions state merely the requirements for recall petitions and applications for same; they do not purport to narrow Proposition 211's reach. At the very least,

---

[6]   *See* Arizona Secretary of State, *Application for Serial Number, Initiative Petition—Protect Arizona Agriculture Act* (May 3, 2019) (available at https://apps.azsos.gov/election/2020/general/ballotmeasuretext/I-10-2020.pdf).

Proposition 211 sows uncertainty and invites standardless discretion, by the Commission and at the behest of private complainants, which the First Amendment forbids. *See Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 133 (1992).

The catch-all trigger for "other partisan campaign activity" similarly invites standardless discretion and weaponization by political adversaries. Ariz. Stat. § 16-971(2)(a)(vi). Defendants argue "partisan" activity must be tied to a "political party," Comm'n Mot. 11, and "support[] the election or defeat of candidates," VRTK Mot. 11. But that is their gloss, different from the law's terms. Given our hyper-partisan culture, regulators can target political rivals by deeming advocacy on hot-button issues to be "partisan," as major political parties and candidates take positions on pressing issues like immigration, abortion, or election integrity. Compl. ¶ 77.

Proposition 211 also reaches preparatory activity occurring wholly outside Arizona's borders. "Campaign media spending" captures preparatory activities, including "[r]esearch, design, production, polling, data analytics, mailing [and] social media list acquisition." Ariz. Stat. § 16-971(2)(a)(vii). Proposition 211 thus regulates an out-of-state organization that spends over $50,000 preparing a "public communication" that merely "refers to a clearly identified candidate" in an online post or national newsletter discussing a salient political issue, so long as the post or newsletter "is disseminated in the jurisdiction where the candidate's election is taking place" within "ninety days before a primary election until the time of the general election." *Id.* § 16-971(2)(a)(iii). Not all $50,000 needs to be spent in Arizona (to the extent Defendants submit that is not how *they* read Proposition 211, that illuminates yet another ambiguity in the law that will cast chill); any dissemination in Arizona combined with a total nationwide budget of $50,000 triggers Proposition 211. Fact development will show that

tripping this wire is remarkably easy.  This is particularly problematic for online posts that are "disseminated" wherever users access the internet.

Defendants' only answer to this obvious, vexing problem is an assertion that "Prop. 211 does not apply to websites."  Comm'n Mot. 12 (citing Ariz. Stat. § 16-971(2)(b)(i)).  But the exception they cite does not ostensibly exempt internet postings or digital advertisements generally, as distinct from news publications that operate online.  *See* Ariz. Stat. § 16-971(2)(b)(i) (exempting "a news story, commentary or editorial *by any* broadcasting station, cable television operator, . . . website or other periodical publication") (emphasis added); *see also Yates v. United States*, 574 U.S. 528, 543 (2015) (explaining "principle of *noscitur a sociis*—a word is known by the company it keeps").  Even mere preparatory costs associated with such internet postings and digital advertisements are included in Proposition 211's trigger.

Defendants also assert that "passively posting something on [a] Virginia-based website mentioning an Arizona candidate alone is not 'disseminating' it" in Arizona.  Comm'n Mot. 11.  For this, Defendants note that "passive postings on [a] website cannot establish personal jurisdiction," citing *Atlantic Asset Management Group, Inc. v. Csira*, 328 F. Supp. 2d 614, 619 (E.D. Va. 2004).  *Id.*  But that was a district court's take on personal jurisdiction, far removed from Proposition 211.  As to personal jurisdiction, the *Csira* court dubbed the website "passive" upon noting it was "devoted solely to *disseminating* information" across state lines.  *Csira*, 328 F. Supp. 2d at 619 (emphasis added).  Notably, the Charleston Principles governing charitable solicitation on the internet suggest that a non-profit is subject to regulation if it solicits through a website and "[r]eceives contributions from the state on a repeated and ongoing basis or a

13

substantial basis."[7]   In any event, "dissemination" is *precisely* what triggers coverage under Proposition 211.  *See* Ariz. Stat. § 16-971(2)(a)(iii).  By no means can Defendants conjure an unstated exception so as to overcome Plaintiffs' contrary allegation as well as the plain terms of the challenged law.  *See Iqbal*, 556 U.S. at 678.  Again, any uncertainty in Proposition 211's application is simply a recipe for private enforcers to make more mischief at the expense of regulated entities.  *See* Ariz. Stat. § 16-977.

In sum, simply reading the law's sweeping triggers belies Defendants' refrain that Proposition 211 is limited to "political advertising," Comm'n Mot. 1, or "election-related spending," VRTK Mot. 10.   Thanks to its broad definitions and all-encompassing enforcement mechanisms, Proposition 211 is destined to ensnare the purest of issue advocacy and more.  Tellingly, the Attorney General refuses to rule out the possibility that even a *bank's loans* can trigger disclosure of its depositors' identities.  *See* Compl. ¶ 34; AG Mot. 7 n.2; *see also id.* at 8.

***Overbroad Disclosures And Disclaimers.***   Proposition 211's disclosure and disclaimer requirements are likewise vastly overbroad.  Under the law, covered entities must disclose direct and indirect donors who contributed more than $5,000, Ariz. Stat. § 16-973(A)(6), (7), while also issuing disclaimers identifying their top three direct or indirect donors, Ariz. Stat. § 16-974(C).  Many courts have focused on the importance of limiting disclosure to contributions specifically earmarked to support campaign-related advocacy.[8]  But Proposition 211 is a different beast:  Its disclosures and disclaimers are

---

[7]   National Association of State Charity Officials, *The Charleston Principles: Guidelines On Charitable Solicitations Using The Internet*, at III(B)(1)(b)(2)(ii) (available at https://www.nasconet.org/wp-content/uploads/2018/04/Charleston-Principles.pdf).

[8]   *Indep. Inst. v. Williams*, 812 F.3d 787, 789 (10th Cir. 2016); *Lakewood Citizens Watchdog Grp. v. City of Lakewood*, 2021 WL 4060630, at *12 (D. Colo. Sept. 7, 2021); *Indep. Inst. v. FEC*, 216 F. Supp. 3d 176, 191 (D.D.C. 2016); *see also Americans for*

not pegged to any purpose, intent, or even knowledge by a donor that a contribution would be used for electioneering—let alone electioneering in Arizona.  Compl. ¶ 61.

By its novel design, Proposition 211 compels the disclosure of donors who had no knowledge of or intent to engage in electioneering.  Contributors to large, heterodox organizations often do not share all of those organizations' views.  Compl. ¶ 60.  Advocacy groups like Plaintiffs take positions across a wide variety of issues, often siding with groups or politicians on one issue and disagreeing with them on others.  *Id.* ¶ 74.  As a result, those who contribute to Plaintiffs may not donate for the specific purpose of supporting the organizations' public communications that trigger Proposition 211.  *Id.* ¶ 64.  Donors often contribute to support an organization's overarching mission without knowing how their funds will be used, let alone intending they be used to influence elections.  *Id.*  The organization's subsequent use of the unearmarked funds is the organization's speech, *not* that of individual donors.

Yet Proposition 211's provisions are indifferent to whether contributions were made with any intent or even awareness that funds would be used for a particular purpose.  Donors will be disclosed based on unforeseeable actions that organizations later undertake.  Because Proposition 211 compels disclosure of donors who had no purpose, intent, or even knowledge that their contribution would be used for electioneering, its requirements are not "narrowly tailored" to any asserted state interest in specifying who exactly is responsible for specific electioneering.  *Bonta*, 141 S. Ct. at 2385.

Making matters worse, Proposition 211 requires disclosure of not only direct donors, but also *indirect* donors.  Ariz. Stat. § 16-973(A)(7).  Such disclosures are premised on the assumption that, if A gives to B, and B gives to C, and C speaks about D,

---

*Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2386 (2021); *Van Hollen v. FEC*, 811 F.3d 486, 501 (D.C. Cir. 2016).

then A must specifically be taking a view on D.  Compl. ¶ 60.  But the Supreme Court has already rejected that assumption as "divorced from reality," particularly insomuch as it targets the same calculated, bad-faith circumvention that is already prohibited. *McCutcheon v. FEC*, 572 U.S. 185, 215, 216 (2014) (plurality opinion).

Proposition 211 thus ensnares third parties around the country who have only the faintest connection to Arizona elections.  Compl. ¶ 81.  Someone in Virginia who donated to a group that aligned with their values (say, humane treatment of animals or environmental protection) could later discover that her name and home address were publicly disclosed not because of whom she gave to, but because of the speech of another group she may have never heard of and never donated to—just because some portion of the money she gave to a different entity, for different reasons, made its way to a group addressing issues in Arizona.  *Id.*  Proposition 211 thus publicizes donors' information based not on their own speech, but rather the speech of downstream organizations to which they lack any meaningful connection.

Donors may be disclosed up to *two years* after making their donation.  Compl. ¶ 90.  And this disclosure may be based on campaign media spending that was unforeseeable when they donated.  *Id.* ¶ 90.  As such, "donors" may face disclosure years later even though they never intended that downstream organizations would receive their funds, let alone their personal information.  Such an indiscriminate dragnet does not qualify as "narrowly tailored."  *Bonta*, 141 S. Ct. at 2385.

But Proposition 211 goes further still.  It also requires disclosure of donors' occupations and employers.  Ariz. Stat. §§ 16-973(A)(6), (7), 16-971(10)(a).  It thereby subjects unwitting employers to doxxing based not on their election-related activity, but rather based on the (potentially) unintended actions of their employees.  Compl. ¶ 66.  Without earmarking or similar limitations, Proposition 211 is menacingly overinclusive.

16

Proposition 211 compels disclosure of not only individuals who give their money, but also those who volunteer their time.  Under Proposition 211, a covered person must file a report disclosing the "identity of each donor of original monies who contributed, directly or indirectly, more than $5,000 of traceable monies or *in-kind contributions* for campaign media spending during the election cycle to the covered person."  Ariz. Stat. § 16-973(6) (emphasis added).  "In-kind contribution" is defined to include "goods, services or anything of value that is provided without charge or at less than the usual and normal charge." *Id.* § 16-971(11).  Therefore, *volunteers* who provide more than $5,000 in volunteer services over a two-year period to an organization must be disclosed as indirect donors should the organization in turn donate to a "covered person."  *See id.* Attorneys doing *pro bono* work could thus trigger disclosure of their own or their law firm's identity after providing just a few hours of assistance to an organization that in turn donates to a "covered person."  Compl. ¶ 35.

In response, the Attorney General insists that an individual "who volunteers by answering the phone a few hours a week at her church would not somehow be disclosed if her church gave more than $5,000 to a covered person" because "her volunteer work is not an in-kind contribution[] for campaign media spending."  AG Mot. 8 (quotations omitted).  But that again ignores how Proposition 211 treats the entire donation chain. Per the law's text, if a church directly contributes $5,000 to covered person without opting out, then the volunteer's contribution of valuable time ostensibly contributed "indirectly" to the "campaign media spending," triggering disclosure.  Ariz. Stat. § 16-973(6).  By no means does Proposition 211's text foreclose such a conclusion, leaving a chill that is backed by the specter of private enforcement.

Although Defendants emphasize that a "donor can . . . avoid disclosure by opting out," Comm'n Mot. 6, the opt-out procedures do not "narrowly tailor[]" the law. *Bonta*,

17

141 S. Ct. at 2385.  To begin, the opt-out provision does not apply to indirect donors. Compl. ¶ 90.  As VRTK concedes, "the Act does not require a covered person to provide any notice to the original source of the funds being passed on by the direct contributor to the covered person."  VRTK Mot. 9.  While VRTK notes that "nothing in the Act *prevents* a covered person from doing so," *id.* (emphasis added), neither does anything in the Act grant such a notice legal import under Proposition 211.  In any event, this proposed solution would be unworkable—requiring covered entities to notify endless, unreachable chains of indirect contributors who have no understanding of Proposition 211.  Indeed, any would-be donor confronted with the opt-out may be left confused, at best, and likely intimidated by the reference, thereby compounding the chill.  Finally, the opt-out becomes all the more infeasible upon considering the web of sui generis "opt outs" that organizations and donors may confront around the country once other states layer their *own* dictates *atop* Arizona's.  Compl. ¶ 89.  Suffice it to note that the opt-out provision does not cure all of the many First Amendment ills that infect Proposition 211. *See* Ariz. Stat. § 16-977.

*Monetary Thresholds.*  Proposition 211's anomalously low monetary thresholds exacerbate First Amendment concerns.  Defendants emphasize that the law's requirements "apply only to entities that spend more than $50,000 in statewide campaigns or more than $25,000 in other campaigns," and only "donors that give more than $5,000 are disclosed."  Comm'n Mot. 6.  VRTK further notes that the $5,000 threshold "is five times as high as the $1,000 threshold for the donor disclosure upheld in *Citizens United.*"  VRTK Mot. 7.  But these thresholds are measured against aggregate spending across the *two-year* election cycle, and are a tiny fraction of the massive election spending in elections that purportedly animate Proposition 211.  VRTK Mot. 7;

*see e.g.*, *Campaign spending in governor race breaks Arizona record*, The Arizona Republic (Jan. 20, 2023).

These thresholds are even more unreasonably low considering the sweep of Proposition 211's coverage. Particularly for large entities like religious organizations and environmental-protection organizations that regularly engage in pure issue advocacy, individuals who make modest donations of just $50 per week during a two-year election cycle will be caught up in Proposition 211's dragnet. Compl. ¶ 33. Such individuals are by no means "big spenders," let alone big spenders on Arizona elections. VRTK Mot. 7. Further, Defendants ignore the lower $2,500 threshold for transfer records. Ariz. Stat. § 16-973(E). Because such records are provided across all organizations in a funding chain, without any associated confidentiality protections, they raise much the same concerns as the disclosures triggered by the $5,000 threshold. Compl. ¶ 93.

Defendants wrongly suggest that "Plaintiffs' complaint that Prop. 211's requirement to keep for five years records of $2,500+ contributions ignores the more stringent recordkeeping requirements in federal law." Comm'n Mot. 13–14. Defendants cite 52 U.S.C. § 30102, which requires record-keeping of any "contribution exceeding $50 or aggregating more than $200 in a calendar year." *Id.* But as Defendants themselves acknowledge, federal law requires record-keep only for "three years," as opposed to five years under Proposition 211. *Id.* at 13. And those contributions are to political committees (and thus inherently earmarked for political spending), different from general donations to a charitable or social-welfare organization that is primarily (or exclusively) engaged in non-political activity. *See* 52 U.S.C. § 30101(4)(A), (8)(A)(i). Beyond that, Proposition 211 will require more recordkeeping than federal law, given its significantly broader scope and triggers. *See* Compl. ¶¶ 99–103.

***Mediums Of Communication.*** Proposition 211 also sweeps up wide-ranging

forms of communication.   Compl. ¶ 103.  It extends across communications made by means of the "internet or another digital method, newspaper, magazine, outdoor advertising facility, mass mailing or another distribution, telephone bank or any other form of general public political advertising or marketing, regardless of medium."  Ariz. Stat. § 16-971(17)(a).  That contrasts with the federal Bipartisan Campaign Reform Act's ("BCRA") narrower coverage specifically of "any broadcast, cable, or satellite communication."  52 U.S.C. § 30104(f)(3)(A)(i).

*No Major Purpose.*  Proposition 211's definition of "covered person" sweeps far beyond "organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate," drastically burdening organizations even when their "major purposes" do not encompass election-related activity.  *Buckley v. Valeo*, 424 U.S. 1, 79 (1976); *see also Wis. Right To Life, Inc. v. Barland*, 751 F.3d 804, 839 (7th Cir. 2014) (citing *id.*).[9]  Under Proposition 211, non-profit organizations of any stripe that engage in anything loosely categorized as "campaign media spending" are lumped together with PACs without regard for their primary purpose.

2.   Proposition 211 Is Unconstitutionally Underinclusive.

While Proposition 211 goes way too far in the above-noted respects, it is strikingly under-inclusive in others—a telltale sign that the law has not been adequately tailored relative to its claimed purposes.  In particular, Proposition 211 is underinclusive due to its

---

[9]  While Plaintiffs recognize that Ninth Circuit precedent currently holds that disclosure requirements need not be limited according to the major purpose of an organization, *see, e.g.*, *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1009–10 (9th Cir. 2010), that case was not decided in the context of a law, like Proposition 211, that extends to both direct and indirect donors of an organization.  Regardless, Plaintiffs respectfully maintain that such a limitation is dictated by the First Amendment and reserve the right to challenge the relevant precedent before the Ninth Circuit as well as the Supreme Court.  Whatever the outcome on this point, however, Proposition 211 violates the First Amendment on other, independent grounds.

conspicuous, inexplicable carve-outs for certain membership organizations as well as media and tech companies. Compl. ¶ 83. A law is unconstitutionally underinclusive when its reach is too limited, regulating some activities while excluding others that are no less integral to the government's claimed interest. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 802 (2011). "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring *a particular speaker* or viewpoint." *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1126 (9th Cir. 2020) (quoting *Entm't Merchs. Ass'n*, 564 U.S. at 802).

Organizations "that spend only their own business income for campaign media spending" are not "covered persons" under Proposition 211. Ariz. Stat. § 16-971(7)(b)(ii). And "business income" is in turn defined as "[m]embership or union dues that do not exceed $5,000 from any one person in a calendar year." *Id.* § 16-971(1)(b). Proposition 211 thus treats most labor unions more favorably than it does other advocacy associations, exempting them from its extensive disclosure requirements and associated administrative burdens without any ostensible justification for such preferential treatment. Further still, media and tech companies have a wholesale exemption from the definition of "campaign media spending." *See* Ariz. Stat. § 16-971(2)(b)(i).

Any serious interest underlying Proposition 211 applies to these exempted entities no less than any other. Compl. ¶ 85. Although the Attorney General points out that "[u]nions are treated like any other membership organization under the Act," AG Mot. 3, that in no way explains why "membership organization[s]" are treated any differently than other organizations. Indeed, $5,000 *per calendar year* is $10,000 for Proposition 211's two-year coverage period, which would otherwise trigger the law's coverage. According to settled law, such differential treatment raises constitutional concerns. *Entm't Merchs. Ass'n*, 564 U.S. at 802.

Defendants cannot justify Proposition 211's media exemption just by comparing it to the federal media exemption surrounding "electioneering communication" under 52 U.S.C. § 30104(f)(3)(B)(i).  *See* Comm'n Mot. 12; VRTK Mot. 12–13; AG Mot. 3.  To begin, "campaign media spending" under Proposition 211 sweeps more broadly than "electioneering communication" under 52 U.S.C. § 30104(f)(3)(A).  *See infra* Section III.  As a result, Proposition 211's media carveout exempts a broader swath of activity than its federal analogue, and is thus more underinclusive.  *Compare* 52 U.S.C. § 30104(f)(3)(B)(i) *with* Ariz. Stat. § 16-971(2)(b)(i).

Although Defendants note that the Supreme Court in *McConnell v. FEC* upheld the federal media exemption, *McConnell* relied on *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990), *see* 540 U.S. at 208–09, which was expressly overturned in critical part by *Citizens United v. FEC*, 558 U.S. 310 (2010).  Moreover, as Defendants concede, *Citizens United* "called into question the media exemption's application to FECA's prohibition on corporations using their general treasury profits to finance expenditures."  VRTK Mot. 13–14 (citing *Citizens United*, 558 at 352–54); *see Citizens United*, 558 at 352–53 ("There is no precedent supporting laws that attempt to distinguish between corporations which are deemed to be exempt as media corporations and those which are not. . . .  This differential treatment cannot be squared with the First Amendment.").  Although *Citizens United* upheld "FECA's disclosure requirements" against a challenge that they were "underinclusive," VRTK Mot. 14, that challenge did *not* concern the media exemption.  Instead, the challenger argued that the disclosure provision was "underinclusive" because they did not apply to certain *mediums of communication*, rather than speakers.  *Citizens United*, 558 U.S. at 368.

Defendants also claim that "[p]aid advertising on media . . . is not exempted."  Comm'n Mot. 13.  But Defendants do not cite any provision of Proposition 211 so

stating; instead, they appear to be revising the law under auspices of defending it.  By its plain terms, Proposition 211 exempts paid advertising so long as it arguably takes the form of "a news story, commentary or editorial" made by "any broadcasting station, cable television operator, video service provider, programmer or producer, newspaper, magazine, website or other periodical publication."  Ariz. Stat. § 16-971(2)(b)(i).  In any event, such special exemption for media and tech companies is problematic regardless of whether paid advertising is specifically carved out.

### 3.     Proposition 211 Imposes Onerous Administrative Burdens.

Proposition 211's administrative requirements, particularly for opt-out correspondence and transfer records, are also unduly burdensome.  Compl. ¶ 86.  Under Proposition 211, a "covered person" must provide donors "an opportunity to opt out of having the donation used or transferred for campaign media spending" and thereby avoid disclosure.  Ariz. Stat. § 16-972(B).  "The notice required . . . may be provided to the donor before or after the covered person receives a donor's monies, but the donor's monies may not be used or transferred for campaign media spending until at least twenty-one days after the notice is provided or until the donor provides written consent pursuant to this section, whichever is earlier."  *Id.* § 16-972(C).

The upshot requires would-be speakers to sit silent for up to 21 days before using or transferring donor monies for campaign media spending.  Compl. ¶ 9.  That is an outright, stifling burden on speech—particularly in the context of political issues, where "timing is of the essence" and "it is often necessary to have one's voice heard promptly, if it is to be considered at all."  *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 163 (1969) (Harlan, J., concurring).  Because "delay may permanently vitiate the expressive content" of such a message, the opt-out procedure perpetrates its own unconstitutional restraint on speech.  *NAACP v. City of Richmond*, 743 F.2d 1346, 1356 (9th Cir. 1984).

1    Mischaracterizing Plaintiffs' position, VRTK argues that "Plaintiffs have no
2    constitutional right to force persons to make donations or to keep donors unaware about
3    how their money might be spent."  VRTK Mot. 8.  But nowhere do Plaintiffs assert a
4    "right" to "force" anyone to donate.  *Id.*  Nor does anything in Proposition 211's text
5    address this supposed problem.  Rather than merely "keep[ing] donors []aware about how
6    their money might be spent," *id.*, Proposition 211 forces donors to tell an organization
7    how to spend their money to prevent a donor's public disclosure.  Thus, Proposition 211
8    suppresses covered entities speech by restricting their ability to spend their own money as
9    authorized by willing donors who are duly informed and glad to support the
10   organization's activities, provided only that the donors can preserve anonymity.

11

12   Defendants also float solutions to the resulting chill that are infeasible, inadequate,
13   and unsupported by evidence.  Defendants contend that "Plaintiffs could also eliminate
14   that [21-day] limitation by simply obtaining donor consent when they receive the
15   donations."  Comm'n Mot. 13.  This, too, is unworkable.  It is unrealistic to expect that
16   organizations raising funds nationwide can obtain total compliance from each and every
17   donor (some of whom may have given two years prior), who must instantaneously
18   provide the requisite authorization in order to enable this solution.  At best, this would
19   require organizations to seek, follow up on, and register such a multitude of
20   authorizations, which would be hugely costly and burdensome.   It would also constitute
21   a government-mandated precondition to speech, which itself violates the First
22   Amendment.  *See DeGregory v. A.G. of N.H.*, 383 U.S. 825, 830 (1966).

23

24   Defendants also claim that a "donor who opts out may still donate to the covered
25   person; opting out just prevents the covered person from using that money for campaign
26   media spending."  Comm'n Mot. 3–4.  As such, Defendants claim that "[a]t most,
27   [Plaintiffs] cannot spend the subject donors' money on campaign media spending during"
28

24

the 21-day period.   Comm'n Mot. 13.   But this purported solution ignores how Proposition 211 ostensibly treats all donations as fungible, such that *one* donor's lack of authorization would at least arguably foreclose *any* covered use of general treasury funds into which that donation has flowed.   Moreover, this suggested work-around is entirely non-administrable and unworkable.   Plaintiffs may not receive consent from enough donors to cover the cost of "campaign media spending" before the opt-out period expires, thereby muzzling speech for 21 days.   Any requirement of separate accounting or segregated funds would itself entail a cumbersome imposition that at least burdens political speech and, for smaller organizations, likely prohibits it altogether.   Plaintiffs will develop the record on compliance burdens as the case progresses.   For now, they have at least made the minimum allegations needed.   *See Iqbal*, 556 U.S. at 678.

VRTK wrongly asserts that Proposition 211 offers "flexibility" for covered organizations "to decide when and to whom they direct this [opt-out] notice." VRTK Mot. 8 n.5.   According to VRTK, "covered persons who may not anticipate engaging in significant campaign media spending at the beginning of an election cycle can raise funds without providing notice to donors at that time, but later provide the required notice to appropriate donors to make sufficient funds available for campaign spending."   VRTK Mot. 8 n.5.   But this proposed workaround likewise departs from the law's text. Proposition 211 makes a "covered person" responsible for *all* donors over the $5,000 threshold who have not opted out, and it is otherworldly to suppose that after-the-fact opt-out solicitations will receive compliant responses *en masse*.   *See* Ariz. Stat. §§ 16-973(A)(6), (7); *id.* § 16-971(18)(a).   In this respect, too, VRTK appears to be defending a law different from the one enacted.

That aside, this "solution" is unworkable.   Even if VRTK's workaround were permissible, the law provides no guidance on whether a covered person must disclose

either:  (1) all donors based on their pro rata share of donations (in which case disclosures will be based on completely unforeseeable expenditures), or (2) if a covered person must disclose just enough donors to cover the speech (in which case such disclosures would be subject to idiosyncratic decisions by organizations, without providing uniform, across-the-board information of the sort Proposition 211 purportedly seeks to unearth).

Ultimately, Defendants' purported workarounds for Proposition 211 are foreign to its actual provisions and subject to great uncertainty and controversy, to boot, thereby "imposing burdens that serve to chill" First Amendment activity.  Compl. ¶ 57.  With such far-reaching yet ill-defined contours, "covered persons" cannot tell their donors, their donors' donors, and so on what exactly triggers coverage and thus when their personal information will be disclosed.  It follows that they cannot reliably protect these individuals' identities.  Absent means of ensuring privacy, regulated entities' protected speech will be chilled.  For purposes of writing briefs, Defendants can sidestep the law's most onerous provisions, but regulated entities and their donors have no such luxury when it comes to their on-the-ground compliance.

Proposition 211's required transfer records also impose undue burdens, placing privacy at risk in the absence of any provisions that would secure these records.  Compl. ¶ 93.  "[M]aintaining 'transfer records' for 'at least' five years and notifying donors regarding the use of their funds for 'campaign media spending' unduly burden protected First Amendment activity."  Compl. ¶ 86.  Notably, the threshold for such transfer records ($2,500) is inexplicably lower—and thus gratuitously burdensome—relative to the threshold for disclosure ($5,000).  To make matters worse, "Proposition 211 mandates that transfer records be retained far beyond the election cycle in which the donation is made."  *Id.* ¶ 94.  All told, secondary donors who give over $2,500 will have

no control or knowledge over the ultimate use of their funds, nor any control over disclosure of their personal information. *Id.* ¶ 93.

    4.    <u>Proposition 211 Does Not Advance The State's Purported Interests.</u>

Exacting scrutiny requires that Proposition 211 bear a "substantial relation" to the "*sufficiently important*" interests asserted by the state. *Bonta*, 141 S. Ct. at 2383 (emphasis added). Not every conceivable interest so qualifies, and those invoked by Defendants fall short. Proposition 211 does not meaningfully advance any anti-corruption interest. Because it is in no way limited to money that flows to candidates in Arizona (indeed, the money would not be flowing directly to candidates at all), it cannot possibly be "narrowly tailored" to any such interest in preventing corruption of Arizona's candidates or the appearance thereof. *Id.* While the Commission flatly asserts that "transparency deters corruption by exposing the sources of money," Comm'n Mot. 5, it fails to explain how disclosing unknowing secondary donors can plausibly serve that interest. Requiring disclosures and disclaimers of unwitting, attenuated donors does not meaningfully curb "dark money" practices. Compl. ¶ 68. Nor can there be *any* anti-corruption interest served for disclosures tied to ballot measures. *See, e.g.*, *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 790 (1978) ("The risk of corruption perceived in cases involving candidate elections, simply is not present in a popular vote on a public issue.") (citation omitted). Particularly as to ballot initiatives, there is no conceivable anti-corruption interest *at all* given that no candidate is in play. *Id.*

VRTK asserts that "[t]he Supreme Court has expressed approval of disclosure in the ballot measure context, where '[i]dentification of the source of advertising' enables voters 'to evaluate the arguments to which they are being subjected.'" VRTK Mot. 11 n.7 (citation omitted). Because Proposition 211 requires entities to dump undifferentiated piles of donor data upon the public, however, the law in fact undermines Arizona's

traditionally recognized interest in "provid[ing] the electorate with information." *Buckley v. Valeo*, 424 U.S. 1, 66 (1976); *see* Compl. ¶ 67.  Indeed, the law will affirmatively mislead voters by directly tying named donors to candidates and issues those donors may support only glancingly, if at all.  Compl. ¶ 67.

Defendants' amorphous, ipse dixit interest in "information" for its own sake bears no relation to combating corruption, as it must in order to satisfy exacting scrutiny in this context.  "Information" in the abstract serves no useful purpose and is certainly not a "sufficiently important" state interest.  *Bonta*, 141 S. Ct. at 2385.  Otherwise, the State of Alabama could have prevailed against the NAACP on the theory that the public desired additional information regarding the NAACP's membership and use of funds to conduct political activity extending to Alabama.  *See NAACP v. Alabama*, 357 U.S. 449 (1958).

The only "informational" interest sufficiently important to pass muster in this context should be part and parcel of combating corruption and the perception thereof. *See Buckley*, 424 U.S. at 67.  But no such rationale is plausibly implicated here, nor is it even invoked by Defendants.  Absent this peculiar law, candidates would never even have reason to know about the existence of all the downstream donors vacuumed by Proposition 211's look-through provisions.  If anything, Proposition 211 tells candidates whom they should be beholden to for supportive speech.

The sheer *volume* of information to be disclosed under Proposition 211 further undermines the state's informational interest, given voters' likely inability to appreciate any contributors beyond direct donors.  Compl. ¶ 67.  Far from adding meaningful information and aiding understanding, a barrage of spurious information far removed from elections can only sow confusion and misperception among the electorate.  This does more harm than good for voters' actual understanding, if that is the Defendants' bottom-line concern.

What is more, the state's purported interests would already be adequately addressed under existing law.  VRTK argues that, "[b]y routing their money through 501(c)(4) corporations, super PACs, or limited liability corporations, wealthy interests fund huge electoral expenditures while obscuring their identity and hiding behind opaque front groups."  VRTK Mot. 2, 6.  But circumventing laws in knowing and intentional ways is *already illegal* under both Arizona and federal law.  Ariz. Stat. § 16-1022(B); 52 U.S.C. § 30122.  Indeed, the facts of the *Pinnacle West Capital Corporation* case cited by VRTK would have been illegal prior to Proposition 211's adoption if the transfers were purposefully coordinated.  VRTK Mot. 3.  As Plaintiffs have alleged, if preventing circumvention was truly the purpose underlying Proposition 211, it would include some form of knowledge or intent requirement before imposing its crushing burdens.  Compl. ¶¶ 69–70.  This further eviscerates any "substantial relation" between Proposition 211 and any creditable interest it might purportedly serve.  *Bonta*, 141 S. Ct. at 2385.

The Attorney General is mistaken in claiming that existing law is not "relevant" to whether Proposition 211 is adequately tailored.  AG Mot. 9.  That a law's purported rationale is already adequately addressed by existing law suggests some *other* rationale is operative.  Moreover, the adequacy of existing law relative to the claimed purpose is proof positive of the additive law's overbreadth.  *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 949 (9th Cir. 2011).  Especially given the fearsome interplay of its burdensome provisions, Proposition 211 cannot be a fit solution to a problem that other laws have independently and narrowly solved.  Compl. ¶ 72.

Defendants also claim that, by operation of Proposition 211, "[l]arge-dollar donors cannot hide their involvement by funneling contributions through intermediary shell companies."  Comm'n Mot. 4.  But such large-dollar donors are free to do exactly that.  They may contribute $4,999 to numerous intermediary shell corporations so as to evade

disclosure.  It follows that Proposition 211 does not ensure that "the true source of contributions [will] be reported to the public" rather than "the names of meaningless front groups or shell corporations."   VRTK Mot. 6.   Given that the asserted interests underlying Proposition 211 are either already addressed by existing law or are not truly served by this new law, the main thing the law is doing—chilling and stifling speech, by making settled First Amendment protections the exception rather than the rule—comes into sharper relief.

Defendants flatly assert an interest in "preserving the integrity of the election process" as well as its "administrative interest."  Comm'n Mot. 5.  But Proposition 211 reaches far beyond the "election process" for all of the reasons set forth above, and "[m]ere administrative convenience" does not suffice under exacting scrutiny.  *Bonta*, 141 S. Ct. at 2387 (majority opinion) (quoting *Reed*, 561 U.S. at 196).  Regardless, Defendants fail to provide any argument showing these are "sufficiently important" under exacting scrutiny and that Proposition 211 bears a "substantial relation" to them.  *Bonta*, 141 S. Ct. at 2383.  As such, they have failed to carry their burden as to these interests.

Although Defendants proceed from the premise that this is a narrow law peculiar to electioneering and the special interests attending same, that premise is fundamentally flawed.  Proposition 211 is unprecedented in its sweep—so sweeping that virtually any advocacy organization may find itself ensnared by the disclosure regime, contrary to what the Court held in *Bonta*.  There, the Supreme Court made clear that "[r]egardless of the type of association, compelled disclosure requirements are reviewed under exacting scrutiny."  *Bonta*, 141 S. Ct. at 2383.  To uphold Proposition 211 under that standard would be irreconcilable with *Bonta*.  The law makes donor disclosure by charities addressing political issues the rule rather than the exception.  It requires direct donors to take affirmative action to avoid being disclosed—and denies indirect donors any opt-out

30

procedure whatsoever.   Compl. ¶ 90.   If Arizona may restrict routine, year-round advocacy by nonprofits as "campaign media spending," then the recognized exception for targeted, reasonable disclosures surrounding electioneering would swallow the First Amendment rule.   To the contrary, the requirement that disclosures bear a "substantial relation" to a "sufficiently important" governmental interest forecloses such casual, sweeping demands.   *Bonta*, 141 S. Ct. at 2385.

### 5.   Proposition 211 Unconstitutionally Infringes The Right To Petition.

The First Amendment also protects the right "to petition the Government for a redress of grievances."   U.S. Const. amend. I.   "[T]his right to petition [i]s one of the most precious of the liberties safeguarded by the Bill of Rights," one that "is implied by [t]he very idea of a government, republican in form."   *BE & K Const. Co. v. NLRB*, 536 U.S. 516, 524–25 (2002) (quotation omitted); *United States v. Cruikshank*, 92 U.S. 542, 552 (1876)).   "[T]he right to petition extends to all departments of the government, including the executive department, the legislature, agencies, and the courts."   *White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000).

Although these Petition Clause decisions did not involve campaign spending, *see* Comm'n Mot. 11, the Supreme Court has "recurrently treated the right to petition similarly to, and frequently as overlapping with, the First Amendment's other guarantees of free expression."   *McDonald v. Smith*, 472 U.S. 479, 490 (1985) (Brennan, J., concurring).   As explained, "Proposition 211 encompasses far more than election-related activity, sweeping up speech addressing the pressing issues of the day."   Compl. ¶ 105. "Through its daunting disclosure, disclaimer, and associated administrative requirements and burdens, Proposition 211 chills the right to opine publicly and petition one's government in violation of this 'precious' First Amendment right."   *Id.*

31

**B.      Proposition 211 Is Unconstitutional As Applied to Plaintiffs.**

Apart from their facial challenge, Plaintiffs have alleged "a 'reasonable probability' that disclosure of its contributors' names 'will subject them to threats, harassment, or reprisals from either Government officials or private parties.'"  *Citizens United*, 558 U.S. at 367 (quoting *Buckley*, 424 U.S. at 74).   Plaintiffs have "faced boycotts, personal threats, and even violence, as the Supreme Court itself has recently recognized."  Compl. ¶ 43.  Because Plaintiffs and their associates have "fierce critics, . . . their opponents regularly strive to identify the organizations' donors in order to threaten, attack, and sow fear among those who support organizations like Plaintiffs."  *Id.* ¶ 108.  Plaintiffs' supporters have specifically been "subjected to bomb threats, protests, stalking, and physical violence."  *Id.* ¶ 109 (quoting *Bonta*, 141 S. Ct. at 2388).

Given these threats, VRTK is badly mistaken in characterizing Plaintiffs' interest as a mere "preference for anonymity."  VRTK Mot. 16.  At this pleading stage, all of Plaintiffs' allegations are taken as true and all reasonable inferences are drawn in Plaintiffs' favor.  *Iqbal*, 556 U.S. at 678.

Defendants argue that Plaintiffs "did not plead facts showing *any* likelihood that disclosing certain high-level donors would chill speech by subjecting them (or anyone else) to threats, harassment, or reprisals."  Comm'n Mot. 2.  Even beyond the detailed allegations of the Complaint, however, the Supreme Court itself has discussed the likelihood that AFPF's donors will be subjected to threats, harassment, and reprisals based on the public disclosure of its donors.  *See Bonta*, 141 S. Ct. at 2388.

Defendants further claim that "nothing in Plaintiffs' Complaint alleges any harassment of them, their donors, or their members by anyone in Arizona."  Comm'n Mot. 15.  But the triggers for Proposition 211's disclosure, disclaimer, and associated administrative burdens are not confined by text or by logic to Arizona's borders.  Nor

will the ensuing harassment be so confined. If Plaintiffs' and their donors' information must be disclosed under Proposition 211, then Arizona officials are required to "make the information public" to the *world*. Ariz. Stat. § 16-973(H). There is no reason to suppose that would-be attackers would limit their attacks to Arizona, nor is there any reason why experience elsewhere in the United States would be inapplicable in Arizona.

No geographic restriction artificially constraints courts' analysis of "reasonable probability" of harm. *Buckley v. Valeo*, 424 U.S. 1, 74 (1976). Nor is there special reason to impose such a restriction here, where Arizona will publicly disclose the underlying information to prying eyes everywhere.

Defendants claim "Plaintiffs have not alleged that anyone falls into this category of donating more than $5,000 but not realizing the recipient spends the money on electioneering." Comm'n Mot. 9. To the contrary, Plaintiffs have alleged in detail that this category encompasses both Plaintiffs and their donors. *See* Compl. ¶¶ 12, 41–42.

Defendants further claim that Plaintiffs "hypothesize" about "unidentified donors," Comm'n Mot. 9, with VRTK implying that "Plaintiffs [must] allege that any specific donor has notified them of an intent to stop donating because of the Act's disclosure requirements," VRTK Mot. 16. These criticisms miss the mark. Again, Defendants and VRTK overlook the procedural posture of this case, as though we are at summary judgment. At this stage of the proceedings, each of Plaintiffs' allegations must be taken as true. Plaintiffs will be glad to develop the evidentiary record and prove up their detailed allegations when that time comes.

VRTK relatedly argues that Plaintiffs' "donors are not plaintiffs here." VRTK Mot. 16. But neither were donors parties in *Bonta*, 141 S. Ct. at 2381, which granted Plaintiff AFPF full relief. Plaintiffs have also alleged that their members have faced harm, that they make assurances to donors, Compl. ¶ 13, and that they themselves are

donors to other organizations that will be deemed "covered persons," Compl. ¶ 42. These allegations amply suffice to ground an as-applied challenge.

None of the precedents recognizing chilling under the First Amendment has named a particular donor who will no longer speak. Most notably, Plaintiffs pointed to the Supreme Court's decision in *Americans for Prosperity Foundation v. Bonta*, which relied upon factual findings regarding the significant risk of harm nationwide arising from public disclosure of donors to Americans for Prosperity Foundation—one of the Plaintiffs in the instant action. 141 S. Ct. 2373 (2021). It did so without a specific donor who would withdraw support if named and exposed to reprisals—a pleading standard that would be self-defeating. The Attorney General is simply wrong in claiming that Proposition 211's "disclosure requirements are not broadly applicable" in the way the disclosure requirement in *Bonta* was. AG Mot. 5; *see supra* Section I.A.

By Defendants' account, *Bonta*'s discussion of harassment should be dismissed as mere "dicta." Comm'n Mot. 15 n.8; VRTK Mot. 17. But the Supreme Court's pronouncements should not be so lightly dismissed. *Bonta* concluded that "the [California] disclosure requirement creates an unnecessary risk of chilling in violation of the First Amendment, indiscriminately sweeping up the information of every major donor with reason to remain anonymous." *Bonta*, 141 S. Ct. at 2388 (quotation omitted). In the same paragraph, the Court reiterated that AFPF "introduced evidence that they and their supporters have been subjected to bomb threats, protests, stalking, and physical violence." *Id.* Like the hundreds of amici curiae in that case, the Court confirmed that "[t]he deterrent effect feared by these organizations is real and pervasive." *Id.*

Defendants also make much of the fact that "[t]he Court did not grant Plaintiffs as-applied relief" against a disclosure regime "unrelated to electioneering." Comm'n Mot. 15 n.8. But this disclosure regime is similarly sweeping, as already noted, and *Bonta*

34

ruled California's regime was *facially* unconstitutional, from which it follows *a fortiori* that *narrower* as-applied relief would, at a minimum, be warranted here.

## II.      Proposition 211 Unconstitutionally Compels Association.

Proposition 211 ties organizations and their donors to various issue positions, other organizations, and candidates based on the ultimate use of their fungible donations, irrespective of their own intent or beliefs.  Compl. ¶ 117.  Given that Proposition 211 requires no nexus between any covered donor, on the one hand, and Arizona political speech, on the other, it will publicly and falsely compel donors to associate with causes they have no interest in and may even oppose.  *Id.*

In response, Defendants assert that "the donors . . . have a chance to opt out, so Prop. 211 does not compel association."  Comm'n Mot. 3.  But for all the reasons noted above, *see supra* Sections I.A.1 & 1.A.2, the opt-out provision is inadequate.  Regardless, Proposition 211's very *purpose* is to draw associations between individuals and entities. And there is no fair basis to ascribe such political motivations to all the donors at issue, particularly where the law omits any knowledge or purpose requirement.

The as-applied challenge is also proper, given concrete factual allegations .  *See supra* Section I.B.  Defendants claim that "Plaintiffs did not allege that they contribute to any other organizations that espouse views somehow contrary to what Plaintiffs' contributors believe."  Comm'n Mot. 17.  In fact, Plaintiffs allege they are heterodox groups espousing idiosyncratic views that not all donors share.  *See* Compl. ¶¶ 74, 88.

Defendants insist that "Plaintiffs are sending those organizations money—no one is compelling them to do so."  Comm'n Mot. 17.  But the issue is not Plaintiffs' association with groups to which they contribute—that is already disclosed under existing law.  The issue is Arizona compelling donors to associate with downstream organizations even when they have not made any conscious decision to associate with those

organizations, let alone specifically to fund their "campaign media spending" in Arizona. *See* Ariz. Stat. § 16-973(A)(6), (7).  Defendants lack an answer to this.

The Attorney General also argues, perplexingly, that Plaintiffs have not "pleaded any facts showing that they or any of their donors have been or could be forced to associate with an organization."  AG Mot. 4.  But she provides no argument on this point, simply asserting that "Plaintiffs' allegations regarding compelled association are speculative and are not sufficient to prevail on a facial challenge."  AG Mot. 3.  But Plaintiffs have indeed alleged such facts with specificity.  *See Iqbal*, 556 U.S. at 678.

**III.    Proposition 211 Differs From All Other Disclosure Laws Defendants Cite.**

Proposition 211's absence of requisite tailoring becomes all the more apparent when compared to the laws that other states have enacted to address so called "dark money."  Given the cumulative burden imposed by the interplay of its various provisions, Proposition 211 also goes far beyond the disclosure requirements under BCRA, which were upheld as applied in *Citizens United v. FEC*, 558 U.S. 310 (2010).  Compl. ¶ 99.

Defendants proclaim that "[c]ourts have upheld campaign finance disclosure requirements for decades," Comm'n Mot. 1, relying on *Citizens United*.  But this is fallacious for all the reasons noted:  BCRA's direct donor disclosure requirements are more narrowly tailored than Proposition 211's limitless look-through disclosure, disclaimer, and administrative burdens, which stifle speech *entirely*.  Federal law does not have a look-through requirement, *see* 52 U.S.C. § 30104(f), unlike Proposition 211, *see* Ariz. Stat. § 16-973(A)(6), (7).  When *Citizens United* was decided, the Federal Elections Commission's regulation 11 C.F.R. § 104.20(c)(9) imposed an earmarking limitation.  Moreover, "BCRA is clearer and more circumscribed in specifying the references that can trigger it," as "Proposition 211 designedly encompasses a wide[r] variety of elected officials involved in a wide[r] variety of facets of everyday life, from

state prosecutors, to county sheriffs, to all elected judges." Compl. ¶ 100. "Proposition 211's disclosure requirements are also triggered by advocacy concerning ballot initiatives . . . while BCRA's disclosure requirements are not." Compl. ¶ 101. Further still, "BCRA's disclosures do not turn on vague standards that invite standardless discretion" from a limitless array of private enforcers. *Id.*; *see* Ariz. Stat. § 16-977.

Defendants' reliance on the ordinance at issue in *No on E* and other state and local laws is similarly misplaced. None of these other laws contain infinite look-through provisions all the way back to the purported "original source," and they generally apply only to organizations' top donors. For example, the San Francisco ordinance at issue in *No on E*, a case decided in a preliminary-injunction posture, limits itself to requiring that disclaimers list the top three donors to a PAC and, if one of them is a committee, its top two contributors. *No On E v. Chiu*, 62 F.4th 529, 534 (9th Cir. 2023). In other words, it includes a secondary-contributor disclaimer requirement where secondary donors are "necessarily . . . making an affirmative choice to engage in election-related activity" by "donating to a primarily formed committee." *Id.* at 545. And it applies only to two or three contributors. *Id.* at 534. In stark contrast, Proposition 211 ventures into uncharted territory by requiring disclosures and disclaimers for hordes of otherwise-anonymous donors based on donations to large, heterodox organizations that engage in missions and activities that do not revolve around elections. That makes the organizations covered by the San Francisco ordinance quite distinct from the diverse array of nonprofits and other organizations that will be caught in Proposition 211's dragnet, where no such "affirmative choice to engage in election-related activity" is required before subjecting "original source" donors to public disclosures and disclaimers.

Notably, the plaintiffs in *No on E* challenged the ordinance's *disclaimer* requirements, but not the associated *disclosure* requirements. 62 F.4th at 545. As such,

the Ninth Circuit concluded that the secondary donors included in the disclaimers under the ordinance would "still . . . be subject to disclosure and publicly visible on government websites" even if the plaintiffs prevailed. *Id.* That alone was dispositive, rendering the rest of the opinion dicta. The Ninth Circuit also stated that "Defendants have a strong governmental interest in informing voters about *who funds* political advertisements," because understanding "what entity is funding a communication allows citizens to make informed choices in the political marketplace." *Id.* at 540 (emphasis added). Such logic does not apply in this case, where many of those subject to disclosure and disclaimer are *not even aware* that they are funding a group that will subject them to disclosure.

To be sure, Proposition 211 masquerades as a run-of-the-mill campaign finance regulation, as reflected in Defendants' accounts. But the masquerade requires either rewriting or ignoring key provisions of the law. Most tellingly, Defendants never grapple with "'the collective burdens associated with' complying" with the law. *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 874 (8th Cir. 2012). They also ignore how Proposition 211 "requires that the 'covered person' sit silent and muzzled for up to 21 days before using or transferring" their general treasury funds that were recently donated, Compl. ¶ 9, stifling speech entirely.

"Campaign media spending"—the trigger for Proposition 211's disclosure, disclaimer, and other requirements—includes speech regarding state and local ballot measures, with a catch-all provision for "other partisan campaign activity." Ariz. Stat. § 16-971(2)(a)(vi). Proposition 211's private enforcement mechanism, *see id.* § 16-977, invites private enforcers to go to court and urge their most aggressive, expansive interpretations of the law as the basis for compelling investigation and enforcement. A vast array of regulated entities is thus exposed to the most aggressive, expansive

approach to enforcement.  And given the limitless look-through provision, Proposition 211 sweeps within its scope untold legions of organizations and donors nationwide.

Imposing PAC-like recordkeeping and disclosure requirements on so many individuals and entities will imperil issue advocacy throughout the United States.  It will change the operations of any organization that potentially gives to any organization, that potentially gives to any other organization (and so on), that potentially engages in speech that Arizona deems "campaign media spending," as broadly defined.  *See* Ariz. Stat. § 16-971(2)(a).  If Arizona can do this, then so can any of the 50 states pursuant to its own disclosure, opt-out, and look-through regimes, resulting in a tangled, unnavigable web for advocacy organizations that try to speak to any issue nationwide.  Compl. ¶ 89.  Contrary to Defendants' account, there is no precedent for a state to do what Arizona is doing.

The Attorney General states that "[t]he Act applies only to campaign media spending, and the definition used in the Act mirrors other campaign disclosure laws that have been upheld."  AG Mot. 3.  But she overlooks how the law imposes burdens and casts chill through unique requirements attaching to its definitions, as set forth above.

By including look-through disclosure and disclaimer requirements not limited in number or in any way to traditional electioneering, while simultaneously imposing burdensome record and opt-out requirements, Proposition 211 ventures beyond any "campaign finance" law that can withstand First Amendment scrutiny.  Its undue burdens combine to cast an unconstitutional chill.  They also unconstitutionally compel association between organizations that choose to engage in traditional issue advocacy in Arizona and downstream "donors" who had no contemplation that their funds would find that particular use and likely have no particular views about Arizona politics.

## CONCLUSION

For the foregoing reasons, the motions to dismiss should all be denied.

1

2                                                DATED this 1st day of June, 2023.

3

4        **GREENBERG TRAURIG, LLP**                 **QUINN EMANUEL URQUHART &**
                                                             **SULLIVAN, LLP**
5

6                                                         */s/ Derek L. Shaffer*
        */s/ Dominic E. Draye*                            Derek L. Shaffer*
7        Dominic E. Draye                           derekshaffer@quinnemanuel.com
8           drayed@gtlaw.com                              John F. Bash, III*
        2375 E. Camelback Rd., Suite 800            johnbash@quinnemanuel.com
9        Phoenix, AZ 85016                              Jonathan G. Cooper*
10       (602) 445-8425                          jonathancooper@quinnemanuel.com
                                                         Paul D. Henderson*
11                                               paulhenderson@quinnemanuel.com
12                                                   1300 I Street NW, Suite 900
                                                     Washington, DC 20005
13                                                        (202) 538-8000
14

15                                                     *Admitted *pro hac vice*
16

17       Attorneys for Plaintiffs
         Americans for Prosperity &
18       Americans for Prosperity Foundation
19

20

21

22

23

24

25

26

27

28