Daniel J. Adelman (011368)
Chanele N. Reyes (034898)
Arizona Center for Law in the Public Interest
352 E. Camelback Rd., Suite 200
Phoenix, AZ 85004
(602)248-8850
danny@aclpi.org
chanele@aclpi.org

David Kolker* (DC Bar # 394558)
Tara Malloy* (DC Bar # 988280)
Elizabeth D. Shimek* (WI Bar # 1095937)
Campaign Legal Center Action
1101 14th St., NW, Suite 400
Washington, DC 20005
(202)736-2200
dkolker@campaignlegalcenter.org
tmalloy@campaignlegalcenter.org
eshimek@campaignlegalcenter.org
*Appearing *Pro Hac Vice*

*Attorneys for Voters' Right to Know*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| **Americans for Prosperity**, et al.,<br><br>    Plaintiffs,<br>v.<br><br>**Damien R. Meyer**, in his official capacity as Chairman of the Citizens Clean Elections Commission, et al.,<br><br>    Defendants. | No. 2:23-cv-00470-ROS<br><br>**PROPOSED INTERVENOR VOTERS' RIGHT TO KNOW'S REPLY IN SUPPORT OF MOTION TO DISMISS**<br><br>(Assigned to the Honorable Roslyn O. Silver) |

Proposed intervenor Voters' Right to Know ("VRTK") demonstrated in its Motion to Dismiss (Doc. 22-2) that the Voters' Right to Know Act ("VRTKA" or "Act") is narrowly tailored to serve compelling First Amendment interests. In their omnibus opposition (Doc. 33), Plaintiffs fail to demonstrate that they would be entitled to relief under any interpretation of facts susceptible of proof and do not even address many of VRTK's arguments. This Court should dismiss Plaintiffs' complaint with prejudice.[1]

## I. Plaintiffs Cannot Demonstrate That the VRTKA Is Facially Unconstitutional.

Plaintiffs virtually ignore the Act's "plainly legitimate sweep," *Ams. for Prosperity Found. v. Bonta,* 141 S. Ct. 2373, 2387 (2021) (citation and quotation marks omitted), and instead focus almost exclusively on speculative applications of the Act. However, "[i]n determining whether a law is facially invalid, [a court] must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449-50 (2008). "To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep." *United States v. Hansen*, —S. Ct.—, 2023 WL 4138994, at *5 (U.S. June 23, 2023) (citations omitted).

Contrary to Plaintiffs' argument (Doc. 33 at 7-8), while a facial challenge can indeed consider the general "sweep" of a statute's clear applications to parties not before a court, a facial challenge cannot rely—as Plaintiffs do—upon imaginary scenarios or erroneous interpretations of a statute. Plaintiffs offer little more than an undifferentiated attack on virtually all disclosure laws. Especially given Arizona voters' overwhelming support for the VRTKA, Plaintiffs' facial challenge is strongly disfavored because it "threaten[s] to short circuit the democratic process by preventing laws embodying the will of the people from being implemented." *Wash. State Grange*, 552 U.S. at 451.

---

[1] In its Order of June 7, 2023 (Doc. 37 at 2), this Court granted VRTK until June 29, 2023, to file this reply brief. Counsel for VRTK have consulted with counsel for the other parties. The Defendants do not object to VRTK's filing this brief, but Plaintiffs do object, based on their opposition to VRTK's proposed intervention.

### A. Plaintiffs do not deny that the Act serves critical First Amendment interests long recognized by the Supreme Court.

Plaintiffs do not deny VRTK's showing (Doc. 22-2 at 1-3) that "dark money" spending has increased dramatically in Arizona and nationally, and that such spending negates the interests served by disclosure laws. Most importantly, Plaintiffs ignore the three critical interests served by campaign finance disclosure laws that the Supreme Court identified in *Buckley v. Valeo*, 424 U.S. 1, 66-68 (1976): (1) providing the electorate with information as to where political campaign money comes from to aid voters in evaluating candidates; (2) deterring actual corruption and the appearance of corruption by shining light on large contributions and expenditures; and (3) gathering the data necessary to detect violations of the law. *See* Doc. 22-2 at 6. Instead, Plaintiffs attack (Doc. 33 at 27) the Act as if it were a limit on contributions rather than a disclosure law, criticizing the Act because it does not limit "money that flows to candidates in Arizona."

But disclosure laws and contribution limits serve different compelling interests in different ways. When the Supreme Court upheld contribution limits, it recognized that giving money directly to a candidate creates an inherent risk of quid pro quo corruption: "Congress was justified in concluding that the interest in safeguarding against the appearance of impropriety requires that the opportunity for abuse inherent in the process of raising large monetary contributions be eliminated." *Buckley*, 424 U.S. at 30. Regarding disclosure, however, the Court's focus was on the First Amendment value of educating the public and empowering citizens to hold their officeholders accountable. While the second interest the Court identified involved the deterrence of corruption, the means by which disclosure laws serve that purpose is not by limiting the amount of money persons can give to candidates, but by shining light on both contributions and expenditures: "A public armed with information about a candidate's most generous supporters is better able to detect any post-election special favors that may be given in return." *Id*. at 67.

Moreover, the Supreme Court has more recently emphasized that the first of the three interests, the public's informational interest, is "alone . . . sufficient to justify"

disclosure laws. *Citizens United v. FEC*, 558 U.S. 310, 369 (2010). And Plaintiffs' omnibus brief says nothing in response to VRTK's showing (Doc. 22-2 at 4-5) that disclosure laws like the Act promote the interests underlying the First Amendment by providing citizens critical tools to engage in self-government and hold their officeholders accountable.[2]

### B. Plaintiffs' sweeping attacks would invalidate virtually all campaign disclosure laws.

After attacking the Act as if it were meant to be a limit on campaign contributions, Plaintiffs then suggest (Doc. 33 at 28) that the Act is counterproductive because it "tells candidates whom they should be beholden to for supportive speech." This astonishing suggestion runs counter to both the law and the facts and, if accepted, would imperil all laws requiring disclosure of expenditures—not just a law like the Act that requires disclosure of the original sources of campaign spending. First, as a matter of fact, Plaintiffs have no basis for their assumption that such spenders, absent a disclosure law, would refrain from informing their favored candidates who was behind the spending that supports them, or that candidates themselves would not learn on their own. And, in any event, as a matter of law, the Supreme Court long ago ruled that disclosure requirements are the "least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist." *Buckley*, 424 U.S. at 68.

Piling on further, Plaintiffs suggest (Doc. 33 at 28) that the Act will give voters *too much* information when they paternalistically assume "voters' likely inability to appreciate any contributors beyond direct donors." First, this argument is particularly baffling as applied to the VRTKA, given that more than 72% of Arizona voters just approved this new law at the ballot box. Plaintiffs offer no factual or legal basis for assuming that the same citizens who voted overwhelmingly to shine light on dark money

---

[2] Contrary to Plaintiffs' unsupported statement (Doc. 33 at 5), the Act imposes no "outright prior restraints on speech." To the contrary, "[d]isclaimer and disclosure requirements . . . impose no ceiling on campaign-related activities . . . and do not prevent anyone from speaking." *Citizens United*, 558 U.S. at 366 (citations and quotation marks omitted).

1  spending are unable to discern the difference between real people or companies and
2  "ad hoc organizations with creative but misleading names." *No on E, San Franciscans*
3  *Opposing the Affordable Hous. Prod. Act v. Chiu*, 62 F.4th 529, 541 (9th Cir. 2023)
4  (citations and quotation marks omitted).

5        Second, the Supreme Court has repeatedly rejected the bald assumption that voters
6  will be confused by objective election information: "our cases reflect a greater faith in the
7  ability of individual voters to inform themselves about campaign issues." *Wash. State*
8  *Grange*, 552 U.S. at 454-55 (citations and quotation marks omitted).

9        Third, when *Citizens United* upheld the disclosure requirements for federal
10  campaign expenditures, it explained:

> With the advent of the Internet, prompt disclosure of expenditures can provide shareholders and citizens with the information needed to hold corporations and elected officials accountable for their positions and supporters. Shareholders can determine whether their corporation's political speech advances the corporation's interest in making profits, and citizens can see whether elected officials are "in the pocket" of so-called moneyed interests.

15  558 U.S. at 370 (citations and quotation marks omitted). As VRTK explained (Doc. 22-2
16  at 6), the internet has made it possible for ordinary citizens to search quickly for relevant
17  information in massive databases containing millions of data points, but this
18  accountability cannot take place if shareholders and citizens cannot learn the true source
19  of the moneyed interests paying for campaign ads.[3]

20        Finally, Plaintiffs complain (Doc. 33 at 15) that original source donors may be
21  disclosed by a spender after the donors' money has been passed on by intermediaries, and
22  that original donors may not agree with all of the spenders' campaign advocacy. Besides
23  the fact that Plaintiffs have failed to allege any particular instances of this hypothetical
24  scenario—let alone any specific harm resulting from this possibility—the more
25  fundamental point is that the same phenomenon could occur when *direct* donors give to
26  organizations. Some donors may give to the NRA because they want to support its gun

---

[3] *See, e.g.,* search capabilities provided by the FEC and the Arizona Secretary of State, available at https://www.fec.gov/data/ and seethemoney.az.gov.

4

safety programs, while other donors may give to the Sierra Club because they wish to address climate change—and these same donors may have no interest in supporting either organizations' election advocacy. These donors are nonetheless subject to many disclosure laws at the federal and state level. Plaintiffs' argument thus proves too much because it would threaten most campaign finance disclosure laws. In any event, as we previously explained (Doc. 22-2 at 7-10) and elaborate below, the Act is uniquely narrowly tailored because its opt-out provisions give donors *more* control over how their money is spent as compared with other campaign finance disclosure laws.

### C.     The Act is narrowly tailored and has a plainly legitimate sweep.

The Act is sharply focused on shining light on dark money in Arizona: revealing big spenders who use large donations from others to finance campaign spending. As VRTK explained (Doc. 22-2 at 7-10), the Act's key features include:

- High thresholds before a spender becomes a "covered person" who must report the original sources of its funds, A.R.S. § 16-971(7), and before an original source donor is identified, A.R.S. § 16-973(A)(6).
- A definition of "campaign media spending" that largely borrows from federal law, A.R.S. § 16-971(2), covering communications that "expressly advocate" for or against a candidate; that promote, support, attack, or oppose a candidate or ballot referendum;[4] that refer to a candidate shortly before an election and that are disseminated in the precise jurisdiction where the election is taking place; and that support the election of candidates of a particular political party.
- A donor notice and opt-out provision that gives donors significant control over how their money is spent and whether their contributions are disclosed. A.R.S. §§ 16-971(18); 16-972(B), (C).

---

[4] Plaintiffs do not attempt to refute the precedent VRTK cites (Doc. 22-2 at 10-11) to demonstrate that the "promotes, supports, attacks, or opposes" standard in A.R.S. § 16-971(2)(a) is constitutional.

### 1. The Act's high thresholds and other features focus on the worst abuses of dark money and protect against circumvention.

Plaintiffs do not dispute VRTK's showing (Doc. 22-2 at 7) that the Act's thresholds for "covered person" status and donor identification are significantly higher than other campaign finance disclosure laws. Plaintiffs misunderstand, however, certain provisions of the Act that are designed to prevent circumvention of the disclosure obligations.

While the threshold for reporting donors to the Secretary of State is $5,000, A.R.S. § 16-973(A)(6), the threshold for identifying original sources of contributions provided by direct donors to covered persons is $2,500, A.R.S. § 16-972(D). The purpose of the lower $2,500 threshold is to prevent the kind of evasion that Plaintiffs themselves foreshadow when they suggest (Doc. 33 at 29-30) that a "large-dollar donor" could hide its role by "contribut[ing] $4,999 to numerous intermediary shell corporations to evade disclosure." In fact, however, if such a donor attempted that kind of evasion, a covered person would be notified of all such $4,999 contributions because that amount surpasses the $2,500 threshold regarding information to be provided to a covered person. That person would then consolidate the disaggregated less-than-$5,000 contributions and report the total contributions received—albeit indirectly—from the original source. Moreover, Plaintiffs ignore A.R.S. § 16-975, which prohibits "structured transactions" that "attempt to . . . evade the reporting requirements" of the Act.[5] Thus, these provisions address precisely the type of subterfuge that Plaintiffs claim the Act permits.

### 2. The definition of "campaign media spending" is not overbroad.

The definition of "campaign media spending" targets campaign advocacy, not so-called "issue advocacy," but in the disclosure context, that supposed distinction is irrelevant. As VRTK explained (Doc. 22-2 at 10), when *Citizens United* upheld the

---

[5] This provision closely tracks a well-established banking law, 31 U.S.C. § 5324(a), which prohibits structured financial transactions to evade reporting requirements for financial institutions. *See United States v. Davenport*, 929 F.2d 1169, 1172-73 (7th Cir. 1991) (upholding statute).

1 disclosure requirements for *all* "electioneering communications," 52 U.S.C.
2 § 30104(f)(3), it "reject[ed] the contention that . . . disclosure requirements must be
3 limited to speech that is the functional equivalent of express advocacy." 558 U.S. at 369.
4 Indeed, the Supreme Court held, 8-1, that "[e]ven if the ads only pertain to a commercial
5 transaction, the public has an interest in knowing who is speaking about a candidate
6 shortly before an election." *Id*. at 369. One such "commercial" ad considered in *Citizens*
7 *United* was a ten-second pitch for a movie about Hillary Clinton, which stated only: "If
8 you thought you knew everything about Hillary Clinton. . . wait 'til you see the movie"
9 (followed by the text "Hillary: The Movie" and "www.hillarythemovie.com"). *See*
10 *Citizens United v. FEC*, 530 F. Supp. 2d 274, 276 n.2 (D.D.C. 2008) (three-judge court).
11 Compared with that rather vacuous ad, a communication concerning Sheriff Arpaio's
12 contempt proceeding shortly before his election in 2016 (Doc. 33 at 9) would be
13 significantly more informative to the public.

14       Similarly, Plaintiffs suggest that disclosure about campaign spending on ballot
15 measures is somehow off limits because they view such communications as "issue
16 advocacy." But any purported distinction between "issue advocacy" and other
17 classifications of advocacy is not relevant under *Citizens United* or Ninth Circuit
18 precedent. *See Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 1016 (9th Cir.
19 2010) ("[T]he position that disclosure requirements cannot constitutionally reach issue
20 advocacy is unsupportable.").

21       Regarding ballot measure disclosure, Plaintiffs repeat the same mistake described
22 above: attacking the Act as if it were a limit on expenditures or contributions rather than a
23 disclosure statute. Rather than refute the precedents (*see* Doc. 22-2 at 11 & n.7) of *First*
24 *Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 792 n.32 (1978), and *Citizens Against Rent*
25 *Control/Coal. for Fair Housing v. City of Berkeley*, 454 U.S. 290, 299 (1981), that
26 expressed approval of disclosure in the ballot measure context, Plaintiffs offer a red
27 herring, citing *Bellotti* for the proposition that *spending limits* on ballot measures cannot
28 be justified by an interest in preventing the corruption of *candidates* (Doc. 33 at 27). But

the Act here provides voters critical information when they engage in direct democracy; it does not purport to limit independent spending on campaign advocacy.

Next, Plaintiffs offer no substantive response to VRTK's explanation (Doc. 22-2 at 11) that the Act clearly states that "partisan campaign activity," A.R.S. § 16-971(2)(a)(vi)—such as driving voters of only one political party to the polls—constitutes campaign spending only if it "supports the election or defeat of candidates of an identified political party or the electoral prospects of an identified political party." Rather than address this description of the Act's unambiguous grammatical construction, Plaintiffs respond (Doc. 33 at 12) with ipse dixit: stating without explanation or contrary interpretation that the Commission's and VRTK's reading of the Act's text is "different from the law's terms."

In sum, while ignoring the Act's central focus on campaign advocacy—i.e., its plainly legitimate sweep—Plaintiffs offer a series of baseless or strained interpretations of the Act to suggest that it reaches significantly beyond disclosures of legitimate interest to voters. VRTK does not agree that the text of the Act contains any genuine ambiguities of constitutional significance. But to the extent the Court finds that the parties' competing interpretations present any risk of constitutional infirmity, the Court should adopt VRTK's interpretation and follow the longstanding "canon of statutory construction" that "as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, [a court's] plain duty is to adopt that which will save the Act." *Rust v. Sullivan*, 500 U.S. 173, 190 (1991) (citations and quotation marks omitted). *See also Hansen*, 2023 WL 4138994, at *10 ("When legislation and the Constitution brush up against each other, our task is to seek harmony, not to manufacture conflict.") (footnote omitted).

### 3. The Act provides donors more control than other campaign finance disclosure laws.

As VRTK explained (Doc. 22-2 at 7-10), the Act includes a unique "opt out" provision that ensures that donors who give to covered persons have notice that their

money may be used for campaign media spending and the right to opt out of that use. Plaintiffs' arguments about this feature are not even internally consistent, much less meritorious.

On the one hand, Plaintiffs complain (Doc. 33 at 24) that the Act burdens donors because it purportedly "forces donors to tell an organization how to spend their money to prevent a donor's public disclosure." But on the other hand, Plaintiffs also complain (Doc. 33 at 15, 18) that upstream donors—those whose funds are transferred to a covered person through an intermediary—do not have the same ability because the Act only requires a covered person to provide the notice to its own direct donors. A.R.S. § 16-972(B). As previously explained (Doc. 22-2 at 7-10), the Act strikes a balance between the duties and privileges of donors and spenders, gives donors great control over how their money will spent and whether their contributions will be publicly disclosed, and refrains from micromanaging the relationships among donors and spenders.

In response to VRTK's observation (Doc. 22-2 at 9) that nothing in the Act prevents a covered person from notifying the original sources of funds about its intent to spend that money on campaigning, Plaintiffs simply state (Doc. 33 at 18) that this "proposed solution would be unworkable." But under the Act, covered persons will learn the identity of the original sources of the funds they receive from their own direct donors, A.R.S. § 16-972(D), and so will have the information necessary to give the same notice and opt-out choice to upstream donors whose identities will be reported in disclosure reports, if they wish.

Plaintiffs also speculate (Doc. 33 at 18) that such an upstream donor (who has indirectly contributed more than $5,000 to a covered person), when "confronted with the opt-out[,] may be left confused, at best, and likely intimidated." This baseless suggestion is contrary to the Supreme Court's faith about citizens' intelligence. *Wash. State Grange*, 552 U.S. at 454-55. It is also contrary to the Court's broader expectation that citizens will educate themselves about new laws and adjust to them: "The entire structure of our democratic government rests on the premise that the individual citizen is capable of

informing himself about the particular policies that affect his destiny" and can "become familiar with their obligations under it." *Atkins v. Parker*, 472 U.S. 115, 130-31 (1985).

The VRTKA's donor notice and traceback features are new. But there is no basis for speculating that donors, intermediaries (if any), and spenders will not adapt and comply with the new law, as well as take advantage of its many flexibilities. Nothing in the Act prevents an upstream donor from putting restrictions on how its contributions can be passed on to covered persons, stops an intermediary from checking with its own donors before passing on their funds to covered persons, or silences a covered person who wishes to consult with the original sources of the funds in its possession. These options minimize that Act's burdens and enhance its narrow tailoring.

**D.  Plaintiffs rely on several other misinterpretations of the Act.**

In their attempt to characterize the Act as overbroad, burdensome, or otherwise unconstitutional, Plaintiffs rely on a series of errors and attack straw men.

First, although Plaintiffs do not deny that the Act permits a covered person to spend a donor's money immediately upon receiving written consent to use the funds for campaign media spending in Arizona, A.R.S. § 16-972(C), they speculate (Doc. 33 at 24) that obtaining such written consent is "unworkable" because it would purportedly "require organizations to seek, follow up on, and register such a multiple of authorizations." But covered persons could take advantage of this option simply by including a consent form with their solicitations (or a checkbox for online contributions), for donors to complete with their contributions.[6]

Second, Plaintiffs suggest (Doc. 33 at 25) that the Act "treats all donations as fungible, such that *one* donor's lack of authorization would at least arguably foreclose *any* covered use of general treasury funds into which that donation has flowed." This suggestion is wrong. Covered persons need not segregate funds that can be used for campaign media spending—i.e., "traceable monies," A.R.S. § 16-971(18)—from funds

---

[6] Plaintiffs appear to ignore the fact that donors can consent in writing immediately. *See* Doc. 33 at 23 ("The upshot requires would-be speakers to sit silent for up to 21 days before using or transferring donors' monies for campaign media spending.").

that come from donors who have opted out. Instead, covered persons need only track and report the amount of traceable monies they have received and spent, as well as maintain "transfer records" about large contributors. *See* A.R.S. §§ 16-971(19); 16-972(A); 16-973(A). Thus, unlike federal law, covered persons under the Act need not establish a political committee or "separate segregated fund," *see* 52 U.S.C. § 30101(4)(B), to receive and spend funds for campaign activity, nor even a separate bank account. *Cf.* 52 U.S.C. § 50104(f)(3)(E) & (F) (requiring a separate bank account for funds contributed for electioneering communications in order to limit disclosure to those contributions). Nothing in the Act prevents covered persons from comingling traceable and non-traceable funds, as long as bookkeeping records keep track of the distinction.[7]

Third, in response to VRTK's explanation (Doc. 22-2 at 8 n.5) that the Act gives covered persons flexibility to provide the required notice and opt-out choice *after* a donation has been received, A.R.S. § 16-972(C), Plaintiffs argue (Doc. 33 at 25) that it is "otherworldly to suppose that after-the-fact opt-out solicitations will receive compliant responses *en masse*." This statement is a non sequitur. The relevant legal point is that the Act allows for the possibility that a covered person may not be able to accurately estimate how much campaign media spending it will engage in during an election cycle. And if it would prefer not to include the applicable notice in all its solicitations, the covered person can lawfully return to its donors later to provide the notice and opportunity to opt out. This procedure is stated unambiguously in section 16-972(C). If Plaintiffs believe they

---

[7] Plaintiffs misrepresent (Doc. 33 at 25-26) the reporting requirements in A.R.S. § 16-973(A). An individual or entity becomes a covered person upon spending over the $50,000 or $25,000 thresholds (for statewide and non-statewide races, respectively) and must file a report within five days of reaching that status and again each time subsequent spending crosses certain thresholds. A.R.S. § 16-973(B). The reports must disclose the total amount of traceable monies owned or controlled by the covered person at the time of the report, A.R.S. § 16-973(A)(5), and must identify donors who provided, directly or indirectly, more than $5,000 in traceable monies to the covered person during the election cycle, A.R.S. § 16-973(A)(6). Contrary to Plaintiffs' speculation (Doc. 33 at 26), nothing in the Act's reporting provisions suggests that donors are to be reported based on their "pro rata share of donations" or that the disclosure reports "disclose just enough donors to cover the speech."

will more likely get "compliant responses *en masse*" if they include the notice at the time the donations are originally solicited, that is their choice; but any such preference does not vitiate the flexible notice option the Act clearly provides.

Fourth, contrary to Plaintiffs' suggestion (Doc. 33 at 6), the Act does not "deputiz[e]" "the entire electorate as enforcers" of the Act. The Act provides no general private right of action for citizens to file lawsuits against covered persons or donors. Rather, it merely allows any qualified voter to file a complaint with the Citizens Clean Elections Commission. A.R.S. § 16-977(A). If the Commission then dismisses or takes no substantive action on the complaint, a complainant can sue the *Commission* to compel it to take action on the complaint. A.R.S. § 16-977(C). Any such Commission enforcement decisions are subject to judicial review. A.R.S. § 16-974(B).

Fifth, Plaintiffs misstate (Doc. 33 at 17) how the Act's traceback features apply to donations of money versus volunteer work or other in-kind contributions. The traceback requirements only look for sources of "original monies," which are defined as either business income or an individual's personal monies, not services or other in-kind contributions. A.R.S. §§ 16-971(1), (12), (14). In other words, although donors who themselves make certain in-kind contributions *directly* to a covered person must inform the covered person of the large sources of "original monies used to pay for the in-kind contribution," A.R.S. § 16-972(E), such donors are not required to disclose the identity of persons who gave them only in-kind contributions. Thus, contrary to Plaintiffs' hypothetical scenario (Doc. 33 at 17) about a volunteer at a church that later makes a donation to a covered person, the church would not have to inform the covered person of the value of the volunteer efforts it had received.

Sixth, regarding the Act's so-called media exemption, *see* A.R.S. § 16-971(2)(b)(i), Plaintiffs' comparison (Doc. 33 at 22) with federal law tells only half the story. The Federal Election Campaign Act has two media exemptions: one regarding electioneering communications, 52 U.S.C. § 30104(f)(3)(B)(i), which Plaintiffs cite, and another that applies more broadly as an exception to the definition of "expenditure," 52 U.S.C.

§ 30101(9)(B)(i), which Plaintiffs ignore. Thus, the Act does *not* exempt a "broader swath of activity than its federal analogue" (Doc. 33 at 22). Moreover, as previously explained (Doc. 22-2 at 13-14), although *Citizens United* expressed skepticism about the media exemption regarding a ban on corporate independent expenditures, the same decision upheld the disclosure requirements for electioneering communications, notwithstanding the federal statute's media exemption.

Finally, the Act's media exemption does not render it underinclusive for another reason: the communications that fall within the exemption do not easily lend themselves to dark money abuse. When a "news story, commentary or editorial" is disseminated by a broadcaster, publisher, or similar media outlet, A.R.S. § 16-971(2)(b)(i), the speaker does not typically hide behind a front group. As explained (Doc. 22-2 at 13), the Supreme Court is especially skeptical of underinclusive arguments under the First Amendment, and specifically in the area of campaign finance, where the Court grants "considerable deference" to laws that cautiously advance "step by step." *FEC v. National Right to Work Comm.*, 459 U.S. 197, 209 (1982).

In sum, Plaintiffs have offered no valid reason for denying VRTK's motion to dismiss Plaintiffs' facial challenge to the Act.

## II. Plaintiffs Cannot Demonstrate That the VRTKA Is Unconstitutional As Applied to Them.

Plaintiffs complain (Doc. 33 at 33) that Defendants are demanding too high an evidentiary showing "at this stage of the proceedings" with respect to their claim for an as-applied exemption from the Act. But Plaintiffs misunderstand VRTK's argument. The problem is not that the "evidentiary record" is incomplete, *see id.*—although Plaintiffs failed to make even the barest attempt at creating a record on their pleadings—but that Plaintiffs have not even *alleged* with specificity any facts that would show "a reasonable probability that the compelled disclosure of . . . contributors' names will subject them to threats, harassment, or reprisals," *Buckley*, 424 U.S. at 74.

As VRTK highlighted, neither Americans for Prosperity ("AFP") nor Americans for Prosperity Foundation ("AFPF") have made any specific allegations that their donors have suffered adverse effects in the past when their association with Plaintiffs became known; nor have they demonstrated reason to believe their donors are likely to suffer threats or harassment in the future by reason of the disclosure required by the Act. Instead, they have made only general statements about "fierce critics," Compl. ¶¶ 43, 108, "opponents" who "regularly strive to identify the organizations' donors," *id*. ¶ 108, and the "empirical[] . . . risk" that their donors may face "character attacks, personal threats, and even violence," *id*.

Nor have Plaintiffs alternatively alleged that their donors have threatened to stop their contributions to Plaintiffs or expressed any particularized concerns about harassment or reprisals by reason of the Act's future application. Plaintiffs protest (Doc. 33 at 33) that they are not yet required to have complied an evidentiary record on this claim, but VRTK's objection is that Plaintiffs have not even *alleged* this type of "chilling effect" on their donors. This silence is particularly notable given that Plaintiffs do not contest VRTK's statement (Doc. 22-2 at 17 n.9) that their affiliated super PAC reported almost $70 million in federal independent expenditures in the 2021-22 election cycle and identified hundreds of donors in public disclosures. Plaintiffs make no allegations here that any such donors have faced any harassment from such disclosure.

Instead of making allegations of harassment arising from the VRTKA, Plaintiffs cite the purported factual findings of two different cases—*John Doe No. 1 v. Reed*, 561 U.S. 186 (2010) and *Bonta*—the first of which did not involve Plaintiffs, and the second of which involved only AFPF. *See* Compl. ¶¶ 43, 108. Even if these cases had found that both Plaintiffs had shown a "reasonable probability" of harassment warranting as-applied relief, their relevance here would be questionable. But these cases did no such thing.

In *Bonta*, the only case with any connection to a party here, the Supreme Court did not consider whether the plaintiffs had made a showing sufficient to qualify for *Buckley*'s as-applied exemption. 424 U.S. at 74. Instead, the Supreme Court, in dicta, merely took

note of the evidence of harassment that the *Bonta* plaintiffs[8] had introduced by way of balancing the countervailing testimony that other groups did "not mind" being subject to the challenged California tax reporting law. 141 S. Ct. at 2388. Moreover, this discussion went to the facial validity of the law at issue there—which was not a campaign finance disclosure law—and whether it chilled a "substantial number" of organizations, not to as-applied relief. Accordingly, *Bonta* explicitly noted that it was *not* requiring the plaintiffs to make the more "demanding" as-applied showing that such organizations would be "subjected to harassment and reprisals." *Id*. at 2389 (noting that plaintiff need not shoulder this "evidentiary burden" where "the challenged regime" was not "narrowly tailored to an important government interest").

Finally, even if *Bonta* had squarely found that the plaintiffs there had demonstrated that their donors would likely draw harassment if subject to public disclosure, Plaintiffs here could not simply rely upon those findings now. This case concerns different plaintiffs, a more targeted law that requires campaign-related disclosures to educate the public, a different time and place, and more donor control over disclosure. Plaintiffs have entirely failed to allege that the disclosure required by *this* Act, at *this* time—and concerning only their Arizona-based "campaign media spending"—is likely to lead to any new or additional impacts on their donors, much less a probability of significant threats and harassment.

In sum, Plaintiffs have offered no valid reason for denying VRTK's motion to dismiss their as-applied challenge to the Act.

---

[8] *Bonta*'s incidental remark about the evidentiary record related to only one of the Plaintiffs here: AFPF, not AFP. And, more problematically, the statement also encompassed evidence from an entirely different plaintiff, the Thomas More Law Center, which had adduced entirely different claims of harassment than those claimed by AFPF. *See* 141 S. Ct. at 2393.

DATED this 29th day of June, 2023.

ARIZONA CENTER FOR LAW IN
THE PUBLIC INTEREST

Daniel J. Adelman
Chanele N. Reyes
352 E. Camelback Rd., Suite 200
Phoenix, AZ  85012

CAMPAIGN LEGAL CENTER ACTION

*/s/ Tara Malloy*
David Kolker (*pro hac vice*)
Tara Malloy (*pro hac vice*)
Elizabeth D. Shimek (*pro hac vice*)
1101 14th St., NW, Suite 400
Washington, DC 20005

*Attorneys for Voters' Right to Know*