**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Americans for Prosperity, et al.,

              Plaintiffs,

v.

Damien R Meyer, et al.,

              Defendants.

No. CV-23-00470-PHX-ROS

**ORDER**

      Plaintiffs Americans for Prosperity and Americans for Prosperity Foundation believe a new Arizona law violates the First Amendment both facially and as applied. Defendants and proposed intervenors filed motions to dismiss. For the following reasons the motions will be granted with limited leave to amend.

## ANALYSIS

      In the 2022 election, Arizona voters passed Proposition 211, known as the Voter's Right to Know Act (the Act). The Act aims to provide the public with additional information regarding the source of the funds for political advertising. The Act focuses on "covered persons" who engage in "campaign media spending." Both terms are defined in the Act.

      The Act defines a "covered person" as any person (either a natural person or entity) "whose total campaign media spending or acceptance of in-kind contributions to enable campaign media spending, or a combination of both, in an election cycle is more than

$50,000 in statewide campaigns or more than $25,000 in any other type of campaigns."[1] A.R.S. § 16-971(7). This definition excludes individuals who spend their own money on campaign media spending, any organization that spends its own business income on campaign media spending, any "candidate committee," and any political action committee that receives $20,000 or less "from any one person in an election cycle." A.R.S. § 16-971(7)(b). The referenced "election cycle" is the two-year period "beginning the day after general election day in even-numbered years and continuing through the end of general election day in the next even-numbered year." A.R.S. § 16-971(8).

The Act contains a lengthy definition of "campaign media spending" that, in general, covers "spending monies or accepting in-kind contributions[2] to pay for" communications that refer to candidates or initiatives.[3] A.R.S. § 16-971(2)(a). The Act

---

[1] Based on this definition, Plaintiffs allege they "could" be deemed "covered persons." (Doc. 1 at 26).

[2] The Act defines "in-kind contribution" as "a contribution of goods, services or anything of value that is provided without charge or at less than the usual and normal charge." A.R.S. § 16-971(11).

[3] The full definition in A.R.S. § 16-971-(2)(a) provides "campaign media spending" covers:

> (i) A public communication that expressly advocates for or against the nomination, or election of a candidate.
>
> (ii) A public communication that promotes, supports, attacks or opposes a candidate within six months preceding an election involving that candidate.
>
> (iii) A public communication that refers to a clearly identified candidate within ninety days before a primary election until the time of the general election and that is disseminated in the jurisdiction where the candidate's election is taking place.
>
> (iv) A public communication that promotes, supports, attacks or opposes the qualification or approval of any state or local initiative or referendum.
>
> (v) A public communication that promotes, supports, attacks or opposes the recall of a public officer.
>
> (vi) An activity or public communication that supports the election or defeat of candidates of an identified political party or the electoral prospects of an identified political party, including partisan voter registration, partisan get-out-the-vote activity or other partisan campaign activity.

excludes from this definition spending by news organizations and nonpartisan activities.[4] A.R.S. § 16-971(2)(b).

The Act requires covered persons keep records, that is maintain "transfer records" that disclose the source of funds of more than $2,500.[5] The responsibility for creating transfer records is spread across multiple individuals or entities. A natural person or entity who donates more than $5,000 to a covered person during an election cycle is required by the Act to provide to the covered person the identity of every "person that directly or indirectly contributed more than $2,500" of the funds being donated. A.R.S. § 16-972(D). The information provided must also identify any previous transfers of $2,500 or more. In other words, if a donation larger than $5,000 to a covered person is comprised of other donations, and any of the other donations was $2,500 or more, all other donations of more than $2,500 must be identified in writing. The final point of information that must be

---

(vii) Research, design, production, polling, data analytics, mailing or social media list acquisition or any other activity conducted in preparation for or in conjunction with any of the activities described in items (i) through (vi) of this subdivision.

[4] The listed exclusions from "campaign medial spending" in A.R.S. § 16-971(2)(b) are:

(i) A news story, commentary or editorial by any broadcasting station, cable television operator, video service provider, programmer or producer, newspaper, magazine, website or other periodical publication that is not owned or operated by a candidate, a candidate's spouse or a candidate committee, political party or political action committee.

(ii) A nonpartisan activity intended to encourage voter registration and turnout.

(iii) Publishing a book or producing a documentary, if the publication or production is for distribution to the general public through traditional distribution mechanisms or if a fee is required to purchase the book or view the documentary.

(iv) Primary or nonpartisan debates between candidates or between proponents and opponents of a state or local initiative or referendum and announcements of those debates.

[5] The Act defines "transfer records" as "a written record of the identity of each person that directly or indirectly contributed or transferred more than $2,500 of original monies used for campaign media spending, the amount of each contribution or transfer and the person to whom those monies were transferred." A.R.S. § 16-971(19).

provided is any donor who provided more than $2,500 that was derived from the donor's regular business activities or personal income, such as "earned income from bona fide employment." A.R.S. § 16-971(14). The Act also requires the donor and covered person to maintain these records for five years. A.R.S. § 16-972.

The Act also has a public disclosure requirement which includes reports that must be provided to the Arizona Secretary of State. Every covered person must file a report with the Arizona Secretary of State identifying each donor who contributed more than $5,000 of the monies used for campaign media spending. A.R.S. § 16-973(6). This report must also identify any other persons or entities who were a prior source of $5,000 or more of the donated monies. A.R.S. § 16-973(7). That is, when a donation consisted of a series of earlier donations, each prior donation of $5,000 or more must be included in the report.[6] The donors and intermediaries must be identified until the source of "original monies" is identified. The source of "original monies" is the person or entity that derived the funds from either regular business income or personal income. A.R.S. § 16-973(6) (requiring disclosure of "donor of original monies"); A.R.S. § 16-971(12) (defining "original monies" as business income or personal income).

While covered persons must disclose certain donors who fund campaign media spending, the Act also requires that covered persons give their donors the opportunity to avoid disclosure. When a covered person wishes to use a donation for campaign media spending, the covered person must "[i]nform donors that they can opt out of having their monies used or transferred for campaign media spending."[7] A.R.S. § 16-972(B)(2). The covered person may provide its donors with this opt-out option either before or after receiving the donations. A.R.S. § 16-972(C). Regardless of when the opt-out option is provided, the covered person cannot use a donation for "campaign media spending until at least twenty-one days after the notice is provided or until the donor provides written

---

[6] The $5,000 threshold for disclosure to the Secretary of State is higher than the $2,500 threshold for donations to a covered person. As explained later, the different disclosure limits were aimed at preventing evasion of the Act's requirements.

[7] The Act appears to require this option be given to donors regardless of the amount donated at a single time.

consent" allowing the use of the donation on campaign media spending.  A.R.S. § 16-972(C).  Thus, if a covered person chooses not to obtain written consent when receiving a donation, it is possible the covered person will have possession of a donation for up to twenty-one days without the ability to spend the donation on campaign media spending.

Beyond requiring disclosures of donations larger than $5,000 to the Secretary of State, the Act also requires covered persons disclose their three largest donors in "public communications," another statutorily defined term.[8]  When a covered person makes a paid communication to the public, such as an advertisement "by means of broadcast, cable, [or] satellite," the communication must "state, at a minimum, the names of the top three donors who directly or indirectly made the three largest contributions" to the covered person of funds the donors derived from regular business activities or personal income.  A.R.S. § 16-974(C).  This requirement does not tie the disclosure to the funds used for a particular public communication.  Rather, a covered person must disclose its three largest donors no matter the amount donated or how those donors' funds are used.

The Act allows a covered person not to disclose "the identity of an original source" if that source is "protected from disclosure by law or a court order."  A.R.S. § 16-973(F).  Alternatively, disclosure is not required if "there is a reasonable probability that public knowledge of the original source's identity would subject the source or the source's family to a serious risk of physical harm."  A.R.S. § 16-973(F).

The Act grants the Citizens Clean Elections Commission ("Commission") power "to implement and enforce" the Act by, among other things, adopting and enforcing rules.  A.R.S. § 16-974(A)(1).  The Commission has not yet adopted any rules.  The Act also grants the Commission enforcement power by granting the Commission authority to impose "civil penalties for noncompliance" and allowing the Commission to "[s]eek legal and equitable relief in court as necessary."  A.R.S. § 16-974(A)(6).  Any civil penalty must

---

[8] The Act defines "public communication" as "a paid communication to the public by means of broadcast, cable, satellite, internet or another digital method, newspaper, magazine, outdoor advertising facility, mass mailing or another mass distribution, telephone bank or any other form of general public political advertising or marketing, regardless of medium" but "[d]oes not include communications between an organization and its employees, stockholders or bona fide members."  A.R.S. § 16-971(17).

"be at least the amount of the undisclosed or improperly disclosed contribution" but may be up to three times that amount.  A.R.S. § 16-976(A).  The Commission is also entitled to "adjust the contribution and expenditure thresholds . . . to reflect inflation."  A.R.S. § 16-974(F).

The Act grants exclusive enforcement power to the Commission, but it also allows any qualified voter to file a "verified complaint" with the Commission alleging a person has failed to comply with the Act.  A.R.S. § 16-977(A).  The Commission must evaluate such complaints and, if the complaint identifies a possible violation of the Act, the Commission "shall investigate the allegations and provide the alleged violator with an opportunity to be heard."  A.R.S. § 16-977(B).  The Act contemplates the Commission may exercise "prosecutorial discretion" in deciding which enforcement actions to pursue, although the Commission cannot invoke that discretion as a basis for not pursuing an enforcement action when the potential penalty "could be greater than $50,000."  A.R.S. § 16-977(C).  If the Commission chooses not to take enforcement action against an alleged violator and the voter who filed the complaint disagrees with that decision, that voter "may bring a civil action against the commission to compel it to take enforcement action."  A.R.S. § 16-977(C).

To be clear, the Act does not allow individuals to pursue any sort of direct action against an alleged violator of the Act.  Rather, all enforcement actions must be pursued by the Commission.  Even when a voter believes the Commission is not pursuing an alleged violator sufficiently, the voter must sue the Commission, not the alleged violator.  Plaintiffs describe this enforcement scheme as "deputization of the entire electorate as enforcers" of the Act's requirements.  (Doc. 38 at 13).  Plaintiffs also claim the Act "vest[s]" private parties "with enforcement power."  (Doc. 38 at 13).  These assertions are factually inaccurate as no individual, entity, or covered person will ever be sued by a private party under the Act.

## PROCEDURAL HISTORY

In March 2023, Plaintiffs filed their complaint.  The complaint describes Plaintiffs

- 6 -

as nonprofit corporations that engage in "broad-based grassroots outreach to advocate for long-term solutions to the country's biggest problems." (Doc. 1 at 11). Plaintiffs identify these problems as including "unsustainable government spending and debt, a broken immigration system, [and] a rigged economy." (Doc. 1 at 11). Plaintiffs fund their activities by raising donations from donors throughout the country. (Doc. 1 at 11).

The complaint asserts two claims under the First Amendment. While not entirely clear, the complaint appears to allege every aspect of the Act is unconstitutional under one or both of Plaintiffs' claims. (Doc. 1 at 29) (alleging "disclaimers, disclosures, speech restrictions, and associated administrative burdens . . . are unconstitutional in their entirety"). Plaintiffs' first claim is that every aspect of the Act is facially unconstitutional and as applied to Plaintiffs because it chills speech. Plaintiffs' second claim is that every aspect of the Act is facially unconstitutional and as applied to Plaintiffs because it compels association. Plaintiffs named as defendants the Chairmen, Commissioners, and Executive Director of the Citizens Clean Elections Commission because that Commission is "responsible for implementing and enforcing the provisions" of the Act. (Doc. 1 at 12). Plaintiffs also named the Secretary of State as a defendant because "he is responsible for receiving disclosure reports" and making those reports publicly available. (Doc. 1 at 13).

## INTERVENTION

After the complaint was filed, the Arizona Attorney General moved to intervene "to defend the constitutionality" of the Act. (Doc. 28). Plaintiffs do not object and the Attorney General will be allowed to intervene as of right. Fed. R. Civ. P. 24(a)(2).

A political action committee, Voters' Right to Know (VRTK), also moved to intervene. Plaintiffs oppose this intervention. The Act states VRTK "may intervene as of right in any legal action brought to challenge the validity" of the Act. A.R.S. § 16-979(A). The Supreme Court recently instructed federal courts to be receptive of state laws designating the proper party to defend a state law. *Berger v. N. Carolina State Conf. of the NAACP*, 597 U.S. 179, 191 (2022). That opinion addressed when a federal court should allow state officials to intervene to defend a law. The underlying logic of that opinion,

however, applies even when the state law designates someone other than a state official as entitled to defend a statute. Not allowing those authorized by state law to defend a suit in federal court would "risk turning a deaf federal ear to voices the State has deemed crucial to understanding the full range of its interests." *Id.*

VRTK's motion is timely, VRTK's interest may be impacted in this suit, and VRTK's interests are not completely aligned with the existing defendants. In particular, "VRTK is interested in maximizing disclosure, both to vindicate the voters' First Amendment right to know who is spending to influence their votes and to hold officeholders accountable once they are in office." (Doc. 39 at 5). VRTK argues it might take a position mandating disclosure beyond that adopted by the other defendants who are existing office holders who may favor less complete disclosure requirements. VRTK will be permitted to intervene as of right. Fed. R. Civ. P. 24(a)(2).

## ANALYSIS

Plaintiffs' complaint reads as primarily alleging the Act facially violates their right to free speech and right to free association.[9] Unfortunately, Plaintiffs' complaint does not identify the exact portions of the Act they believe are unconstitutional. Instead, Plaintiffs argue the Act, in its entirety, violates their rights.

The Act, as codified, consists of eight separate sections, covering more than twenty pages of text. A.R.S. §§ 16-971 to 16-978. Included in the Act are various provisions that

---

[9] Plaintiffs also seem to believe the Act infringes on their right under the First Amendment to petition the government for redress of grievances. The First Amendment's "right to petition is generally concerned with expression directed to the government." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011). It is not clear why or how Plaintiffs believe the Act infringes on their right to petition the government as the complaint does not provide any meaningful factual allegations supporting such a theory and despite this lawsuit where Plaintiffs are, in fact, petitioning the government for redress. (Doc. 1 at 58-59). Similarly, Plaintiffs' opposition to the motion to dismiss does not develop any argument regarding their right to petition for redress of grievances. (Doc. 38 at 38). To the extent Plaintiffs intended to assert such a claim, existing authority indicates there is substantial, if not complete, overlap between the reach of free speech rights and the right to petition for redress of grievances. *Cf. McDonald v. Smith*, 472 U.S. 479, 485 (1985) (noting the right to petition did not grant "greater constitutional protection to statements made in a petition to the President than other First Amendment expressions"). Absent supporting allegations or meaningful argument, any right to petition claim is not plausible and, to the extent Plaintiffs attempted to state such a claim, the Court will dismiss it without addressing it.

seem unlikely to be relevant to Plaintiffs' current claims.  For example, one provision of the Act requires that covered persons comply with rules adopted by the Commission. A.R.S. § 16-972(B)(3).  But the Commission has not yet adopted any rules and there are no allegations that Plaintiffs have a basis to challenge the constitutionality of non-existent rules.  Another provision of the Act requires that a covered person inform its donors that the donors' funds "may be used for campaign media spending."  A.R.S. § 16-972(B)(1). This provision, standing alone, does not require disclosure of the donors' identities to the public, which seems to be Plaintiffs' overriding concern regarding the Act.

Despite the complaint's sixty-eight pages, the named defendants are mostly "left in the dark" regarding the exact provisions Plaintiffs are trying to challenge.  *Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1177 (9th Cir. 2021) (holding complaint failed to state a claim where defendant was "left in the dark" regarding basis of the plaintiff's claim). Given the unfocused nature of Plaintiffs' complaint, the Court must rely on the parties' briefing to provide guidance.  Based on the briefing, Plaintiffs' free speech and compelled association facial challenges fail, and any amendment would be futile.  Plaintiffs' current as-applied challenges also fail, but perhaps Plaintiffs can allege additional facts to state a plausible free speech as-applied challenge.

## I.    Legal Standard

The Act does not impose any limit on political donations or on how much individuals or entities may spend on political activities.  Rather, the Act imposes disclosure and recordkeeping requirements.  Therefore, for both the facial and as-applied challenges, the governing legal standard is that the Act must survive "exacting scrutiny."  *No on E v. Chiu*, 85 F.4th 493, 503 (9th Cir. 2023) (applying exacting scrutiny to disclosure and disclaimer requirements); *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 239 (2003) (applying exacting scrutiny to recordkeeping), *overruled in part on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010).

"Exacting scrutiny" consists of "three steps," and the law must satisfy all three to survive.  *No on E*, 85 F.4th at 504.  The three steps are: 1) there is "a 'substantial relation'

between the challenged law and a 'sufficiently important' governmental interest"; 2) "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights"; and 3) the disclosure requirements must be "narrowly tailored to the government's asserted interest." *Id.* The Ninth Circuit recently applied the exacting scrutiny test in two cases. Those opinions merit detailed analysis because they mandate much of the result in the present case.

Starting with *No on E v. Chiu*, San Francisco voters passed an initiative requiring additional financial disclosures for independent political committees "making expenditures which support or oppose any candidate for City elective office or any City measure." 85 F.4th 493, 498 (9th Cir. 2023). The initiative requires ads paid for by committees include the identity of the "top three contributors [to the committees] of $5,000 or more." *Id.* If one of those three contributors is itself a committee, the ad must include "the name of and the dollar amount contributed by each of the top two major contributions of $5,000 or more to that committee." *Id.* Thus, the initiative requires ads identify the funders of an ad and, sometimes, the "secondary contributors" to an initial funder.

In 2022, a group of plaintiffs filed suit claiming the initiative's "secondary contributor disclosure requirement violate[d] the First Amendment, both on its face and as applied." *Id.* at 500. The plaintiffs presented both free speech and compelled association arguments. The district court denied the plaintiffs' request for a preliminary injunction and the plaintiffs appealed. The Ninth Circuit's opinion addresses the issues under the standard of review applicable to preliminary injunction appeals but, in doing so, the Ninth Circuit set forth numerous legal principles relevant here.

The Ninth Circuit began by quoting the reasoning in *Buckley v. Valeo*, 424 U.S. 1, 68 (1976), that "disclosure provides the electorate with information as to where political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek federal office." *No on E*, 85 F.4th at 504. Based on that, the Ninth Circuit concluded there is "a strong governmental interest in informing voters about who funds political advertisements." *Id.* at 505. Identifying funders "enables the electorate

to make informed decisions and give proper weight to different speakers and messages." *Id.* (quoting *Citizens United*, 558 U.S. at 371). Funders, however, have identified a way to avoid meaningful disclosures: "donors to local committees are often committees themselves and . . . committees often obscure their actual donors through misleading and even deceptive committee names." *Id.* at 506. Given that, the Ninth Circuit concluded the "interest in learning the source of funding for a political advertisement extends past the entity that is directly responsible." *Id.* Accordingly, the Ninth Circuit found a "strong governmental interest" supporting disclosure of the first and second levels of funding for political ads such that the first step of "exacting scrutiny" was met.

The next step was to assess the strength of the governmental interest compared to the "actual burden on First Amendment rights." *Id.* at 506. The disclosures required by the initiative meant up to "one-third of a video ad's duration" would consist of identifying the funders. Similarly, "up to 35% of a printed ad" would be occupied by the required disclosures. *Id.* at 507. While those were significant portions, there was "no evidence suggest[ing] that a smaller or shorter [disclosure] would achieve the same effect as the required disclaimers." *Id.* at 508. The plaintiffs had argued the disclosures burdened "their right to freedom of association" by "driv[ing] away potential donors." *Id.* The only evidence supporting this assertion was that some donors had expressed a "desire not to have their names listed in an on-advertisement [disclosure]." *Id.* at 509. The Ninth Circuit concluded this desire from some donors was not sufficient to show the initiative was having a "real and pervasive" deterrent effect on donors. *Id.* Overall, the court concluded the initiative's modest burdens were sufficiently outweighed by the interest of informing the public of who is providing the funding.

The final step of exacting scrutiny required the Ninth Circuit assess whether the initiative was "narrowly tailored to the interest it promotes." *Id.* The Ninth Circuit concluded the "realities of voters' decision-making processes" meant on-advertisement disclosures of secondary contributors was "in proportion" to the interest of informing the electorate. *Id.* at 510. Because all three steps of "exacting scrutiny" were met, the Ninth

Circuit affirmed the denial of a preliminary injunction.

The Ninth Circuit recently reaffirmed the reasoning of *No on E* in the context of a challenge to an Alaskan statute. *Smith v. Helzer*, 2024 WL 1125095 (March 15, 2024). That statute addressed donations to entities engaged in "independent expenditures," defined as the "purchase or transfer of money . . . made for the purpose of . . . influencing the nomination or election of a candidate." *Id.* at *2 n.1. If a donor contributed more than $2,000 to such an entity, the donor had to report that contribution to a state official within 24 hours. In making that report, the donor had to identify "the true sources of the contribution, and intermediaries, if any." *Id.* at *3. The statute defined the "true source" of a donation as the "person or entity whose contribution is funded from wages, investment income, inheritance, or revenue generated from selling goods or services." *Id.* The statute also required "any communication intended to influence the election of a candidate contain an easily discernible on-ad disclaimer" providing information about the speaker. *Id.* at *3. The statute required groups that received more than 50% of their contributions from outside Alaska include a statement to that effect. A group of donors and organizations sued, arguing the statute "facially violate[d] the First Amendment." *Id.* at *2.

On appeal, the donors and organizations did not attack the constitutionality of the "true source" requirement. *Id.* at *6. The arguments were aimed at the requirements that donors report contributions within 24 hours and that groups disclose if more than 50% of their funding came from outside Alaska. The Ninth Circuit addressed these requirements under the "exacting scrutiny" standard. The court began by noting both requirements were supported by the "sufficiently important interest" of providing information to voters. *Id.* at *5-*6. In fact, based on Supreme Court authority, as well as *No on E*, the plaintiffs did not even dispute the existence of an important government interest. *Id.* The Ninth Circuit then assessed whether the statute's two other requirements were "substantially related" to the government interest and "narrowly tailored." *Id.* at *6.

On the requirement that donors report all contributions within 24 hours, the plaintiffs conceded such disclosures were "substantially related to the state's asserted

informational interest." *Id.* at *6.  As for the narrowly tailored requirement, the court held the new disclosure requirement did not mirror preexisting laws, the "reporting mechanism [was] relatively simple" such that it would not be burdensome, and the $2,000 monetary threshold was evidence of a targeted approach.  *Id.* at *7-*8.  Thus, requiring donors disclose all contributions was narrowly tailored.

The requirement that groups report if more than 50% of their funding came from outside Alaska was also substantially related to the state's interest.  As for narrow tailoring, the court held the required disclosures would not take up too much time or space on advertisements and, while it impacted speakers outside of Alaska more than those in Alaska, that differentiation was permissible because the disclosure requirement did not "*restrict*[] out-of-state speakers' speech." *Id.* at *9.

For purposes of applying the "exacting scrutiny" standard to the current case, *No on E* and *Smith* establish two crucial points.  First, there is "a strong governmental interest in informing voters about who funds political advertisements." *No on E*, 85 F.4th at 505.  And second, a government's chosen method of vindicating that interest may impose some burdens, even time-sensitive requirements such mandating disclosure within 24 hours, and still qualify as narrowly tailored.  These two points significantly undermine Plaintiffs' attacks on the Act at the very outset.

## II.    Free Speech and Free Association Facial Challenges

Plaintiffs' free speech and free association facial challenges can be analyzed together.  Plaintiffs "confront a heavy burden" in making these challenges. *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998).  "Facial invalidation is, manifestly, strong medicine that has been employed by the [Supreme] Court sparingly and only as a last resort." *Id.* (quotation marks and citations omitted).  "To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep." *United States v. Hansen*, 599 U.S. 762, 770 (2023).

Normally, the first step in resolving a facial challenge "is to construe the challenged

statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Williams*, 553 U.S. 285, 293 (2008). In this case, Plaintiffs state their facial challenges are to "Proposition 211," *i.e.* the entire Act. But as mentioned earlier, the Act consists of eight separate sections, covering more than twenty pages of text. A.R.S. §§ 16-971 to 16-978. Thus, as an initial step it is not possible to "construe the challenged statute." *Williams*, 553 U.S. at 293. Instead, the Court must retreat to a less focused analysis, applying exacting scrutiny in a more general way, with specific discussion only of those provisions Plaintiff identify as particularly troublesome.

### A. Substantial Relation and Governmental Interest

Based on *No on E* and *Smith*, the Act has a substantial relation to a strong governmental interest of identifying funders of campaign media spending. *See also Gaspee Project v. Mederos*, 13 F.4th 79, 87 (1st Cir. 2021) (holding "Rhode Island's interest in an informed electorate is sufficiently important to satisfy the first imperative of exacting scrutiny" for a campaign finance disclosure law). That interest is not meaningfully vindicated by disclosures identifying only the "creative but misleading names" of the immediate donors. *No on E*, 85 F.4th at 505. Disclosure regimes aimed at identifying "who is speaking" are only effective if the disclosures identify the speaker. *Id.* Accordingly, the Act's requirement of identifying the original source of funds bears a substantial relation to the governmental interest of informing the electorate who is paying for campaign media spending.

### B. Strength of Interest and Burden

The second step of exacting scrutiny requires comparing the governmental interest to the burdens imposed by the Act. Because there is a "strong" governmental interest at play, the burdens would need to be significant for Plaintiffs to prevail. Based on the complaint and the response to the motions to dismiss, Plaintiffs believe the Act imposes "crushing" administrative burdens and "profoundly chills" their free speech and associational rights. (Doc. 38 at 15, 25). In reality, however, the Act's administrative burdens are spread across multiple individuals and entities such that they are not unduly

onerous for any individual person or entity.  And the non-administrative burdens on Plaintiffs' free speech and associational rights are not nearly as onerous as Plaintiffs claim.

Beginning with administrative burdens, the Act requires covered persons keep records of where large donations are coming from and retain those records for five years. A.R.S. § 16-972.  When a covered person receives more than $5,000 from any donor, the covered person must obtain from the donor written proof of the source or sources of the donated funds.  A.R.S. § 16-972(D).  If the $5,000 donation included contributions from others, the donor must disclose to the covered person the identity of all other contributors who donated $2,500 or more.  *Id.*  These recordkeeping requirements are spread across the different layers of donations.  Using Plaintiffs as examples, if they are the covered persons at the end of a lengthy sequence of donations, Plaintiffs will first receive the donations along with a detailed breakdown of the various sources of the funds.  Plaintiffs would then be required to retain those records for five years.   In this scenario, the additional recordkeeping burden on Plaintiffs is tiny.

Perhaps anticipating they will merely be receiving records generated by others, Plaintiffs characterize the requirement they maintain the transfer records for five years as an "undue burden[]," that places "privacy at risk." (Doc. 38 at 33).  There is no explanation what Plaintiffs are referencing regarding privacy issues.  As for five years being too long, it is useful to compare the Act to federal law which imposes dramatically more burdensome recordkeeping requirements.  Under federal law, donation records must be maintained for three years for single donations larger than $50, or donations from an individual that exceed $200 during a calendar year.  52 U.S.C. § 30102.  Thus, federal law requires retention for three years of records regarding donations as small as $50 while the Act here requires retention of records for five years, but only for those donations that are at least $2,500. Requiring covered persons retain transfer records for significantly larger donations for slightly longer than federal law is not unduly burdensome.  *See Nat'l Ass'n for Gun Rts., Inc. v. Mangan*, 933 F.3d 1102, 1118 (9th Cir. 2019) ("[D]isclosure laws may impose certain adjunct requirements on political speakers, to enable gathering the data necessary

to enforce more substantive electioneering restrictions.").

Plaintiffs also complain about the alleged administrative burdens of the recordkeeping requirements because they view the monetary limits as irrational. According to Plaintiffs, the "threshold for such transfer records ($2,500) is inexplicably lower—and thus gratuitously burdensome—relative to the threshold for disclosure ($5,000)." (Doc. 38 at 33). As explained by VRTK, this aspect of the Act is not inexplicable. (Doc. 40 at 7). The lower $2,500 disclosure threshold is to counter a strategy Plaintiffs themselves identify. According to Plaintiffs, the Act is flawed because "large-dollar donors" will be able to hide their funding activities by contributing "$4,999 to numerous intermediary shell corporations so as to evade disclosure." (Doc. 38 at 36-37). The lower $2,500 disclosure threshold will prevent this exact strategy. If a donor were to send a covered person multiple $4,999 contributions through "numerous intermediary shell corporations," those shell corporations would have to inform the covered person of the source of the funds because each donation was larger than $2,500. Upon learning that a single donor had made contributions totaling more than $5,000 through intermediaries, the covered person would then be required to disclose the large-dollar donor. Thus, rather than being "gratuitously burdensome," any marginal burden imposed by the $2,500 disclosure threshold is justified by a need to defeat the workaround Plaintiffs identify.

Plaintiffs' final administrative burden argument is that the Act might require disclosure of a large amount of information to explain a lengthy chain of donations. Plaintiffs do not allege any facts explaining why producing information identifying donors, even assuming such production would be voluminous, would be burdensome in a legally relevant way. As mentioned earlier, the recordkeeping and disclosure burdens are spread across multiple individuals or entities and when a covered person receives a donation, the donor must provide the information required by the Act. Requiring Plaintiffs disclose that information, even if it is voluminous, is not unduly burdensome.

As for the non-administrative burdens on Plaintiffs' free speech and associational rights, Plaintiffs identify the Act's opt-out provision as significantly chilling. Plaintiffs'

arguments are hard to follow but they seem to take issue with the requirement that, before spending donations on campaign media spending, a covered person must obtain consent from its donors.  The Act's opt-out provision is straightforward.  Every covered person must provide notice to donors if their donations may be used for campaign media spending.  A.R.S. § 16-972(B).  The notice can be provided before or after a donation is made.  Donors are then given the chance to "opt out of having their monies used or transferred for campaign media spending by notifying the covered person in writing within twenty-one days after receiving the notice."  A.R.S. § 16-972(B)(2).  Upon expiration of twenty-one days, or upon receipt of written consent from the donors, whichever is earlier, the covered person can use the donations for campaign media spending.  Given this structure, Plaintiffs' arguments make little sense.

According to Plaintiffs, the Act "requires would-be speakers to sit silent for up to 21 days before using or transferring donor monies for campaign media spending."  (Doc. 38 at 30).  To the extent that is accurate, it would only come about because of decisions made by the "would-be speakers," *i.e.* covered persons, or their donors.  If covered persons wish to use donations for campaign media spending, they can provide the required notice to their donors at the time of the donation.  Alternatively, covered persons could provide the notice later and the donors could provide immediate written consent.  Under either of these options, covered persons would be free to spend donations immediately.  Because covered persons and their donors can easily avoid the 21-day period, the opt-out provision is not unduly burdensome.

Plaintiffs also argue the opt-out requirement is unduly burdensome because "*one* donor's lack of authorization would at least arguably foreclose *any* covered use of general treasury funds into which that donation has flowed."  (Doc. 38 at 32) (emphases in original).  Plaintiffs appear to be arguing the Act provides that when one donor refuses to allow a donation to be used for campaign media spending, all the funds in the covered person's "general treasury" cannot be spent on campaign media spending.  Plaintiffs do not identify the sections of the Act they are interpreting in this manner and there are no

such sections.  The Act states "*the donor's monies* may not be used or transferred for campaign media spending" until the donor consents or 21 days have passed since the notice.  A.R.S. § 16-973(E) (emphasis added).  The words "the donor's monies" cannot plausibly be interpreted to mean "all funds in the covered person's general treasury."  An imaginary burden based on misreading the Act is not a burden.

In addition to the opt-out provision, Plaintiffs argue the Act is unduly burdensome because it "suppresses" speech by covered persons "by restricting their ability to spend their own money as authorized by willing donors who are duly informed and glad to support the organization's activities, provided only that the donors can preserve anonymity."  (Doc. 38 at 31).  This appears to be an argument that all campaign disclosure laws are unduly burdensome because they require disclosure of who is funding election-related speech.  This position is obviously foreclosed by precedent and there is no cognizable burden to prohibiting anonymous donations to covered persons.

The Act is supported by a strong governmental interest and imposes only minimal burdens.  Thus, the Act satisfies the first two steps of exacting scrutiny.  The final step requiring narrow tailoring is where Plaintiffs focus most of their arguments.

### C. Narrow Tailoring

Exacting scrutiny's third step requires the Act "be narrowly tailored to the interest it promotes."  *No on E*, 85 F.4th at 509.  This does not require the Act be "the least restrictive means of achieving that end," nor must the Act be "the single best" way of vindicating the relevant interest.  *Id.*  The Act, however, must reflect a "reasonable fit" between the burdens and the governmental interest.  *Gaspee Project v. Mederos*, 13 F.4th 79, 88 (1st Cir. 2021).  Plaintiffs repeatedly ignore this standard and point out alternatives to the Act they believe would have been better.  That is not the test.  Under the correct test, the Act qualifies as narrowly tailored.

Many of Plaintiffs' arguments regarding narrow tailoring are based on alleged flaws in the Act's definition of "campaign media spending."  A.R.S. § 16-971(2).  Plaintiffs' arguments, however, often rely on misreading the Act's text.

- 18 -

1          **i.      A.R.S. § 16-971(2)(a)(iii)**

2          Plaintiffs first argue the Act is not narrowly tailored because it applies to any

3  campaign media spending that "refers to a clearly identified candidate." (Doc. 38 at 16)

4  (quoting A.R.S. § 16-971(2)(a)(iii)).   According to Plaintiffs, the use of "refers" is

5  overbroad and will "sweep[] in issue advocacy well outside the electoral context." (Doc.

6  38 at 16).  Plaintiffs make no effort to engage with relevant authority on this point.

7          Federal law imposes disclosure obligations for all "electioneering

8  communications."  *See* 52 U.S.C. § 30104(f)(1).   That term is defined as any

9  communication that "refers to a clearly identified candidate for Federal office." 52 U.S.C.

10  § 30104(f)(3)(A)(i)(I).   In 2010, the Supreme Court addressed and upheld the federal

11  definition. According to the Supreme Court, the federal definition was permissibly applied

12  to even a remarkably cursory reference to a candidate.  *Citizens United v. Fed. Election*

13  *Comm'n*, 558 U.S. 310, 368 (2010).  One of the communications at issue was a ten second

14  ad that stated, in full, "If you thought you knew everything about Hillary Clinton . . . wait

15  'til you see the movie." *Citizens United v. Fed. Election Comm'n*, 530 F. Supp. 2d 274,

16  276 (D.D.C. 2008).  In determining this ad met the statutory definition of "refer[ring]" to

17  a candidate, the Supreme Court rejected an argument that the definition needed to be

18  narrowed. *Citizens United*, 558 U.S. at 368-69.  Plaintiffs make no effort to explain how

19  their argument regarding the Act's use of "refers" is viable given the discussion in *Citizens*

20  *United* of the similar federal definition.

21          **ii.     A.R.S. § 16-971(2)(a)(iv)**

22          Plaintiffs next complain the Act is not narrowly tailored because its application to

23  communications involving initiatives is "stunningly broad." (Doc. 38 at 16-17).  The Act

24  applies to any communication "that promotes, supports, attacks or opposes the qualification

25  or approval of any state or local initiative or referendum." A.R.S. § 16-971(2)(a)(iv).

26  Plaintiffs argue this language will mean individuals and entities will inadvertently "step[]

27  into a dragnet" through general issue advocacy statements. According to Plaintiffs, every

28  ad on a particular topic might be viewed as implicitly promoting or opposing a pending

1  initiative on that topic.  That is incorrect.

2      To illustrate their fears, Plaintiffs offer the example of a 2016 ballot initiative that

3  "would have preserved the right of local governments to ban puppy mills."  (Doc. 38 at

4  17).  Plaintiffs argue that, given the scope of the Act's language, any communications

5  before the vote on that initiative that "[a]dvocat[ed] for the humane treatment of puppies

6  and kittens," would have rendered the speaker subject to the Act's disclosure requirements.

7  (Doc. 38 at 18).  Plaintiffs do not explain why any official would ever read the Act as

8  reaching that situation.

9      Generic communications that make no reference to an initiative would not be

10  covered.   In other words, a communication advocating for the humane treatment of

11  animals, containing no mention of a pending initiative, would not trigger the Act.

12  Alternatively, a communication advocating for the humane treatment of animals and

13  recommending approval of the initiative would trigger the Act.  Plaintiffs do not explain

14  why it would be inappropriate to apply the Act to communications engaged in such obvious

15  advocacy regarding a pending initiative.

16      Plaintiffs cannot argue the Act fails narrow tailoring by pointing to scenarios where

17  officials might apply the Act contrary to the Act's term's.  The Court will not read the Act's

18  language in a way that will manufacture problems where a more straightforward reading is

19  not troublesome.  *See United States v. Hansen*, 599 U.S. 762, 781 (2023) (noting canon of

20  constitutional avoidance means a court's "task is to seek harmony, not to manufacture

21  conflict").

22          **iii.    A.R.S. § 16-971(2)(a)(v)**

23      Plaintiffs engage in another strained reading of the Act in complaining about the

24  language regarding recalls of public officers.  The Act defines "campaign media spending"

25  as including any communication "that promotes, supports, attacks or oppose the recall of a

26  public officer."  A.R.S. § 16-971(2)(a)(v).  Plaintiffs argue "any speech that criticizes or

27  praises an officeholder could potentially be characterized as advocating (at least implicitly)

28  for or against the officeholder's recall."  (Doc. 38 at 18).  The most obvious reading of the

Act's language is that it is referring to a recall that already exists. That is, it refers to "the recall" of an elected official, not merely a "possible recall" or "future recall." Once there is a pending recall, the Act will be triggered by communications promoting or opposing that recall. Until then, the Act will not be triggered by Plaintiffs or others merely referencing public officials.

### iv.    A.R.S. § 16-971(2)(a)(vi)

Plaintiffs apply a third strained reading to argue the Act will apply to all speech, regardless of the topic. The Act's definition of campaign media spending includes:

> An activity or public communication that supports the election or defeat of candidates of an identified political party or the electoral prospects of an identified political party, including partisan voter registration, partisan get-out-the-vote activity or other partisan campaign activity.

A.R.S. § 16-971(2)(a)(vi). Plaintiffs cite the last three words and argue regulators might deem speech on any topic "partisan campaign activity." (Doc. 38 at 19). That is, Plaintiffs argue all "hot-button issues" will be deemed "partisan campaign activity." Plaintiffs' reading is implausible and divorced from context. (Doc. 38 at 19).

The relevant subsection of the Act deals with activities or communications that support "the election or defeat of candidates of an identified political party," such as partisan voter registration drives, partisan get-out-the-vote activities, "or other partisan campaign activity." As explained by VRTK, this language is targeting situations such as "driving voters of only one political party to the polls." (Doc. 40 at 9). In other words, "partisan campaign activity" is referring to activities or communications similar to the other items in the list, *i.e.*, those activities specifically aimed at helping a particular political candidate or party. Activities or communications involving general topics, even controversial topics, will not qualify as "partisan campaign activity." The possibility that officials will misread the Act and apply it to any speech they deem "hot-button" is not plausible. Should that occur, the targeted individuals or entities would be free to make an as-applied challenge. Plaintiffs' fears are too speculative to support a facial challenge.

### v.    A.R.S. § 16-971(2)(a)(vi)

- 21 -

Plaintiffs claim additional evidence of the Act's alleged lack of narrow tailoring is how broadly it may apply. According to Plaintiffs, the Act is overbroad because it "reaches preparatory activity occurring wholly outside Arizona's borders." The Act covers "[r]esearch, design, production, polling, data analytics, mailing or social media list acquisition or any other activity conducted in preparation for or in conjunction with any" of the other campaign media spending activities set forth in the Act. A.R.S. § 16-971(2)(a)(vi). According to Plaintiffs, this might result in the Act applying when an "out-of-state organization" spends "$50,000 preparing a public communication" that refers to an Arizona candidate "in an online post or national newsletter discussing a salient political issue." (Doc. 38 at 19). Plaintiffs, again, misread the Act.

The Act's definition of campaign media spending excludes any "news story, commentary or editorial by any . . . website or other periodical publication that is not owned or operated by a candidate, a candidate's spouse or a candidate committee, political party or political action committee." A.R.S. § 16-971(2)(b)(i). Based on this exception, Plaintiffs' professed concern over an "online post" is hard to follow. Plaintiffs argue the exception applies only to "news publications that operate online." (Doc. 38 at 20). But the Act states "campaign media spending" excludes any 1) news story; 2) commentary; or 3) editorial. These may appear in written publications or on "any website." The reference to websites is not limited to "news publications" and there is no basis in the text of the Act for concluding only "news publications" may invoke this exclusion.

Plaintiffs appear to fear a covered person, located outside of Arizona, will become subject to the Act upon posting something to a website referencing an Arizona candidate. Plaintiffs have not alleged any plausible factual basis to conclude the Act would apply to such a posting. To qualify as a covered person, an individual or entity must be spending $50,000 in an election cycle on campaign media spending for an Arizona election. That drastically limits who might be subject to the Act. More importantly, assuming the covered person posted something on a website, the language of the Act makes clear such a post would not trigger the Act. All "commentary" and "editorials" posted to "any website" are

exempt from the Act.  Plaintiffs have not alleged any plausible facts identifying a covered person, outside of Arizona, who wishes to post something online that will qualify as a "public communication" under the Act but will not qualify as a "commentary" or an "editorial."  Plaintiffs' fears regarding websites appear to be imaginary.

As for Plaintiffs' professed fear that national newsletters will trigger the Act, at least some publications of that type will qualify as exempt "periodical publications."  Moreover, it is not clear why Plaintiffs believe it would be inappropriate for a newsletter to trigger the Act, assuming the newsletter meets all the demanding requirements of the Act.[10]   In Plaintiffs' view, it would be unconstitutional to require financial disclosures when a covered person, distributes a newsletter to the public in Arizona by means of mass mailing, and the newsletter references an Arizona candidate.  Such activity easily falls within the legitimate reach of the Act.

### vi.     Freedom of Association

Beyond the Act's definition of "campaign media spending," Plaintiffs argue the Act is not narrowly tailored because it requires the disclosure of the entire chain of donors.  (Doc. 38 at 21-22).  Plaintiffs complain the Act's disclosure requirements are "premised on the assumption that, if A gives to B, and B gives to C, and C speaks about D, then A must specifically be taking a view on D."  (Doc. 38 at 22-23).  This argument is premised on the assumption that campaign disclosure laws are permitted only because disclosures will reflect a donor agrees with the message being conveyed.  That is, Defendants contend it is unconstitutional for a disclosure law to operate such that a donor is identified as funding a communication the donor might disagree with.  The Ninth Circuit has rejected this line of thinking.  As explained in *No on E*, disclosure laws "further the governmental interest in revealing the source of campaign funding, not ensuring that every donor agrees

---

[10]  The Act primarily addresses "campaign media spending" that involves a "public communication."  The Act defines "public communication" as excluding "communications between an organization and its employees, stockholders or bona fide members."  A.R.S. § 16-971(17)(b).  If a newsletter is sent only to an organization's "bona fide members," it may not qualify as a "public communication" that would trigger the Act.  Alternatively, it is appropriate for the Act to treat a "newsletter" sent to the general public simply as political advertising under a different name.

with every aspect of the message." 85 F.4th 493, 506. In other words, disclosure laws aim to identify who is funding political advertisements even if particular donors might disagree with certain messages they are funding. While the Act and all other disclosure laws may sometimes reveal donors that disagree with particular positions adopted by a covered person, that does not mean the disclosure law is unconstitutional.

The Act requires disclosure of more than just secondary contributors but requiring additional disclosures of the source of funds furthers the same interest as more limited disclosure requirements. Identifying the actual funders of communications cannot be achieved any other way. *See McCullen v. Coakley*, 573 U.S. 464, 467 (2014) (noting "narrow tailoring requirements" depends on showing "alternative measures that burden substantially less speech would fail to achieve the government's interests"). And the Act does not pursue disclosure at all costs. Rather, the Act grants a significant amount of control to donors such that donors may, if they wish, avoid disclosure. The First Circuit explained how granting control to donors can alleviate constitutional concerns.

In *Gaspee Project v. Mederos*, 13 F.4th 79, 82-83 (1st Cir. 2021), a Rhode Island statute required disclosure of donors who contributed $1,000 or more to a person or entity who then spends $1,000 or more on election-related communications. The law allowed a donor to instruct the recipient not to use the donation on election-related communications. *Id.* at 89. If a donor opted-out, the donation could not be used for election-related communications and the recipient was not required to disclose the donor's identity. In the First Circuit's view, the "relatively large" threshold of $1,000, together with the ability to opt-out of having the donation used for election-related communications and thereby avoiding disclosure, meant the law was appropriately targeted. *Id.* at 89. The same reasoning applies here.[11]

The Act here requires disclosure of individuals who donate $5,000 or more when those donations are used on campaign media spending. Thus, the monetary limit is significantly higher than the limit in Rhode Island and disclosure is only required when

---

[11] Despite being cited by Defendants, Plaintiffs ignored *Gaspee Project v. Mederos*, 13 F.4th 79 (1st Cir. 2021), when responding to the motions to dismiss.

those funds are used in certain ways.[12]   The Act also requires donors giving to a covered person be given the chance to opt-out of having their funds spent in such a manner that would require disclosure.  Thus, a donor can avoid all disclosure either through choosing to contribute less than the limit or demanding their funds not be used in a way that will require disclosure.  Thus, a significant number of donors will be able to avoid the Act entirely.  There is no basis to conclude the Act compels association in a prohibited way.

### vii.   In-Kind Contributions

Finally, Plaintiffs claim the Act is not narrowly tailored because it will require disclosure of those who provide in-kind contributions for an organization that in turns donates to a covered person.  (Doc. 38 at 24).  The Act requires disclosure of those who donate "more than $5,000 of . . . in-kind contributions *for campaign media spending*." A.R.S. § 16-973(A)(6) (emphasis added).  Given this text, it is hard to follow Plaintiffs' argument.

The Act addresses in-kind contributions that are made "for campaign media spending."  And "campaign media spending" is clearly defined to include "in-kind contributions to pay for" the various public communications involving elections.  A.R.S. § 16-971(2)(a).  Thus, the type of in-kind contributions the Act is targeting are those that are used to "pay for" public communications.  Applying this language to situations with no direct connection to campaign media spending is a misreading of the Act's language.

Plaintiffs hypothesize that a volunteer who answers the phone a few days per week at her church might need to be disclosed if her church later gives $5,000 to a covered person.  (Doc. 38 at 24).  But as explained by VTRK, Plaintiffs have misread the "traceback features" of the Act.  (Doc. 40 at 13).  The Act requires a covered person disclose "[t]he identity of each person that acted as an intermediary <u>and</u> that transferred . . . traceable

---

[12] Plaintiffs complain the Act's $5,000 limit for disclosure is "anomalously low" despite being five times higher than the $1,000 disclosure threshold upheld in *Citizens United*. (Doc. 38 at 25).  Plaintiffs argue the Act's threshold differs from the federal limit because the Act is "measured against aggregate spending across the *two-year* election cycle." (Doc. 38 at 25).  That is true but why Plaintiffs believe that helps their position is not explained. The Act's threshold is $5,000 across two years while *Citizens United* approved of a threshold of $1,000 across two years.  Thus, the Act remains significantly more lenient than federal limits.

monies of more than $5,000 from original sources to the covered person."  A.R.S. § 16-973(A)(7) (emphasis added).  The Act defines "traceable monies" as monies that are "given, loaned or promised to be given to a covered person and for which no donor has opted out of their use or transfer for campaign media spending."  A.R.S. § 16-971(18).  Thus, the Act requires disclosure of intermediaries only if the intermediaries contributed "monies."  If intermediaries made in-kind contributions, there is no disclosure requirement.  Therefore, a volunteer who makes an in-kind contribution by answering phones at her church need not be disclosed, even if the church later makes a large donation to a covered person.

### D. Conclusion on Facial Challenges

The Act satisfies the demanding requirements of exacting scrutiny for purposes of Plaintiffs' facial challenges because there is first a strong governmental interest in knowing who is funding campaign media spending, the Act furthers that interest, and there is a reasonable fit between the Act's burdens and the governmental interest.  Accordingly, Plaintiffs' facial challenges fail.

### III. As-Applied Free Speech

An as-applied free speech challenge is possible "if there is a reasonable probability that the group's members would face threats, harassment, or reprisals if their names were disclosed." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 370 (2010).  Plaintiffs' as-applied free speech challenge is based on generic allegations regarding the treatment of their donors in unrelated matters.  The complaint alleges "Plaintiffs have fierce critics, and their opponents regularly strive to identify the organizations' donors in order to threaten, attack, and sow fear among those who support organizations like Plaintiffs."  (Doc. 1 at 60).  In addition, Plaintiffs allege their "supporters have been subjected to bomb threats, protests, stalking, and physical violence."  (Doc. 1 at 60).  There are no specific factual allegations supporting these assertions.

Plaintiffs argue they were not required to offer more detailed factual allegations at this early stage.  (Doc. 38 at 40).  That is not correct.  While Plaintiffs need not make

voluminous allegations of possible harm, they must make some allegations that can plausibly be tied to the Act. If Plaintiffs have a factual basis for believing the disclosures required by the Act will lead to "threats, harassment, or reprisals," they must allege those facts to state a viable claim. Of note, the Act contains a provision that prevents disclosure of individuals where there is a reasonable probability of physical harm. A.R.S. § 16-973(F). Thus, Plaintiffs must allege facts establishing a reasonable probability of harm even though the exemption might preclude disclosures. At present, the lack of specific factual allegations dooms Plaintiffs' as-applied free speech challenge.

## IV.     As-Applied Right to Free Association

Plaintiffs also present an as-applied claim alleging the Act violates their First Amendment right to free association by requiring disclosures that indicate a relationship where none exists. The complaint alleges Plaintiffs receive large donations from individuals and Plaintiffs make large donations to other covered persons. Because of this, the covered person that receives Plaintiffs' donations will be required "to disclose the identities of Plaintiffs as well as *Plaintiffs' donors*." (Doc. 1 at 67) (emphasis in original). According to Plaintiffs, "[t]he premise and thrust of such disclosure would be that associational ties exist between Plaintiffs' donors and other organizations."[13] (Doc. 1 at 67). Plaintiffs believe this will result in Plaintiffs and their donors being "compelled to associate with various issue positions, other organizations, and candidates in Arizona" that Plaintiffs and their donors did not intend to associate. (Doc. 1 at 67). The complaint provides a hypothetical that Plaintiffs believe shows how the compelled association will operate. In reality, however, even Plaintiffs' hypothetical shows disclosures can easily be avoided and, when donors choose not to avoid disclosure, the Act requires disclosure of undoubtedly accurate information regarding who is funding campaign media spending.

Plaintiffs imagine a mosque that donates a sufficiently large amount to a religious-

---

[13] All campaign finance disclosure laws might result in the type of "compelled association" Plaintiffs complain about in this suit. When someone donates directly to a candidate, that candidate may subsequently adopt positions the donor does not agree with or wish to be associated with. However, the most basic disclosure law will still identify the donor as funding the candidate's activities. Thus, if Plaintiffs' "compelled association" theory were accepted, no disclosure law would be constitutional.

liberty organization and that organization, in turn, donates a sufficiently large amount to a Christian group.  (Doc. 1 at 64-65).  The Christian group qualifies as a covered person and uses the monies from the religious-liberty organization on campaign media spending. Thus, the Act will require the Christian group disclose both the religious-liberty organization and the mosque as the source of the funds.  According to Plaintiffs, this disclosure results in unconstitutional compelled association between the Christian group and mosque.  Based on the Act's operation, however, the mosque and religious-liberty organization could avoid such disclosure and alleged association.

If the mosque does not wish to have its donations to the religious-liberty organization used in campaign media spending, it could inform the organization when the funds are donated.  The Act does not require the religious-liberty organization give this option to the mosque but there is no prohibition on the mosque demanding such an assurance.  Thus, the mosque could avoid the "compelled association" with the Christian group from the outset.  Alternatively, the Christian group must provide the religious-liberty organization the opportunity to opt out of having the donated funds used on campaign media spending.  If the religious liberty organization were to opt out, the Christian group would be prohibited from using the money on campaign media spending and the Christian group would not disclose the mosque as having provided funds.  Only if the religious-liberty organization affirmatively chose to allow its donation for campaign media spending would the mosque be disclosed.  Given these possibilities, the mosque will be disclosed as funding the Christian group's campaign media spending only if the mosque and the religious liberty organization make affirmative decisions to allow such spending.

Based on Plaintiffs' own example, the possibility their donors will be disclosed contrary to their donors' wishes would be attributable to decisions made by the donors and Plaintiffs, not the Act.  That is, Plaintiffs could ask their donors if they wish to have their donations used on campaign media spending which creates the possibility of disclosure.  If the donors do not consent, Plaintiffs are free to place that limitation on the funds when Plaintiffs pass the funds on to a covered person.  Accordingly, any "compelled association"

imposed on Plaintiffs' donors would be due to Plaintiffs' decisions, not the Act.[14]  In the end, Plaintiffs have not cited any authority establishing that disclosures in the campaign finance context, that can be avoided by the donor, result in constitutionally prohibited compelled association.

Beyond the fact that disclosure might be avoided, Plaintiffs argue the Act unconstitutionally compels association because it will lead the public to believe "associational ties exist between Plaintiffs' donors and other organizations." (Doc. 1 at 67).  Thus, Plaintiffs argue their donors will be disclosed as funding campaign media spending the donors "did not and could not intend or foresee." (Doc. 1 at 67).  This is another argument that is hard to follow.  The Act will require Plaintiffs' donors be disclosed as funding campaign media spending that the donors did, in fact, fund.  If Plaintiffs' donors have disagreements about the use of the funds they donated to Plaintiffs, the donors should complain to Plaintiffs.  Arguing the Act "compels association" when the association is solely the product of choices made by Plaintiffs is, to put it lightly, not convincing.

**V. Summary**

Plaintiffs' facial challenges fail as does their compelled association as-applied challenge.  Plaintiffs may be able to allege additional facts establishing "there is a reasonable probability that" their members "would face threats, harassment, or reprisals if their names were disclosed." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 370 (2010).  Therefore, Plaintiffs will be granted leave to amend their as-applied free speech challenge.

Accordingly,

**IT IS ORDERED** the Motions to Intervene (Doc. 22, 28) are **GRANTED**.

**IT IS FURTHER ORDERED** the Motion for Leave to File Reply (Doc. 41) is **GRANTED**.  The Clerk of Court shall file the document lodged at Doc. 42.

---

[14]  The complaint argues all disclosure laws result in unconstitutional compelled association.  (Doc. 1 at 66) (stating "even compelled disclosure of *direct* donors violates their freedom of association as protected by the First Amendment").  That position is foreclosed by existing Supreme Court authority.  *See Doe v. Reed*, 561 U.S. 186, 196 (2010) (citing cases addressing disclosure requirements).

1     **IT IS FURTHER ORDERED** the Motion to Dismiss (Doc. 23) is **GRANTED IN**

2  **PART**.  The complaint is dismissed with leave to amend.  Plaintiffs shall file an amended

3  complaint within twenty-one days of this Order.  The Clerk of Court is directed to enter

4  judgment in favor of Defendants in the event no amended complaint is filed by that date.

5          Dated this 20th day of March, 2024.

6

7

8                                                  _____
                                                   Honorable Roslyn O. Silver
9                                                  Senior United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28