**KRIS MAYES**
**ATTORNEY GENERAL**
(Firm State Bar No. 14000)

Alexander W. Samuels (No. 028926)
Nathan Arrowsmith (No. 031165)
Shannon Hawley Mataele (No. 029066)
Office of the Arizona Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004-1592
Phone: (602) 542-3333
Alexander.Samuels@azag.gov
Nathan.Arrowsmith@azag.gov
Shannon.Mataele@azag.gov
ACL@azag.gov

*Attorneys for Proposed Intervenor*
*Arizona Attorney General Kris Mayes*

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| Americans for Prosperity; Americans for Prosperity Foundation,<br><br>Plaintiffs,<br>v.<br><br>Damien R. Meyer, in his official capacity as Chairman of the Citizens Clean Elections Commission; *et al.*,<br><br>Defendants. | No. 2:23-cv-00470-ROS<br><br>**ATTORNEY GENERAL'S REPLY IN SUPPORT OF MOTION TO DISMISS**<br><br>(Assigned to the Honorable Roslyn O. Silver) |

Plaintiffs' Omnibus Opposition (Doc. 38) to the three motions to dismiss (Doc. 22-2, 23, 28-2) does little more than recycle speculative claims and hyperbolic language from their Complaint (Doc. 1). The Court should grant the motions to dismiss.

## ARGUMENT

The Complaint asserts facial and as-applied constitutional challenges to Proposition 211, known as the Voters' Right to Know Act (the "Act"), codified at A.R.S. § 16-971 *et seq*. Plaintiffs contend (Opp. at 2) that "the detailed allegations of the Complaint, once credited (as they must be), amply state claims." Not so. Plaintiffs have stuffed the Complaint with hypotheticals, editorial statements about the Act, legal argument and legal conclusions. Few of their allegations are entitled to the presumption of truth, as allegations of fact are noticeably absent. Plaintiffs also contend (Opp. at 1) that "Defendants purport to defend a law quite different from the law that was enacted." This is projection—both the Complaint and the Opposition use far-fetched (and imagined) scenarios, hyperbolic language, and cherry-picked quotes from inapposite cases to present the Court with a distorted view of the Act. In doing so, Plaintiffs stretch far beyond what is permissible for a facial challenge to an election disclosure law. Likewise, their as-applied challenge relies on speculative predictions about what *might* happen, not facts about what has occurred because of the Act. The Complaint fails to state any claim for relief and should be dismissed.

**I.   Most of the Complaint's allegations are not factual and need not be taken as true.**

Plaintiffs argue that all of their allegations should be taken as true, and in doing so they correctly note that "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). However, the "tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id*. A "court considering a motion to dismiss can … begin by identifying pleadings that, because they are no more than

conclusions, are not entitled to the assumption of truth." *Id.* at 679. The Complaint here is rife with conclusions, not facts.

Only twelve paragraphs of Plaintiffs' 124-paragraph, 68-page Complaint can be reasonably read as asserting factual allegations. *See* Compl. ¶¶ 7, 12, 13, 41-42, 44-47, 110-111. Most paragraphs in the Complaint are a combination of legal conclusions and quotations[1], editorial statements and argument[2], and fictional scenarios.[3] These paragraphs need not (and should not) be taken as true. *See Iqbal*, 556 U.S. at 679.

For example, Plaintiffs allege that the Act imposes "crushing" administrative burdens in paragraphs 86-95 of the Complaint, but none of those paragraphs contain factual allegations. Plaintiffs claim the Act's "opt-out provision forbids speech for up to a 21-day period." Compl. ¶ 87. This is a legal conclusion that misreads the Act.

The next paragraph claims that the Act's "opt-out provision provides a veto right to donors, thereby exacerbating the chilling effect." Plaintiffs go on to say that "[b]y providing a special veto power to [ ] donors nationwide, [the Act]'s opt-out procedure creates the risk that donors will hamstring the advocacy of groups such as [Plaintiffs]." Compl. ¶ 88. This paragraph is argument; it includes no factual allegation.

Paragraph 89 states that if the Act is permitted to stand, Plaintiffs could be subjected to "a head-spinning array of opt-out provisions from other states that would be no less empowered to impose themselves maximally on the natural flow of political expression and donations nationwide." This paragraph is irrelevant speculation. What other states require has nothing to do with whether the Act is facially constitutional.

Paragraph 91 states that "[t]racing the flow of fungible money across time and organizations may pose unworkable burdens for many covered entities. And indirect

---

[1] *See* Compl. ¶¶ 1-12, 21-28, 30, 32, 34-42, 51-71, 75-80, 82-87, 93-95, 97-100, 103-109, 111-115, 117-124.
[2] *See id.* ¶¶ 1-11, 13-14, 29-34, 36, 40, 43, 58-59, 67-70, 72-74, 76-77, 79-85, 87-91, 93-94, 96, 98, 100-103, 108, 111, 117.
[3] *See id.* ¶¶ 2-5, 9, 12-14, 21, 24, 29, 31, 33-36, 43, 47-49, 59-60, 64-67, 72-73, 75, 77, 79-81, 89, 92-94, 100, 107-108, 117, 119-120, 123-124.

'donors' would predictably be baffled by notices" received pursuant to the Act. No part of this paragraph is factual—it is pure speculation and argument.

The few examples above illustrate that although Plaintiffs claim their allegations are entitled to the presumption of truth, most are plainly not factual. The Court should consider each allegation with caution in light of Plaintiffs' reliance on conclusory statements masquerading as factual allegations.

## II. Plaintiffs ignore issues raised by the Attorney General and continue to cite inapplicable cases to distract the Court.

### A. Plaintiffs rely on inapposite overbreadth cases.

Plaintiffs continue to argue, relying on *Americans for Prosperity Foundation v. Bonta*, 141 S. Ct. 2373 (2021), that the appropriate standard for their facial challenge is whether a substantial number of the Act's applications are unconstitutional, judged in relation to the Act's plainly legitimate sweep. Opp. at 3. They contend that the Attorney General "errs by suggesting" that the "no set of circumstances" test applies instead. *Id.* Plaintiffs' facial challenges fail under either standard, but it is worth noting that Plaintiffs do not meaningfully respond to the points raised by the Attorney General. *See* Doc. 28-2 at 6-7. Indeed, Plaintiffs do not direct the Court to any election cases applying the "substantial number of applications" test (*Bonta* is not an election case). *Compare Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (holding "no set of circumstances" test applies in facial challenge to election law); *Libertarian Party of N.H. v. Gardner*, 843 F.3d 20, 24 (1st Cir. 2016) (applying *Grange* to facial challenge to election law); *Green Party of Tenn. v. Hargett*, 700 F.3d 816, 826 (6th Cir. 2012) (same); *Republican Party of Pa. v. Cortes*, 218 F. Supp.3d 396, 407 n.4 (E.D. Pa. 2016) (same); *N.C. Democratic Party v. Berger*, 1:17-CV-1113, 2018 WL 10323510, at *11 (M.D.N.C. June 25, 2018) (same).

Plaintiffs likely avoid this point because the "substantial number of applications" test is applied in the context of the overbreadth doctrine, and this case is unlike cases that have applied the overbreadth doctrine. Courts apply the overbreadth doctrine in cases

where a law is written so broadly that it may restrict or penalize constitutionally protected speech or expression. *See U.S. v. Stevens*, 559 U.S. 460, 464-65 (2010) (considering scope of statute criminalizing sale or distribution of media depicting animal cruelty); *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 124-25 (1992) (considering facial challenge to municipal ordinance that allowed municipality to vary the permit fee for parades, meetings, and open air gatherings); *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1988) (considering application of New York law prohibiting discrimination in places of public accommodation to private clubs and private associations); *New York v. Ferber*, 458 U.S. 747, 769-771 (1982) (considering scope of law criminalizing child pornography); *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973) (considering scope of law prohibiting public employees in Oklahoma from engaging in certain political activities); *4805 Convoy, Inc. v. City of San Diego*, 183 F.3d 1108, 1112 (9th Cir. 1999) (facial challenge to municipal ordinance regulating businesses that allow nude dancing).

Despite the distinctions between this case and cases applying the overbreadth doctrine, the language Plaintiffs use to describe the Act is pulled directly from some of these cases. They describe the Act as "vague" and "invasive"; they claim that it imposes "crushing burdens" and "ensnares pure issue advocacy" in its "dragnet" of regulations, that it requires organizations to "sit silent and muzzled," and that the Act affords the Commission "standardless discretion" to enforce the Act. *See generally* Opp. Plaintiffs' goal is clear: they are trying to jam the square peg of the Act into the round hole of the overbreadth doctrine.

But it just does not fit—election disclosure requirements like the Act are "not a prohibition on speech." *Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 1005 (9th Cir. 2010) (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)). This is not a situation where protected speech may be impermissibly swallowed by restrictions, such as an instructional video for hunters about cleaning an animal that may violate a law barring depictions of animal cruelty. *See Stevens*, 559 U.S. at 475-77. Election-related disclosure

4

1  and disclaimer requirements "impose no ceiling on campaign-related activities and do not
2  prevent anyone from speaking." *Nat'l Ass'n for Gun Rights v. Mangan*, 933 F.3d 1102,
3  1112 (9th Cir. 2019) (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S 310,
4  366 (2010)) (internal quotation marks omitted). Indeed, the plain language of the Act
5  does not restrain or restrict any speech.

6  Accordingly, courts considering claims of facial overbreadth in election disclosure
7  cases simply apply exacting scrutiny: "[A] campaign finance disclosure requirement is
8  constitutional if it survives exacting scrutiny, meaning that it is substantially related to a
9  sufficiently important governmental interest." *Brumsickle*, 624 F.3d at 1005. The
10 Supreme Court has emphasized that "disclosure requirements [are] subject to the less
11 demanding standard of review of exacting scrutiny" because they are "not a prohibition
12 on speech." *Id.* (quoting *Reed*, 561 U.S. at 196). The Act easily survives exacting
13 scrutiny. *See* Doc. 23 at 5-7; Doc. 22-2 at 5-7.

14  **B.   *Bonta* does not control here.**

15  Plaintiffs also ignore another point raised by the Attorney General—that *Bonta* is
16 inapposite (Doc. 28-2 at 4-5)—and they continue to cite *Bonta* as if it were dispositive.
17 For example, Plaintiffs claim (Opp. at 30) that the Act "is unprecedented in its sweep—
18 so sweeping that virtually any advocacy organization may find itself ensnared by the
19 disclosure regime, contrary to what the Court held in *Bonta*," and that upholding the Act
20 would be "irreconcilable with *Bonta*." These arguments misrepresent *Bonta* and avoid
21 the significant ways its law enforcement disclosure requirement differs from the Act.

22  The disclosure requirement at issue in *Bonta*—a California law requiring all
23 charitable organizations to annually disclose information about certain donors—is in no
24 way analogous to the Act's disclosure requirements. The *Bonta* disclosure requirement
25 applied to ***every*** charitable organization on an ***annual basis*** whereas the Act's disclosure
26 requirements only apply to entities that engage in specific, election-related conduct during
27 specific time periods. 141 S. Ct. at 2379-80. What's more, the *Bonta* disclosure
28 requirement was not election-related, meaning California could not defend the law based

on the well-established, compelling government interests undergirding election-related disclosure requirements. *Id.* at 2385-86 (analyzing California's proffered interest for the disclosure requirement—"preventing wrongdoing by charitable organizations").

Plaintiffs' efforts to use language from *Bonta*, such as the term "dragnet," to describe the Act, and their efforts to present it as controlling, are absurd. Plaintiffs are no doubt pleased with the result in *Bonta*, but it is not relevant to the Act or to Plaintiffs' claims here. Where Plaintiffs rely on *Bonta*, the Court should be wary.

**III.    Plaintiffs rely on overblown language and hypotheticals that stretch far beyond reason.**

Attempting to distinguish prior cases considering election disclosure requirements, Plaintiffs try to portray the Act as a law that "goes far beyond the disclosure requirements" upheld in *Citizens United*. Opp. at 36. Because the Act has not been implemented, Plaintiffs rely almost entirely on far-fetched hypotheticals that ignore the plain language of the Act. And as discussed above, Plaintiffs rely on hyperbolic language pulled from inapposite cases in an effort to distract from applicable precedent and the important interests undergirding the Act.

**A.    Plaintiffs' hypotheticals ignore or misread the language of the Act.**

The Complaint is filled with hypothetical examples that are untethered from reality. Plaintiffs (at 8) rely on *4805 Convoy, Inc.* and *Forsyth County* to justify their near-total reliance on hypotheticals, claiming that they are merely seeking to demonstrate that the Act has the "potential to chill" the rights of other parties. Although the *4805 Convoy* and *Forsyth County* courts permitted plaintiffs to raise facial challenges to licensing schemes, nothing in those cases provides support for the proposition that a party asserting a facial challenge may rely on pure speculation to sustain their challenge. Indeed, both courts considered the relevant municipality's "implementation and interpretation" of the challenged ordinances. *See 4805 Convoy*, 183 F.3d at 1113-16; *Forsyth Cty.*, 505 U.S. at 132-33. Of course, Plaintiffs can't point to the Act's implementation or the Commission or Secretary's interpretation of the Act (because the

6

Act hasn't yet been implemented), so they lean almost entirely on speculative scenarios.

Because "[c]laims of facial invalidity often rest on speculation," they risk "premature interpretation of statutes on the basis of factually barebones records." *Grange*, 552 U.S. at 450 (citation omitted).  Courts should exercise judicial restraint in facial challenges to avoid "unnecessary pronouncement[s] on constitutional issues" and "premature interpretations of statutes in areas where their constitutional application might be cloudy." *Id.* (citation omitted).  Courts analyzing whether a law is facially invalid "must be careful not to go beyond the statute's facial requirements and speculate about hypothetical and imaginary cases." *Id.* at 449-50 (citation and quotation marks omitted).

Yet Plaintiffs ask the Court to do exactly what *Grange* warns that it should not do—make unnecessary pronouncements on the Act's constitutionality, prematurely interpret the Act before it has even been implemented, and go well beyond the Act's facial requirements and speculate about imaginary situations.  Plaintiffs' speculative allegations ignore the Act's "facial requirements" and quickly spiral into absurdity.

Consider Plaintiffs' hypothetical about a person who puts money in a church collection plate.  This story relies on disregard for (or misreading of) the Act's text and assumes that:

- a fictional church is giving more than $5,000 to an unidentified covered person ***and*** is neither affirmatively restricting its donation nor opting out of having its donation used for campaign media spending; and
- there are hypothetical parishioners at the fictional church putting more than $2,500 in the church's collection plate during an election cycle without attaching restrictions, ***and*** the church is transferring more than $2,500 of a hypothetical parishioner's money to the unidentified covered person.

*See* A.R.S. § 16-973(A)(6) (requiring covered persons to disclose the "identity of each donor of original monies who contributed … more than $5,000 of traceable monies); A.R.S. § 16-972(B) (providing that covered persons must notify donors in writing and provide them an opportunity to opt out before using or transferring a donor's monies

7

campaign media spending); § 16-972(D) (requiring persons that donate more than $5,000 to a covered person, upon receiving a written request, to provide the identity of "each other person" that "contributed more than $2,500 in original monies being transferred").

Put another way, the following would have to occur for a covered person to be required to disclose the personal information of a church parishioner: (1) the parishioner would have to give more than $2,500 of unrestricted funds to the church in an election cycle, (2) the church would have to transfer more than $2,500 *of that specific parishioner's money* to a covered person, (3) the church would have to give more than $5,000 of unrestricted funds to a covered person during an election cycle, and (4) the church would have to decline to opt out when it received notice from the covered person that its donation would be used for campaign media spending. This is exactly the kind of impermissible speculation warned about in *Grange*—Plaintiffs ask the Court to conclude that the fifth domino in a row will fall while ignoring the other four dominoes that would have to fall first. But if the other dominoes happen to fall, then the Act **should** apply. There is a "strong government interest in informing voters about who funds political advertisements," and that interest extends "beyond just those organizations that support a measure or candidate directly." *No on E, San Franciscans Opposing the Affordable Hous. Prod. Act v. Chiu*, 62 F.4th 529, 540 (9th Cir. 2023).

Plaintiffs' insistence (at 17) that a parishioner who volunteers answering the phone at her church could end up having her identity disclosed under the Act is similarly wrong. Even if the hypothetical volunteer's church donates more than $5,000 to a covered person and the church declines to opt out, neither the church nor the covered person would be required to disclose the volunteer's time. Covered persons must disclose the "identity of each donor of original monies who contributed, directly or indirectly, more than $5,000 of traceable monies or ***in-kind contributions for campaign media spending*** during the election cycle[.]" A.R.S. § 16-973(A)(6) (emphasis added). "Campaign media spending" is specifically defined in the Act, and volunteering to answer the phone at a church does not fall within that definition. A.R.S. § 16-971(2)(a)(i)-(vii). The fictional volunteer is

8

making an in-kind contribution to her church, not the covered person, and answering the phone is not campaign media spending under the Act. No disclosure would be required.

As to the church, the Act requires that persons who donate more than $5,000 to a covered person inform the covered person "of the identity of each other person" that contributed "more than $2,500 in original monies being transferred." A.R.S. § 16-972(D). The definition of "original monies" does not include in-kind contributions. A.R.S. § 16-971(12) ("'Original monies' means business income or an individual's personal monies."). The church therefore would have no obligation to provide a transfer notice to the covered person as to the fictional volunteer. There is no universe where someone who volunteers answering the phone at their church would end up in a disclosure because their church gave money to a covered person and didn't opt out.

Even more incredible are Plaintiffs' assertions that the Act would apply to "classic subjects of pure issue advocacy," and that non-profit groups that engage in issue advocacy will now be "stepping into a dragnet," and will be "equated with electioneering committees and subject to corresponding administrative and disclosure burdens." As an example, Plaintiffs reference (at 10-11) three recent ballot measures, including the 2016 "Save the Puppies and Kittens" initiative, and argue that "[a]dvocating for the humane treatment of puppies and kittens does not equate with 'political advertising' … or 'election-related spending.'"

Plaintiffs' reading of the Act is nonsensical. Let's say, for argument's sake, that the Arizona Humane Society wants to produce a series of commercials "advocating for the humane treatment of puppies and kittens," by reminding Arizonans not to leave pets outside unattended during summer months. Such an ad, without more, could not be considered campaign media spending under any reasonable reading of the Act. The hypothetical ad does not: (1) advocate for or against the election of a candidate, (2) promote, support, attack, or oppose a candidate within six months of an election involving that candidate, (3) refer to a clearly identified candidate within 90 days of a primary election involving that candidate, (4) promote, support, attack, or oppose a state or local

referendum or initiative, (5) promote, support, attack, or oppose the recall of a public officer, or (6) support the election or defeat of candidates or address the electoral prospects of an identified political party. A.R.S. § 16-971(2)(a)(i)-(vi).

Indeed, the Arizona Humane Society would only find itself required to make disclosures under the Act if it made an ad that did any of the aforementioned things. For example:

- An ad encouraging Phoenicians to vote against Mayor Gallego because she doesn't like cats would likely fall under prongs 1 and probably 2 and 3, depending on timing.
- An ad encouraging Arizonans to support the reelection of Senator Sinema because she adopted a dog would likely fall under prongs 1, 2, and 3, depending on the timing.
- An ad that directly addressed the "Save the Puppies and Kittens" initiative by encouraging voters to support the initiative would fall under prong 4.
- An ad encouraging Arizonans to vote against Democratic candidates because Democrats kick puppies would likely fall under prong 6.

Aside from the initiative example, it is highly unlikely that the Humane Society would make such ads. But it certainly could make them if it wanted to, subject to the Act's disclosure requirements, which would only apply if the Humane Society spent more than $50,000 during an election cycle (or more $25,000 if the candidate or issue mentioned was not statewide). A.R.S. § 16-973(A). And if the Humane Society is going to spend more than $50,000 on any of these hypothetical ads, then it ***should*** be required to make disclosures under the Act because "[d]isclosure of who is speaking 'enables the electorate to make informed decisions and give proper weight to different speakers and messages.'" *No on E*, 62 F.4th at 540 (quoting *Citizens United*, 558 U.S. at 371).

The plain language of the Act refutes Plaintiffs' claims that any issue advocacy by any non-profit would be labeled as campaign media spending. If a non-profit wants to engage in campaign media spending, then the Act may apply. But the Act's disclosure

10

requirements don't apply to ads about issues that don't fall into any of the categories outlined in A.R.S. § 16-971(2)(a). That some non-profits might, in some specific circumstances, be required to make disclosures under the Act does not render the Act unconstitutional—disclosure requirements "do not prevent anyone from speaking." *Citizens United*, 558 U.S at 366 (citation omitted).

### B. Plaintiffs' attempts to distinguish the Act from other election disclosure requirements also ignore the Act's plain language.

Plaintiffs cannot avoid that the Act is similar to election disclosure laws that have been upheld. So, in an effort to argue that the Act "goes far beyond" other election disclosure requirements, Plaintiffs repeatedly mischaracterize the plain language of the Act. For example, Plaintiffs make the untenable claim (at 38) that the Act requires covered persons to "sit silent and muzzled for up to 21 days before using or transferring" donations. This claim ignores the plain language of the Act and relies on an assumption that Plaintiffs are receiving unplanned and unrestricted donations.

The Act provides that opt-out notices "may be provided to the donor before or after the covered person receives a donor's monies, but the donor's monies may not be used or transferred for campaign media spending until at least twenty-one days after the notice is provided or until the donor provides written consent … whichever is earlier." A.R.S. § 16-972(C). The Act's 21-day waiting period starts to run from the time of the notice rather than the time of the donation. *Id.* Accordingly, Plaintiffs can handle their notice requirements before they even have a donor's money. If Plaintiffs are aware of a forthcoming donation, they may notify the donor that it may be used for campaign media spending before the donation is even received. Also, donations are immediately available for campaign media spending when the donor provides written consent. *Id.* To ensure donor funds are immediately available for campaign media spending, Plaintiffs can simply ask donors to provide "written consent" to have their donations used for campaign media spending at the time of their donation.

Plaintiffs complain (at 24) that obtaining consent from donors is "unworkable"

because it is unrealistic to assume that donors will "instantaneously provide the requisite authorization in order to enable this solution." Adding a simple checkbox to a fundraising form that states "I authorize [nonprofit] to use or transfer my donation for campaign media spending" is neither unrealistic nor unworkable—it's simple and straightforward. Plaintiffs also complain that the Act "forces donors to tell an organization how to spend their money to prevent a donor's public disclosure." *Id.* But this ignores that donors regularly tell nonprofits "how to spend their money." Plaintiffs cannot reasonably dispute that a donor to a nonprofit may attach any restrictions to their gift, and of course, the nonprofit is free to decline a gift if it does not agree with a donor's restrictions. This also refutes Plaintiffs' arguments (at 25) that the Act would "foreclose any covered use of general treasury funds into which [a] donation has flowed," and that "separate accounting" would "entail a cumbersome imposition that at least burdens political speech[.]" It is customary and commonplace for nonprofits to manage and track gifts with restrictions. Obtaining donor consent or managing donations from donors who attach restrictions to their donations are well within standard fundraising and accounting practices for nonprofits. Put another way, the Act's disclosure and notice requirements do not require nonprofits to do anything that they aren't already accustomed to doing.

Plaintiffs also protest (at 38) what they call a "catch-all provision for 'other partisan campaign activity.'" This again ignores the Act's plain language. Campaign media spending means spending monies or using in-kind contributions to pay for several things, including "[a]n activity or public communication *that supports the election or defeat of candidates of an identified political party or the electoral prospects of an identified political party*, including partisan voter registration, partisan get-out-the-vote activity or other partisan campaign activity." A.R.S. § 16-971(2)(a)(vi) (emphasis added). Plaintiffs ignore the emphasized language—for an activity or public communication to fall within this prong, it must (1) support the election or defeat of candidates of an identified political party or (2) address the electoral prospects of an identified political party. *See id.* An activity or communication that does neither of those

1  things is not campaign media spending. This is not "standardless discretion"—there are
2  clear standards.

3  Plaintiffs' arguments that the Act is so broad and burdensome that it "casts chill
4  through unique requirements" are belied by the Act's text. As set forth above, nearly all
5  of their arguments about the purported chilling effects of the law rely on misreading the
6  Act or total speculation about its application. Speculation and misstatement are not
7  sufficient to sustain a facial challenge.

8  **IV.    Plaintiffs' compelled association claims make no sense.**

9  Plaintiffs cite no authority in support of their compelled association claims. Opp.
10 at 35-36. Perhaps because the cases they cite in their Complaint—*Crowe v. Oregon St.
11 Bar*, 989 F.3d 714, 729 (9th Cir. 2021), and *Janus v. American Federation of State,
12 County, and Municipal Employees, Council 31*, 138 S. Ct. 2448, 2463 (2018)—bear no
13 resemblance to this case. *Crowe* involved a claim that the State Bar of Oregon's
14 "compulsory Bar membership requirement" violated the First Amendment associational
15 rights of the plaintiffs. 989 F.3d at 720. Like many states, Oregon requires practicing
16 lawyers to join the State Bar and pay annual membership fees in order to practice law in
17 Oregon. *Id.* The plaintiffs in *Crowe* filed suit against the State Bar based on objections
18 to two statements condemning white nationalism that appeared in the State Bar's monthly
19 publication. *Id.* at 721-23. The court reversed and remanded the district court's dismissal
20 of the plaintiffs' compelled association claims, reasoning that neither the Ninth Circuit
21 nor the Supreme Court had ever considered "whether the First Amendment tolerates
22 mandatory membership itself—independent of compelled financial support—in an
23 integrated bar that engages in nongermane political activities." *Id.* at 729.

24 *Janus* considered whether an Illinois law that required public employees who
25 decline to join a union to pay an "agency fee" to the union to cover expenses related to
26 collective bargaining. 138 S. Ct. at 2460. But *Janus* is not actually a compelled
27 association case; it is a compelled speech case. *Id.* at 2464 ("Because the compelled
28 subsidization of private speech seriously impinges on First Amendment rights, it cannot

13

be casually allowed."). Plaintiffs do not allege that the Act compels them or anyone else to speak or compels them or anyone else to subsidize the speech of another.

Both *Crowe* and *Janus* dealt with circumstances where the parties were required by law to belong to or make payments to an organization. Plaintiffs do not make any allegation that the Act requires them or anyone else to make any payments or join any organization. Nor could they. As with most of their Complaint, Plaintiffs rely on speculation to claim that the Act "associates donors based on the political speech of another group they may have never heard of, never donated to, and may disagree with[.]" Compl. ¶ 120. The Supreme Court has rejected a similar argument.

In *Washington State Grange*, the Supreme Court considered a compelled association claim based on a Washington law that listed primary election candidates' "party preference" on ballots even though "voters may vote for any candidate; and [ ] the top two votegetters for each office, regardless of party preference, advance to the general election." 552 U.S. at 444. The state Republican Party claimed that this primary scheme burdened their associational rights because "voters will assume that candidates on the general election ballot are the nominees of their preferred parties," and that the party would therefore be compelled "to associate with candidates they do not endorse." *Id.* at 454. The Court rejected this claim because it was not based "on any facial requirement" of the challenged statute and the possibility that "voters will misinterpret the party-preference designation is sheer speculation." *Id.* Plaintiffs' far-fetched examples of compelled association, such as a Christian group being "compelled" to associate with a mosque, are also "sheer speculation." As in *Grange*, there is "simply no basis to presume that a well-informed electorate will interpret" a donor's gift to a nonprofit as an endorsement of any and all political speech disseminated by that nonprofit. *Id.*

Plaintiffs' compelled association claim also fails because the facial requirements of the Act do not compel anyone to donate to any organization. As noted above, Plaintiffs cannot reasonably dispute that a donor may restrict how a nonprofit may use their gift. And nonprofits may decline to accept gifts if they do not agree with a donor's proposed

14

restrictions. Any donor who is concerned about the possibility that their donation to one nonprofit could be transferred to another nonprofit and used for campaign media spending may simply restrict their gift to the first nonprofit by saying that it may not be transferred for campaign media spending. Donors have complete control over where they donate their money and how their money may be used. The Act does not require any person to give money to any other person nor does it require any person to become a member of any organization. Accordingly, Plaintiffs' facial compelled association claim fails.

Their as-applied compelled association claim fails for the same reasons. Plaintiffs have not alleged that the Act requires them to give money to or become members of any other entity. Plaintiffs have failed to state a claim, and their compelled association claims should be dismissed.

## V. Conclusion.

It would be impossible to address each of Plaintiffs' nonfactual allegations and inapposite citations, or to dismantle each of their hypotheticals with the space allotted. But the analysis above demonstrates that Plaintiffs' Complaint is insufficient to sustain either facial or as-applied challenges to the Act. The Court should dismiss the Complaint.

RESPECTFULLY SUBMITTED this 29th day of June, 2023.

**KRIS MAYES**
**ATTORNEY GENERAL**

By: */s/ Nathan Arrowsmith*

Alexander W. Samuels
Nathan Arrowsmith
Shannon Hawley Mataele
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, Arizona 85004
Telephone: (602) 542-3333
Alexander.Samuels@azag.gov
Nathan.Arrowsmith@azag.gov
Shannon.Mataele@azag.gov
ACL@azag.gov

*Attorneys for Proposed Intervenor*
*Arizona Attorney General Kris Mayes*

15